Marion T. Hack (SB #179216)
marion.hack@troutman.com
Luke N. Eaton (SB #280387)
luke.eaton@troutman.com
William Taylor (*admitted pro hac vice*)
william.taylor@troutman.com
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
350 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
Telephone: 213.928.9800
Facsimile: 213.928.9850

Attorneys for
AECOM Technical Services, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND

| | |
|---|---|
| JH KELLY, LLC<br><br>Plaintiff,<br><br>vs.<br><br>AECOM TECHNICAL SERVICES, INC., et al.<br><br>Defendant. | Case No. 4:20-cv-05381-HSG (Lead Case)<br><br>(Reference withdrawn from Bankruptcy Case No. 19-30088, Adv. Proc. No. 20-03019 and Adv. Proc. No. 19-03008)<br><br>(Consolidated with Case No. 3:20-cv-08463-EMC)<br><br>**SECOND AMENDED COUNTERCLAIM OF AECOM TECHNICAL SERVICES, INC.**<br><br>**DEMAND FOR JURY TRIAL** |

Defendant and Counterclaimant AECOM Technical Services, Inc., hereby alleges for its Second Amended Counterclaim against Counter-Defendants JH Kelly, LLC ("JH Kelly") and Pacific Gas & Electric Company ("PG&E" and together with JH Kelly, collectively referred to as the "Counter-Defendants"), as follows:

///

///

## JURISDICTION AND VENUE

1.    On January 29, 2019, PG&E filed voluntary Chapter 11.

2.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1334(b).

3.    Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1), 1408 and 1409.

## THE PARTIES

4.    Counterclaimant AECOM Technical Services, Inc. ("AECOM") is a California corporation with its principal place of business located at 300 South Grand Avenue, Los Angeles, California.  AECOM is a duly licensed contractor in the State of California under Contractors State License Board License No. 641639.

5.    Counter-Defendant PG&E is a California corporation with its principal place of business located at 77 Beale Street, San Francisco, California.  PG&E is also the owner of the real property on which the improvements were constructed and that give rise to all of the facts and circumstances that JH Kelly complains of in this proceeding against AECOM.

6.    Counter-Defendant JH Kelly is a Washington limited liability company with its principal place of business in Longview, Washington.  JH Kelly describes itself as "one of the largest industrial mechanical contractors in the nation."[1]

## INTRODUCTION

7.    This is a dispute between PG&E, AECOM and JH Kelly[2] concerning the design and construction of a private work of improvement at the existing Burney compressor station ("Burney Station" ), including but not limited to replacement of the existing compressor and upgrades to other parts of the Burney Station ("Project").

8.    The Burney Station is one of nine gas compressor stations that compress and transmit natural gas through PG&E's pipelines that serve approximately 4.2 million customers from Bakersfield, California to the southern Oregon border.

---

[1] https://www.jhkelly.com/about.
[2] This action was consolidated with the later-filed dispute between JH Kelly and its subcontractor/vendor Ed Staub & Sons, captioned as *JH Kelly, LLC v. Ed Staub & Sons Petroleum, Inc.*, Case No. 4:20-cv-08463-EMC (N.D. Cal.).

SECOND AMENDED COUNTERCLAIM OF AECOM TECHNICAL SERVICES, INC.

-2-

9. PG&E and AECOM entered into an Engineering, Procurement and Construction ("EPC") of Natural Gas & Electric Transmission Facilities Agreement (the "EPC Agreement"). A true and correct copy of the EPC Agreement, with the voluminous attachments removed, is attached hereto as **Exhibit 1**. To complete the construction of the Project, AECOM entered into a subcontract with JH Kelly (the "Subcontract"). The Subcontract is attached to JHK's First Amended Complaint ("JH Kelly's FAC") as Exhibit A.

10. Under the EPC Agreement, AECOM agreed to design and construct the Project and to procure certain materials and equipment. In EPC projects, the owner (here, PG&E) typically seeks a turnkey, lump sum price for a facility that is fully engineered, all material is purchased by the contractor, and the facility is constructed complete, including startup and commissioning, based on the FEED (Front End Engineering Design) package provided by the owner. All parties are resistant to changes which will impact cost and schedule, and therefore the owner takes a hands-off approach. Consistent therewith, PG&E represented (as explained below) that it would make minimal changes to the Project's scope and design.

11. Under the Subcontract, which incorporates the terms of the EPC Agreement with some modifications, AECOM assigned its construction obligations to JH Kelly and JH Kelly agreed to construct the Project, to supply certain materials, and to be responsible for construction planning and scheduling. As a result, while AECOM's self-performed work scope principally focused on the preparation of updated designs for the Burney Station based on PG&E's original design intent, JH Kelly was responsible for the actual procurement and construction of the Project. Based on PG&E's description of the Project, PG&E's statements during the Parties' pre-contracting discussions in connection with the Project, and the representations made in PG&E's Request for Proposal (the "RFP") and in the EPC Agreement, AECOM was led to believe that the design would be complete in time for construction to commence in October 2016. The parties planned for a break in the construction during the winter (when inclement weather would affect progress) from November 2016 through February 2017,[3] during which time JH Kelly would perform certain work off-site for

---

[3] A break that PG&E recognized was necessary in light of historically bad winter conditions in Burney: a remote location in the Sierra Nevadas of Northern California.

the construction. Construction would then re-commence on site in March 2017 and the Project would be fully complete by December 1, 2017.

12. At the core of JH Kelly's FAC are claims to recover cost overruns stemming from alleged delays and interference with the construction caused by perpetual and arbitrary changes to the scope of the Project. The Project was completed more than a year later than expected, on January 11, 2019, due, in part, to PG&E's interference in the design and construction of the Project.

13. JH Kelly's FAC tells only half of the story, however. JH Kelly fails to mention that PG&E – not AECOM – bears responsibility for these changes and JH Kelly itself is responsible for its own inefficiencies, delays and cost overruns.

14. When PG&E solicited bids for the Project, PG&E indicated that the Project would be a relatively straightforward upgrade and refurbishment project for the Burney Station and provided a design basis consistent with that fact. Based on PG&E's statements, both AECOM and JH Kelly understood that PG&E intended to implement minimal changes to accommodate modest modifications to the original design where necessary. After AECOM and PG&E entered into the EPC Agreement, PG&E immediately rejected the design upon which AECOM (and JH Kelly) had bid the work and thereafter continued to change the design, causing AECOM (and JH Kelly) to suffer substantial cost overruns and delays.

15. These changes included, but are not limited to, ongoing changes to the electrical design (including a complete overhaul of the design when it was supposed to be complete); a fundamental change to the "control philosophy" (i.e., how the compressor station is controlled and operated); changes to building designs (*e.g.*, expanding the footprint and layout of the auxiliary building that houses the control center for Burney Station); and the addition of structures (*e.g.*, the hazardous materials storage building).

16. These changes were mostly preferential. They were largely unnecessary to ensure Burney Station properly functioned, and were dictated (over the objections of AECOM) by PG&E, who arbitrarily and unilaterally decided to abandon the original design basis in exchange for a state of the art compressor station that was not at all contemplated by the EPC Agreement.

17.     To make matters worse, although PG&E demanded these changes to the scope of the Project, PG&E also actively interfered with AECOM's and JH Kelly's work and subsequently refused AECOM's requests for additional compensation and extensions to the construction schedule necessary to address PG&E's considerable changes to the original work scope and planned working conditions. The delays resulting from these changes prevented the Project from being completed by December 1, 2017 (and before the 2017/18 winter), at which time PG&E refused to suspend work until spring. Notwithstanding the delays that PG&E caused, PG&E demanded AECOM increase the workforce and work overtime to "recover" the schedule. Thus, AECOM and JH Kelly were forced to work through the harsh winter season at an accelerated rate, increasing the time, cost and safety risks of performance.

18.     PG&E's refusal to compensate AECOM (and its subcontractors) for the increased costs and delays it caused directly impaired AECOM's relationship with its subcontractors, including JH Kelly. And even when PG&E did approve payment for changes it demanded to the Project, it routinely failed to pay for those changes in a timely manner despite the absence of any controversy over AECOM's (or its subcontractors') entitlement to payment.

19.     PG&E also repeatedly failed to timely pay AECOM amounts owed under the EPC Agreement. While the EPC Agreement contemplated that AECOM would receive monthly "progress payments" as the work progressed, and that PG&E would approve and issue "change orders" for AECOM's increased costs resulting from PG&E's changes to the work, PG&E repeatedly ignored these payment obligations. Instead, PG&E continually and improperly withheld amounts it owed to AECOM, failed to pay approved and undisputed change orders, and chronically issued late progress payments (typically after threatening improper withholdings).

20.     Accordingly, AECOM generally denies JH Kelly's indiscriminate attribution of responsibility for delay and increased costs to AECOM, and asserts that PG&E and JH Kelly's conduct contributed to such delays and increased costs.

21.     In addition to the failure of PG&E, JH Kelly's conduct also directly and significantly interfered with the progress and completion of construction. JH Kelly failed to supply an adequate

number of workers and supervisors, which hampered the progress of work, including the electrical wire installation, field coating of gas pipe, and excavation work.

22.     JH Kelly also delayed completion of work on the critical path of the Project.[4]  In particular, JH Kelly's sequencing of construction activities and lack of appropriate staff to complete the work, coupled with its direction to its excavation contractor, created delays in certain excavation work related to the installation of underground electrical conduit—work that must be completed before the foundations of buildings may be constructed.  Likewise, JH Kelly's work to complete pulling wire through electrical conduit and terminating the connections was slow.  These delays caused damage to AECOM in the form of increased direct costs on the job and the assessment of liquidated damages by PG&E against AECOM.

23.     JH Kelly also consistently failed to follow proper safety practices on site, which in one instance resulted in PG&E demanding a change in JH Kelly's supervision, and also required AECOM to provide additional site safety and supervisory personnel.  JH Kelly's lack of attention to safety resulted in a near-catastrophic accident on site when its fuel supplier drove a fully-loaded fuel truck on site without adequate supervision or safety spotters–in violation of protocol–and backed into a live gas main, causing extensive damage to the pipeline.  JH Kelly has failed to indemnify both AECOM[5] and PG&E for the damages associated with this incident.  As a result, PG&E withheld its costs from AECOM, which AECOM in turn withheld from JH Kelly as permitted by the Subcontract.

24.     Moreover, JH Kelly committed numerous breaches of the Subcontract over the course of the Project, as detailed below, including, but not limited to:  failing to complete its contractually-required scope of work; performing defective work; failing to comply with the contractual requirements for owner-related claims; and breaching its duty to cooperate and act in good faith

---

[4]  Construction project schedules reflect the contractor's plan for the sequence of events to complete the required work.  Schedules will often identify logical ties between the start and completion of one activity to the start of the next activity.  The "critical path" is the sequence of activities.  The critical path is the sequence of activities (with zero schedule float or contingency) that must be completed to construct a project.  This is also the sequence of activities that shows the minimal time in which a project can be completed.  Generally speaking, if there is a delay in one activity on the critical path, the project will be delayed.  The critical path is not completely static, as delays to activities not on the critical path can create situations where that activity can become critical to complete before other progress can be made.

[5]  AECOM incurred costs for the addition of extra supervisory and safety staff to ensure JH Kelly's performance.

with AECOM in presenting such to PG&E. By way of example, JH Kelly alleges that its work was delayed and impacted by the late delivery of, and substantial changes to, the final electrical design drawings (referred to in JH Kelly's FAC as the "IFC Electrical"). JH Kelly blames these delays and impacts on AECOM, but JH Kelly is well aware that such delays and impacts were caused by PG&E, and that PG&E's delayed approvals to purchase associated equipment further exacerbated the problem. Rather than cooperate with AECOM in presenting and prosecuting a claim for the delay and impacts to PG&E, as required by the Subcontract, JH Kelly is pursuing AECOM.

25. Under the terms of the Subcontract, AECOM is entitled to recover for the various breaches of contract, the assessment of liquidated damages imposed by PG&E for JH Kelly-caused delays, and for AECOM's direct costs. These direct costs include, but are not limited to, increased site supervision, increased engineering support, and additional site safety and construction management personnel costs.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**A. Project Bidding and Bidding and Award of the EPC Agreement to AECOM**

26. AECOM has a long history of successfully performing engineering and construction work for PG&E. This relationship with PG&E, and the resulting work, has been very important to AECOM. Because of the relationship, on or about August 3, 2015, PG&E solicited a competitive bid from AECOM by way of an RFP to reconstruct the aging and outdated Burney Station.

27. After PG&E solicited the bid, the parties met on several occasions to discuss various aspects of, and expectations for, the Project. The principal representatives for PG&E were Francis Del Rosario, Matt Udey, Mel Wong, and Ted Bestor. The EPC Agreement identifies Francis Del Rosario as the "PG&E Negotiator" in the EPC Contract, and Mel Wong as the "PG&E Work Supervisor." Matt Udey's title was Category Lead Expert and Ted Bestor's title was Principal Engineer. The principal representatives for AECOM were Steven Petto, Bob Turley, and Shawn Kelly. Their positions were Senior Project Manager, Vice President, and Vice President, respectively.

28. On August 21, 2015, representatives of PG&E and AECOM met to discuss the bid. The attendees for PG&E were Roland Trevino, Jana Browning, Don Yorke, Todd Hogenson, Traci

King, and Matt Udey. The attendees for AECOM included Jay Clare, Louis Armstrong, Bob Turley, Shawn Kelly, Michael Belanger, and Patrick Dunn. The meeting was held at PG&E's office in San Ramon, California.

29. On August 25, 2015, Bob Turley of AECOM and Mel Wong and Ted Bestor of PG&E held a bid walk at the Project site.

30. On October 21, 2015, Bob Turley and Steve Petto of AECOM and Mel Wong and Francis Del Rosario of PG&E met in person at PG&E's office in San Ramon, California to discuss AECOM's proposal for the Project.

31. On December 18, 2015, Kirk Johnson, Roland Trevino, Jana Browning, Mel Wong, Wayman Pon, Ted Bestor, Matt Udey, Michael Walker, and Francis Del Rosario of PG&E, and Bob Turley of AECOM met at PG&E's office in San Ramon, California to discuss next steps related to the Project.

32. On January 19, 2016, representatives of PG&E and AECOM met in person for the "Kick-Off Meeting" at PG&E's office is San Ramon, California. Present were Ted Bestor and Mel Wong of PG&E and Bob Turley of AECOM. The parties discussed, among other thing, review of project expectations and project specific information included in the RFP.

33. At these meetings, PG&E personnel represented that the risk of the Project's design and scope changing was low. PG&E explained its experience with other similarly situated compressor station refurbishment projects, and explained that its compressor stations utilize similar designs. PG&E also explained that these stations are relatively simple outposts along PG&E's gas pipeline that are composed of a series of simple structures and underground utilities. During these meetings, PG&E personnel represented that the Project would closely follow previous compressor station projects, including a recently completed project at Delevan, California.

34. AECOM relied on these representations. They were important to AECOM's decision to enter into the EPC Agreement because the Project's scope and anticipated design changes affected, among other things, the contract price, change order processes, schedule, and any limitations on liability.

35. Also, the RFP included the information (provided by PG&E) upon which bidders were supposed to rely in preparing their bids. In the RFP package, PG&E provided the preliminary design basis for the replacement compressor station (commonly referred to as the "30% design"). In Section 1 of the Work Scope Document dated July 29, 2015 (one of the documents that comprised the RFP package), PG&E represented that a "minimum of changes [would] be made to the existing 30% Design Deliverables." A true and correct copy of Attachment 1 of the RFP is attached hereto as **Exhibit 2**. Given that PG&E had utilized a similar compressor station design in the past, it was entirely reasonable to conclude that PG&E would require a minimum number of changes to the original design.

36. Upon receipt of the RFP from PG&E, AECOM provided JH Kelly a copy. JH Kelly admits it received the RFP and used it to develop a proposal for the performance of the construction work on the Project.

37. The cost of the work, construction scope, and the project schedule, which are set out in the EPC Agreement and Subcontract, were based on the representations made by PG&E in the meetings described above and in the RFP. In particular, PG&E's representations caused AECOM to price the contract, agree to critical contract terms (including, for example, limitation of liability provisions), and plan and staff its work in a manner consistent with a low-risk project.

38. AECOM prepared and submitted its bid for the Project in reliance on PG&E's representations during the meetings described above, email communications between the Parties, and the RFP package.

39. PG&E ultimately awarded the Project to AECOM.

40. A Project "Kick-Off Meeting" was held on January 19, 2016.

41. On or about February 11, 2016, AECOM and PG&E officially executed the EPC Agreement for a lump sum price of $40,510,262.

42. JH Kelly and AECOM entered into the Subcontract on or about October 21, 2016.

43. The EPC Agreement specifically contemplated that AECOM would be compensated for the increased costs of delivering the Project where such costs were due to the conduct of PG&E

or outside of AECOM's control. The EPC Agreement also contemplated that AECOM would be entitled to additional time and overhead costs for owner-caused delays.

44. Per the EPC Agreement, AECOM was to be substantially complete with the design of the replacement compressor station by November 7, 2016 and substantially complete with construction just over a year later on November 17, 2017.

**B. Exemplar PG&E Changes to Design**

**1. Initial Changes to the Electrical Design**

45. From the very outset of the Project, PG&E disregarded its own stated intent to keep design changes to a "minimum," and its conduct belied its representations that the Project would be like its other compressor station refurbishment projects.

46. Unbeknownst to AECOM, PG&E concealed from AECOM that the drawings submitted as part of the RFP package were wrong and incomplete, and PG&E had no intention of relying upon them. That was because PG&E's lead electrical engineer, Khaled Malsen, informed PG&E's Ted Bestor by email in November 2014 that the design for the Project did not reflect his comments and changes. His comments and changes were not included because, according to Ted Bestor, they would require a significant amount of re-work and a change order. Ted Bestor assured Khaled Malsen that his changes and comments would be addressed in later design phases.

47. When PG&E issued the RFP in July 2015, it included the design drawings that did not reflect Khaled Malsen's changes and comments.

48. Therefore, AECOM bid upon a RFP that incorporated a materially incomplete and inaccurate design.

49. Relatedly, during the course of the Parties' negotiations regarding the RFP and changes thereto, and unbeknownst to AECOM, PG&E began to fundamentally alter the designs that PG&E instructed AECOM to rely on for purposes of pricing and assessing the risk of the Project.

50. The design changes that PG&E prepared would convert the relatively simple compressor station upgrade into a state of the art facility that was never contemplated in the original designs. PG&E did not disclose these facts to AECOM.

51.     Further, PG&E apparently intended to implement these significant design modifications through the change provisions rather than give AECOM full and fair notice of the actual design at the bidding stage.  While changes on construction projects are common, an owner's right to direct changes is constrained to modifications that are generally within the overarching framework of the original design.  Thus, the change provisions contained in the EPC Agreement were not intended to permit PG&E to direct AECOM to execute an entirely different project.

52.     An owner cannot induce a contractor to enter into an EPC agreement with the understanding that the contractor will execute one type of project and then use change order provisions to direct the contractor to execute a fundamentally different type of work both in form and substance.  Nevertheless, this is precisely what PG&E intended when it caused AECOM to enter into the EPC Agreement.

53.     Thus, starting at the "Kick-Off Meeting" that occurred on or about January 19, 2016, PG&E told AECOM that comments to PG&E's own 30% electrical design were "omitted" from the RFP and would be forthcoming.  At this meeting, which took place prior to the execution of the EPC Agreement, PG&E stated that the specific nature, scope, or significance of the changes would be minimal.  The participants, location, and date are alleged above.

54.     AECOM did not receive the comments until a month later, on February 16, 2016, after the EPC Agreement was executed.  The "comments" were not "minimum" changes, but required AECOM to entirely scrap the electrical design upon which AECOM bid the Project and to develop an electrical design from scratch.

55.     By August 6, 2016, nearly a year after AECOM had bid the Project, PG&E still had not settled on the fundamental concept for the electrical design.  This was so even though the design of the Project, per the EPC Agreement, was to be nearly complete by November 7, 2016.

56.     PG&E also: (i) unilaterally agreed to contractual terms with the supplier of the turbine-driven compressor unit (the equipment that actually moves the gas through the pipeline) that conflicted with the terms and conditions of the EPC Agreement with AECOM, resulting in delays to procurement of the unit and incorporation of technical requirements of that equipment into the Project design; (ii) added new buildings to be designed and constructed (*e.g.*, a new hazardous

materials storage building); (iii) expanded the footprint and scope of other buildings (*e.g.*, the new control building (auxiliary building) and fire water pump house were expanded); (iv) changed the concept for how the compressor station electrical systems would be controlled by requiring a "smart" motor control centers; (v) changed the diameters of the suction and discharge headers; and (vi) changed the power source for some control valves from pneumatic to gas. PG&E then refused to authorize the purchase of the equipment to meet its new "smart" control center requirements.

57. PG&E's changes pushed out the completion deadline of the electrical design and substantially increased design hours.

58. However, as a result of the continuing redesign of the electrical (due to no fault of AECOM), this deadline was further extended, ultimately to February 24, 2017. PG&E also extended the date by which the electrical design would be completed by AECOM to accommodate the fact that PG&E elected to purchase a different motor control center than originally planned but refused to agree on a price for the equipment, thereby delaying incorporation of the equipment's requirements into the electrical design.

**2. PG&E's Last Minute Overhaul of the Electrical Design**

59. On February 8, 2017, just about two weeks before AECOM was to be complete with the electrical design, PG&E requested a preview of the near finished design (referred to JH Kelly's FAC as the "IFC Electrical"), which AECOM provided even though it was outside of the contemplated scope of the Project and resulted in additional work performed by AECOM.

60. Then, on or about February 14, 2017, less than a month before JH Kelly was preparing to mobilize at the Project site to begin construction of the replacement compressor station, PG&E demanded another overhaul of the electrical design. The vast majority of changes were not due to any design issues of AECOM. Instead, PG&E introduced a new "resiliency"[6] concept in the design. This involved: maximizing the extent to which conduit was placed underground rather than above ground; increasing the amount of underground conduit; increasing the design ambient temperature, which thereby reduced the amount of current the conductors would be permitted to carry; and

---

[6] "Resiliency" as used here is the concept of creating redundancy to reduce the risk of catastrophic failure in the electrical system.

changing the depth for below grade conduit, which resulted in increased excavation work and encountering much more rock or boulders.

61.    These late changes ultimately increased the total number of conduits (as well as the amount of underground conduit) and resulted in almost four times the number of electrical pulls. All of this had direct impacts on the scope and cost of the work and the time it took to construct the Project.  These changes also created unanticipated conflicts with existing underground utilities, some of which were not identified on the as-built drawings supplied by PG&E.

62.    Such changes so late in a project are contrary to accepted practice.  A concept like "resiliency" is a design philosophy that should be introduced early in a project.  It is standard industry practice to establish design criteria prior to the start of detailed engineering and design activities and seldom is such criteria changed even after the preliminary design basis has been developed, much less when the design is near complete.  It was not reasonable nor necessary for PG&E to introduce a new design philosophy (i.e., "resiliency"), especially one that was preferential and not consistent with the original scope of work.

63.    AECOM promptly advised PG&E that the changes would involve engineering rework, and would likely increase construction costs and delay the completion of the Project.

64.    PG&E still insisted on these preferential changes to the electrical design and, in an unprecedented move, PG&E's lead electrical engineer inserted himself as a de facto member of AECOM's design team in AECOM's offices and continued to make changes and effectuate a redesign from March 13, 2017 to April 9, 2017.

65.    AECOM moved forward with the design and construction in good faith, understanding, based on the parties' conduct and past practices on this and other projects, that PG&E would compensate AECOM for the increased costs of design and construction, and provide an appropriate extension of the schedule to accommodate the impacts resulting from the requested design changes.

66.    AECOM's admonitions to PG&E came true.  The changes made by PG&E did in fact impact completion of the Project.  For example, the changes delayed the start of certain construction activities as follows:

- IFC Electrical for the compressor building was not released until April 7, 2017, delaying work that was anticipated to start in March 2017.

- IFC Electrical for the underground conduit (except for the auxiliary building[7]) was not released until May 5, 2017, delaying work that was anticipated to start in March 2017.

- IFC Electrical for the "plant above ground, equipment & sections" was not released until May 18, 2017, interrupting the planning and sequencing of construction.

- IFC Electrical for the underground conduit for the auxiliary building was not released May 22, 2017, which delayed the excavation and fabrication of conduit.

- IFC Electrical for the lighting power distribution was not released until May 26, 2017, interrupting the planning and sequencing of construction.

- IFC Electrical for the connection diagrams/schematics was not released until August 3, 2017, interrupting the planning and sequencing of construction.

67.    In its FAC, JH Kelly sums up the impact of the IFC Electrical redesign as follows:

"[D]elay in issuing the IFC Electrical, and the extensive changes to the IFC Electrical, fundamentally changed the timing, sequencing, and scope of JH Kelly's work on the Project."

(JH Kelly FAC at ¶ 38.)

**3.    PG&E's Failure to Take Responsibility for Its Impacts**

68.    In August and September 2017, AECOM continued to release IFC Electrical drawings for construction while JH Kelly tried to progress construction of the Project in the field.

69.    The EPC Agreement originally contemplated that in August 2017, the old compressor station would be permanently shut down and then decommissioned.  The EPC Agreement also contemplated that the Project would be complete by December 1, 2017. The shutdown meant that the Burney Station could not operate until substantial completion was achieved.

70.    By August 2017, it was evident that construction of the Project would not be done by December 1, 2017 due to the impacts to construction resulting from PG&E's perpetual redesign of the IFC Electrical, among other things.

---

[7] The Auxiliary building houses several essential components of the project, including the motor control center and the standby electrical generator.  It is essentially the brains of the Burney Station while the Compressor building is the brawn.

71.     Thus, in August 2017 (and then again in September 2017), AECOM proposed that PG&E delay the scheduled shutdown and decommissioning of the old compressor station and that PG&E hit pause on construction during the winter months. This proposal had several benefits. First, it would have ensured that the old compressor station remained operational during the winter months when natural gas is in high demand by PG&E customers. This was especially important given the uncertainty around when the new, replacement compressor station would be constructed and operational. Second, it would have enabled AECOM, JH Kelly, and PG&E to suspend construction while fully evaluating the impacts of PG&E's late design changes. And finally, hitting pause during the winter months would have avoided safety risks and inefficient working conditions commonly associated with construction in winter weather (particularly in the Sierra Nevadas), as well as the increased costs associated with such challenging conditions.

72.     PG&E rejected this proposal and rejected all responsibility for delays, denying that any of its changes had increased the scope of the Project. In doing so, PG&E exacerbated the losses resulting from its late-driven design changes.

73.     PG&E also rejected AECOM's request for an extension of its substantial and final completion deadlines due to the impacts resulting from PG&E's changes to the IFC Electrical.

74.     PG&E, instead, directed AECOM and JH Kelly[8] to use all efforts to accelerate the construction of the compressor station by the original planned dates (November 17, 2017 for substantial completion, and December 1, 2017 for final completion), while intimating that any delay in the delivery of the Project would have serious and irreparable financial consequences for PG&E and simply could not be tolerated.

75.     And then, rather than compensate AECOM for the increased costs associated with the design, in December 2017, over AECOM's objection, PG&E imposed the first of two withholdings, this one in the amount of $880,000 in liquidated damages due to 44 days of delay purportedly caused

---

[8] JH Kelly likewise asserts, in its FAC, that in September of 2017, it was required to "implement an accelerated schedule (the 'Accelerated Schedule') to compensate for the delays to the Project." JH Kelly further alleges that the Accelerated Schedule contemplated: a) the initiation of overtime for all labor; b) the requirement that JH Kelly work through the cold and wet winter period; and c) the addition of nightshifts for electricians. (JH Kelly's FAC ¶40).

SECOND AMENDED COUNTERCLAIM OF AECOM TECHNICAL SERVICES, INC.

by AECOM and/or its subcontractors.  PG&E ultimately withheld payment of $1,500,000 based on alleged liquidated damages incurred by PG&E.

76.     In its FAC, JH Kelly asserts claims against AECOM for additional costs and delays that it alleges arise from these and other changes, which changes forced it to perform out-of-sequence work, accelerate its work, adopt an overtime schedule, and work through the winter months in order to satisfy PG&E's direction to complete the work in accordance with the original schedule, none of which were contemplated by any of the parties at the time of contracting.  (JH Kelly FAC at ¶ 40.)

**4.     PG&E Interference with Contractor Means and Methods**

77.     AECOM is informed and believes and based upon such information and belief alleges that PG&E disrupted the Project by directing the means and methods by which AECOM and JH Kelly completed the excavation of trenches for gas piping and electrical conduit.  This occurred most often in two areas of excavation.  The first was in trenches for large bore pipe or valve nests. These excavations required wider and deeper trenches.  JH Kelly claims that PG&E refused to allow code compliant excavations, and instead forced JH Kelly dig larger trenches that were opened up and sloped in a manner far in excess of industry standards.  PG&E also required AECOM, at its own costs, to obtain third party engineering to approve the excavations.  This was an unnecessary, onerous and time-consuming endeavor given that AECOM has licensed civil engineers on staff and required work that was beyond the requirements of the EPC Contract.

78.     PG&E also required AECOM and its subcontractor to use hydro-vacuum trucks or hand digging to perform significant amounts of excavation.  The use of low-pressure water and suction excavation as compared to mechanical excavation is incredibly inefficient and time consuming.  This is especially so given the pervasive existence of large rocks and boulders in Burney, a volcanic area.  PG&E disregarded the impact of the equipment rental costs, added labor and time this required, and refused to allow conventional mechanical excavation throughout much of the site.  This direction, and PG&E's ultimate refusal to pay for the added costs, directly contradicted the information provided to bidders in the RFP and PG&E's response to questions, where PG&E specifically directed bidders to assume the use of mechanical excavation for bidding

purposes and that PG&E would provide additional compensation where hand or hydro-vacuum was required. A true and correct copy of Attachment 10 of the RFP, Questions and Clarifications, is attached hereto as **Exhibit 3**.

### 5.    Additional Project Delays and Impacts Caused by PG&E

79.    In the end, PG&E imposed a large number of changes to the original scope of the Project, which impacted the entirety of the Project. The large number of changes, coupled with the late timing of significant changes, had a multiplying impact on the overall time and cost to complete the Project and changed the work required to complete the Project. Nevertheless, PG&E refused to acknowledge many of its changes and the impacts the changes had on the Project.

80.    PG&E's conduct was directly contrary to the representations PG&E made to AECOM at the pre-contract stage of the Project. For the reasons stated above, PG&E led AECOM to believe that this was a low-risk project that would be subject to limited changes. Instead, PG&E flooded AECOM with hundreds of design changes that imposed an administrative burden that AECOM's contract administration could have never anticipated. When AECOM came to grips with the extent of the changes and informed PG&E of the repercussions of their decisions, PG&E refused to work with AECOM to resolve the challenges facing this Project and reach an equitable result. Instead, PG&E elected to find any and every excuse possible to deny AECOM relief.

81.    In fact, despite later attempting to utilize the change order provisions to bar AECOM's recovery, PG&E repeatedly declined to follow the change order provisions. For example, Section 8.1 of the General Conditions of the EPC Agreement required PG&E to instruct AECOM to execute additional work or changes by a written directive that was signed by PG&E. However, PG&E repeatedly instructed AECOM to proceed with additional work scope throughout the Project without formal written directives.

82.    Additionally, PG&E refused to acknowledge over 100 requests for information ("RFI"), which are a critical aspect of the change order process. On this project, what are traditionally known as change order requests or change notices were submitted in the form of RFIs.

**C. Delayed Payment of Invoices, Wrongful Withholdings, And Payments Owed for Increased Costs Caused by PG&E**

**1. PG&E's Dilatory Change Order Processing Practices**

83. For the duration of the Project, AECOM consistently provided PG&E with notice of the added costs and delays resulting from PG&E's design changes, increases to the scope of work, interference with the work, and deviations from the EPC Agreement. Indeed, AECOM submitted nearly 300 RFIs and over 150 proposed change orders ("PCOs") to PG&E.

84. In addressing the RFIs and PCOs submitted by AECOM, PG&E wrongfully rejected costs that AECOM incurred as a result of PG&E's design changes, scope increases, and delays and interference with the work. AECOM remains uncompensated for that work.

85. Even when PG&E approved PCOs submitted by AECOM, PG&E routinely failed to pay the approved PCOs in a timely manner, despite no controversy over AECOM's entitlement to payment.

86. Further, on multiple occasions, PG&E refused to pay AECOM for approved and performed change order work because AECOM declined (in exchange for payment to which it was already entitled) to waive all rights for additional compensation related to the work performed, including waiver of AECOM's rights to compensation and schedule extensions for costs and schedule impacts that could not yet be calculated. Through this practice, PG&E effectively held approved change order amounts hostage. By way of example, proposed Change Order 7 ("CO 7") for $4,142,761.23 has been held up based on this unreasonable PG&E position. In fact, in Change Order 6 ("CO 6"), PG&E refused payment until AECOM agreed to limiting language which forced it to remove any items from that change order where there were costs that were not yet quantifiable or certain.

87. In other instances, PG&E refused to acknowledge changes to which it had formally agreed. Instead, in December of 2017, PG&E assessed liquidated damages against AECOM for failing to achieve substantial completion by November 17, 2017. PG&E provided no evidence (and still has not) to support the imposition of liquidated damages against AECOM.

88. Additionally, numerous requests for additional compensation submitted by AECOM were simply never addressed by PG&E.

89. Also, PG&E adopted a practice of delaying approval of changes, then bundling RFIs and PCOs into formal change orders months after the work was complete.

**2. Withholding of Amounts Owed**

90. In July 2017, PG&E stopped paying AECOM for several months, refused to acknowledge that changes it had directed had expanded the scope of work, extended the duration of the Project, and when payments resumed, PG&E improperly withheld significant sums from the past due amounts owed.

91. In addition to the liquidated damages of $1,500,000 improperly withheld, PG&E also withheld amounts for alleged property damage arising from a JH Kelly fuel supplier, Ed Staub & Sons, entering the job site and negligently running its loaded fuel truck into a live gas line, causing significant property damage and repair costs. However, the EPC Agreement specifically provided that any amounts withheld by PG&E for property damage would be withheld from the retainage amount. PG&E ignored this and imposed over $800,000 in withholdings from progress payments owed to AECOM to cover its "estimated" property damage.

92. Further, PG&E has continued to withhold additional amounts from payments owed to AECOM based on speculative or non-existent damages. As a matter of practice, when progress payments and approved change order amounts become due, PG&E asserts withholdings equal to or in excess of the amount due, only relenting after AECOM notifies PG&E that the threatened withholdings are not supported by the EPC Agreement and violated California law.

**D. Project Completion**

93. Despite the many obstacles created by PG&E and JH Kelly, on June 6, 2018, AECOM achieved substantial completion of the Project. However, even though the Burney Station was commercially operational as of June 6, 2018, and only non-operational work remained, PG&E refused to acknowledge that AECOM had achieved substantial completion under the EPC Agreement.

94.    Thereafter, AECOM continued to perform punch-list work, as well as address warranty items that emerged, in order obtain PG&E's acknowledgment of substantial and final completion.  PG&E continued, however, to force AECOM to play whack-a-mole with PG&E's ever expanding punch-list work by adding what was appropriately warranty work and items outside the EPC Agreement's scope of work.    Nonetheless, AECOM achieved final completion and demobilized from the Project site on January 11, 2019, just two weeks before PG&E filed its Chapter 11 case.  Upon the bankruptcy filing, PG&E failed and/or refused to process change order requests and/or payments to AECOM.

**E.    The Mechanic's Liens**

95.    On or about November 1, 2018, JH Kelly recorded a Claim of Mechanics Lien ("Claim of Lien") in Shasta County asserting a claim against PG&E's interest in the Project, including the real property in Burney, California on which it is located, claiming $15,881,776.21, plus interest.

96.    On information and belief, JH Kelly willfully overstated its Claim of Lien, including amounts that were subject to lien waivers executed by JH Kelly, and amounts that are not lienable under California law, in an effort to obtain leverage against AECOM.

97.    On January 25, 2019, AECOM recorded a Claim of Lien against the Burney Station in the amount of $23,535,812.39, plus interest.

## FIRST CAUSE OF ACTION

### (DETERMINATION OF PRIORITY AND EXTENT OF AECOM'S VALID MECHANICS' LIEN AGAINST ALL COUNTER-DEFENDANTS)

98.    AECOM incorporates the allegations of paragraphs 1-97 above as if fully stated herein.

99.    The Court dismissed this cause of action with prejudice. See Doc. No. 64.  AECOM incorporates by reference the allegations in support of this claim from its first amended complaint for reference's sake and to preserve this issue for appeal.  Pursuant to applicable law (*see, e.g., Lacey v. Maricopa County*, 693 F.3d 896, 928 (9th Cir. 2012)), AECOM is not required to replead this cause of action in order to preserve it for appeal.

## SECOND CAUSE OF ACTION

## (BREACH OF CONTRACT AGAINST COUNTER-DEFENDANT PG&E)

100.    AECOM incorporates the allegations of paragraphs 1-99 as if fully stated herein.

101.    AECOM has performed all of the conditions and requirements of the EPC Agreement, except those it has been prevented or excused from performing.

102.    PG&E has breached the EPC Agreement, including but not limited to: the breaches set forth in the preceding paragraphs, failing to process change orders, denying proposed change orders, improperly denying requests for schedule extension, refusing to acknowledge agreed-to schedule extensions, improperly imposing liquidated damages and other withholdings, failing to pay AECOM for work performed and failing to pay amounts owed to AECOM in accordance with the terms of the EPC Agreement and California law.

103.    Additionally, as a result of PG&E's aforementioned breaches of contract, JH Kelly has asserted claims against AECOM for damages for claims in contract and in tort against AECOM. JH Kelly has also asserted various claims against PG&E.  AECOM is informed and believes, and based upon such information and belief alleges, that some or all of JH Kelly's claims stem from and were caused by PG&E's wrongful actions and breaches of the EPC Agreement.

104.    AECOM cannot be held liable for the damages that PG&E caused by virtue of its breaches of the EPC Agreement and wrongful conduct as they pertain to JH Kelly.

105.    As a result of PG&E's breaches, AECOM has suffered damages in an amount to proven at trial, but in excess of $34,000,000, plus interest, penalties, attorneys' fees and costs, to the extent allowable by law.

## THIRD CAUSE OF ACTION

## (BREACH OF IMPLIED WARRANTY OF ADEQUACY OF PLANS AND SPECIFICATIONS AGAINST COUNTER-DEFENDANT PG&E)

106.    AECOM incorporates the allegations of paragraphs 1-105 as if fully stated herein.

107.    Through discussions with AECOM and the RFP and the EPC Agreement, PG&E represented that it would provide a 30% design for the Project and that only a minimum amount of changes to the design should be expected.  Further, at the time PG&E accepted AECOM's proposal

and awarded the EPC Agreement to AECOM, PG&E impliedly warranted the adequacy, sufficiency, and completeness of the plans and specifications for purposes of bidding, designing and constructing the Project.

108.    AECOM relied on these representations and warranties from PG&E in the RFP and the EPC Agreement.

109.    The plans, specifications, drawings, and other design documents and information provided to AECOM by PG&E were in fact inadequate, inaccurate, and incomplete.  Moreover, PG&E failed to timely remedy the defective plans and specifications, and in fact imposed a large number of changes to the represented basis for the design throughout the Project, all of which constitute material and substantial breaches of the implied warranty of the adequacy of plans and specifications.

110.    Additionally, as a result of PG&E's aforementioned breaches of the implied warranty, JH Kelly has asserted claims against AECOM for damages for claims in contract and in tort against AECOM.  JH Kelly has also asserted various claims against PG&E.  AECOM is informed and believes, and based upon such information and belief alleges, that some or all of JH Kelly's claims stem from and were caused by PG&E's wrongful actions and breaches of the implied warranty. Therefore, AECOM cannot be held liable for the damages that PG&E caused by virtue of its breaches and wrongful conduct as they pertain to JH Kelly.

111.    As a direct and foreseeable result of PG&E's breach of the implied warranty of the adequacy of plans and specifications, AECOM incurred significant increased costs and delays in performing its obligations under the EPC Agreement, resulting in damages in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION

### (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST COUNTER-DEFENDANT PG&E)

112.    AECOM incorporates the allegations of paragraphs 1-111 as if fully stated herein.

113. Implied in the EPC Agreement is a covenant of good faith and fair dealing, which requires PG&E to refrain from any action that would impair the benefits that AECOM has a right to expect from the EPC Agreement.

114. PG&E breached the implied covenant of good faith and fair dealing by its conduct, including but not limited to, making substantial and untimely design changes and acknowledging that AECOM would be compensated for these changes through price increases and time extensions and that formal change order requests would not be required to obtain additional money or time extensions for such changes, but thereafter failing to properly address, approve and/or execute AECOM's claims for extra compensation and time extensions via change orders, failing to timely pay approved and undisputed change order work, refusing to recognize AECOM's achievement of project milestones, untimely payment of amounts owed, prematurely and improperly assessing liquidated damages, forcing AECOM to complete the Project while failing itself to comply with the EPC Agreement, threatening AECOM with damages and failing to participate in the dispute resolution process required by the EPC Agreement.

115. The EPC Agreement further provided PG&E with certain rights of approval or rejection, including but not limited to the right to approve drawings, specifications, bid proposals, purchase orders, change order requests, schedule extensions and contract price increases. AECOM is informed and believes and based thereon alleges that PG&E withheld such approval, in bad faith and without a reasonable or proper basis. By the foregoing, PG&E further breached the implied covenant of good faith and fair dealing.

116. Additionally, to the extent that the EPC Agreement provided PG&E with discretion as to the time and manner in which it approved the design, as well as the time and manner in which PG&E negotiated change orders, PG&E exercised that discretion in bad faith and to deny AECOM the benefits of the contract.

117. Whereas AECOM consistently provided PG&E with notice of, and PG&E had actual notice of, the added costs and delays resulting from PG&E's design changes, increases to the scope of work, interference with the work, and deviations from the EPC Agreement, PG&E failed to timely address AECOM's notices and PCOs.

118.    PG&E also wrongfully rejected costs that AECOM incurred as a result of PG&E's design changes, scope increases, and delays and interference with the work.

119.    Additionally, even when PG&E approved PCOs submitted by AECOM, PG&E routinely failed to pay the approved PCOs in a timely manner, despite no controversy over AECOM's entitlement to payment.

120.    Further, on multiple occasions, PG&E attempted to use its leverage in the change order process by refusing to pay AECOM for approved and performed change order work because AECOM declined (in exchange for payment to which it was already entitled) to waive all rights for additional compensation related to the work performed, including waiver of AECOM's rights to compensation and schedule extensions for costs and schedule impacts that could not yet be calculated.  Through this practice, PG&E effectively held approved change order amounts hostage.

121.    In other instances, PG&E refused to acknowledge changes to which it had formally agreed.  Instead, in December of 2017, PG&E assessed liquidated damages against AECOM for failing to achieve substantial completion by November 17, 2017.  PG&E provided no evidence (and still has not) to support the imposition of liquidated damages against AECOM.

122.    Additionally, numerous requests for additional compensation submitted by AECOM were simply never addressed by PG&E.

123.    Similarly, PG&E acted in bad faith by interfering with the procurement process.  PG&E knew that AECOM's ability to perform under the EPC Agreement relied, in part, on timely procurement of the materials for the Project.  It nonetheless directly interfered with the procurement process.  For example, its complete overhaul of the electrical design and continued insistence on further changes prevented AECOM from procuring key equipment and materials, which caused material delays, especially to long lead-time items.  Additionally, PG&E unilaterally agreed to contractual terms with the supplier of the turbine-driven compressor unit (the equipment that actually moves the gas through the pipeline) that conflicted with the terms and conditions of the EPC Agreement with AECOM, resulting in delays to procurement of the unit and incorporation of technical requirements of that equipment into the Project design.

124.    PG&E likewise withheld information and consent needed to complete the permitting process, including but not limited to the materials to be housed in the storage building.  This interference and inaction materially delayed the permitting process.

125.    Additionally, as a result of PG&E's aforementioned breaches of the implied covenant, JH Kelly has asserted claims against AECOM for damages for claims in contract and in tort against AECOM.  JH Kelly has also asserted various claims against PG&E.  AECOM is informed and believes, and based upon such information and belief alleges, that some or all of JH Kelly's claims stem from and were caused by PG&E's wrongful actions and breaches of the implied covenant of good faith and fair dealing.  Therefore, AECOM cannot be held liable for the damages that PG&E caused by virtue of its breaches and wrongful conduct as they pertain to JH Kelly.

126.    As a direct and foreseeable result of PG&E's breach of the implied covenant of good faith and fair dealing, AECOM incurred damages in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION

### (NEGLIGENT MISREPRESENTATION AGAINST COUNTER-DEFENDANT PG&E)

127.    AECOM incorporates the allegations of paragraphs 1-126 as if fully stated herein.

128.    PG&E prepared and issued the RFP for business purposes in the course of its business.

129.    PG&E had an independent duty to all bidders, including AECOM, to communicate accurate information through its RFP, as AECOM and the other bidders relied on this information to prepare their respective bids for the Project.

130.    During discussions with AECOM representatives prior to the execution of the EPC Agreement, PG&E personnel represented that the Project would mirror similar PG&E compressor station projects and, therefore, that the risks that the Project's design and scope would change were low.

131.    Further, in the RFP, PG&E represented that: (a) it would only make minimum changes to the existing pre-bid design, (b) the pre-bid design was accurate, (c) the allowable means and methods for the construction of the Project were as described in the RFP, and (d) the scope of the Project and the scope of the design would be frozen at the 30% (pre-bid) stage and any changes

thereafter would entitle AECOM to a schedule extension and/or increase in contact price. See RFP, Attachment 1, at pp. 1-9; *Id*. at pg. 1; EPC Agreement, Project Specific Information, at pp. 6 and 1533; *Id*. at p. 5.

132. Without reasonable grounds for believing the truth thereof, PG&E misrepresented the state of completion of the Project's design, its willingness to allow contractors to utilize machine excavation, the scope of work and costs required to complete the Project, and its intent regarding changes to the Project's design, including its intent to approve change orders for changed conditions. PG&E made these misrepresentations with the intent of inducing AECOM rely on these misrepresentations in preparing its bid and entering into the EPC Agreement.

133. PG&E knew or should have known, or was without any reasonable basis for not knowing, at the time PG&E issued the RFP and made these representations to AECOM, among other things, that significant re-work of and revisions to the design of the Project would be expected and/or required by PG&E.

134. At all times relevant hereto, AECOM was ignorant of the true state of the Project's design, PG&E's intent to make substantial changes to the design, and the costs and scope of work required to implement PG&E's intended design, and justifiably relied on the representations made by PG&E in the RFP and the meetings described above.

135. As a result of PG&E's misrepresentations, AECOM entered into the EPC Agreement for a price which was inadequate to cover the costs of PG&E's intended design, as opposed to the design represented at the time of the RFP, and expended substantial additional costs, design labor, and Project time in order to complete the Project design actually intended and required by PG&E.

136. But for PG&E's misrepresentations, AECOM would not have agreed to enter into the EPC Agreement for the stated price that was not adequate to cover the costs of PG&E's actual intended design, which was not disclosed at the time AECOM entered into the EPC Agreement. PG&E's misrepresentations also caused AECOM to agree to terms consistent with a low-risk Project that AECOM would not have accepted had AECOM been aware of PG&E's actual intentions. Last, PG&E's misrepresentations caused AECOM to plan its work (*e.g.*, schedule and

staffing) in a manner that would not have otherwise been the case had AECOM known PG&E's actual intentions.

137.　PG&E required AECOM to design and construct a project which was much more expensive than that represented in the RFP and PG&E should be required to pay for the services and value it received.

138.　As a proximate result of the misrepresentations of PG&E as herein alleged, AECOM has sustained damages subject to proof at trial, but in an amount that will compensate AECOM for all the detriment caused by PG&E's misrepresentations.

## SIXTH CAUSE OF ACTION

## (FRAUDULENT INDUCEMENT AGAINST COUNTER-DEFENDANT PG&E)

139.　AECOM incorporates the allegations of paragraphs 1-138 as if fully stated herein.

140.　PG&E prepared and issued the RFP for business purposes in the course of its business.

141.　In preparing the RFP, PG&E had an independent duty to all bidders, including AECOM, to communicate accurate information through its RFP, as AECOM and the other bidders relied on this information to prepare their respective bids for the Project.

142.　During discussions with AECOM representatives prior to the execution of the EPC Agreement, PG&E representatives stated that the Project would mirror similar PG&E compressor station projects and that the Project would require limited changes.

143.　Further, in the RFP, PG&E represented that it intended to only make minimum changes to the existing pre-bid design, represented the accuracy of the pre-bid design, represented the allowable means and methods for the construction of the Project, and represented that the scope of the Project and the scope of the design would be frozen at the 30% (pre-bid) stage and any changes thereafter would entitle AECOM to a schedule extension and/or increase in contact price.　A true and correct copy of excerpts of Project Specific Information contained in the EPC Agreement is attached hereto as **Exhibit 4**.

144.　PG&E misrepresented the state of completion of the Project's design, misrepresented its willingness to allow contractors to utilize machine excavation; misrepresented the scope of work

and costs required to complete the Project, and misrepresented its intent regarding minimum changes to the Project's design, including its intent to approve change orders for changed conditions.

145. At the time of the signing of the EPC Agreement, PG&E knew that these representations were not true.

146. PG&E made these misrepresentations in the RFP with the intent of inducing AECOM rely on these misrepresentations in preparing its bid and entering into the EPC Agreement.

147. PG&E knew at the time it issued the RFP and made the representations to AECOM, among other things, that significant re-work of and a complete overhaul to the design of the Project would be expected and/or required by PG&E.

148. At all times relevant hereto, AECOM was ignorant of the true state of the Project's design, PG&E's intent to make substantial changes to the design, and the costs and scope of work required to implement PG&E's intended design, and justifiably relied on the representations made by PG&E in the RFP.

149. As a result of PG&E's misrepresentations, AECOM entered into the EPC Agreement for a price that was not adequate to cover the costs of PG&E's actual intended design, which was not disclosed at the time AECOM entered into the EPC Agreement, as opposed to the design represented at the time of the RFP, and expended substantial costs, design labor, and Project time in order to complete the Project design actually intended and required by PG&E.

150. But for PG&E's misrepresentations, AECOM would not have agreed to enter into the EPC Agreement for the stated price, which was not adequate to cover the costs of PG&E's actual intended design, which was not disclosed at the time AECOM entered into the EPC Agreement. PG&E's misrepresentations also caused AECOM to agree to terms consistent with a low-risk Project that it would not have accepted had AECOM been aware of PG&E's actual intentions. Last, PG&E's misrepresentations caused AECOM to plan its work (*e.g.*, schedule and staffing) in a manner that would not have otherwise been the case had AECOM known PG&E's actual intentions.

151. PG&E required AECOM to design and construct a project which was much more expensive than that represented in the RFP and PG&E should be required to pay for the services and value it received.

152. As a proximate result of the fraudulent conduct and intentional misrepresentations of PG&E as herein alleged, AECOM has sustained damages subject to proof at trial, but in an amount that will compensate AECOM for all the detriment caused by PG&E's misrepresentations.

153. PG&E's conduct was fraudulent and/or malicious, thereby justifying an award of punitive and exemplary damages.

## SEVENTH CAUSE OF ACTION

### (QUANTUM MERUIT AGAINST COUNTER-DEFENDANT PG&E)

154. AECOM incorporates the allegations of paragraphs 1-153 as if fully stated herein.

155. PG&E imposed an excessive number of changes on AECOM such that AECOM's scope of work under the EPC Agreement was significantly altered. The changes PG&E imposed on AECOM materially increased AECOM's costs and caused AECOM to perform its work on the Project under extremely disadvantageous conditions. As a result, the scope of work undertaken by AECOM greatly exceeded what was called for under the EPC Agreement.

156. AECOM is informed and believes, and based thereon, alleges that during the course of the Project, both parties abandoned the EPC Agreement's change order process by their conduct: PG&E abandoned the EPC Agreement, and the contractual change order process, by fundamentally redesigning the electrical scope of the Project, and requiring AECOM to construct a final Project that was significantly and materially different from the original Project, without following the change order provisions or processing change orders for changed conditions. PG&E's extensive changes also caused AECOM to abandon the EPC Agreement's change order process in order to complete the Project in accordance with PG&E's demanded changes.

157. Further, PG&E led AECOM to believe that the Parties would not strictly enforce the change orders provisions of the EPC Agreement. As a result, PG&E and AECOM had an implicit understanding that the Project would proceed on a quantum meruit basis.

158. Without admitting any liability, AECOM alleges that in relation to the abandonment described herein, JH Kelly has asserted that "AECOM abandoned the contractual COR process, abandoned its scheduling duties, and abandoned the contractual payment scheduled in the

Subcontract" and that "AECOM has abandoned the Subcontract," and seeks to recover on a quantum meruit basis against AECOM. See JH Kelly FAC ¶¶ 77-82.

159. AECOM alleges that PG&E abandoned the COR process required by the EPC Agreement, and forced AECOM to do the same. As a result, both PG&E and AECOM abandoned the EPC Agreement, and AECOM is entitled to recover the reasonable value of the labor, services and materials supplied to the Project.

160. AECOM alleges that, as a result of the fraudulent misrepresentations alleged herein, the EPC Agreement may be void and unenforceable.

161. AECOM provided labor, services and materials at the direction and request of PG&E for the design and construction of the Project, for which PG&E agreed to pay AECOM the reasonable value of such labor, services and materials.

162. AECOM pleads this instant cause of action in the alternative to its other causes of action. See FRCP Rule 8(d)(3). AECOM is entitled to the reasonable value of unpaid labor, services, materials, and costs, which amount will be proven at trial, but in excess of $34,000,000, together with interest at the prevailing legal rate, should AECOM not prevail on its other causes of action.

## EIGHTH CAUSE OF ACTION

## (VIOLATIONS OF CALIFORNIA PROMPT PAYMENT ACT

## AGAINST COUNTER-DEFENDANT PG&E)

163. AECOM incorporates the allegations of paragraphs 1-162 as if fully stated herein.

164. Over the course of the Project, PG&E improperly withheld amounts from progress payments due and owing to AECOM for which there was no good faith dispute regarding the work performed under the progress payment at issue. PG&E similarly withheld payment for approved and undisputed change order work and retention amounts from AECOM, for which there was no good faith dispute.

165. These withholdings were in violation of Sections 8800 and 8818 of the California Civil Code.

166. Pursuant to Sections 8800 and 8818 of the California Civil Code, AECOM is entitled to 2% monthly interest for the wrongfully withheld amounts and its attorneys' fees and costs.

## NINTH CAUSE OF ACTION

## (IMPLIED CONTRACTUAL INDEMNITY AGAINST COUNTER-DEFENDANT PG&E)

167. AECOM incorporates the allegations of paragraphs 1-166 as if fully stated herein.

168. JH Kelly alleges in its FAC that it has incurred damages as a result of certain failures in the construction of the Project. JH Kelly's FAC, for purposes of allegations only, is incorporated herein by this reference as though fully set forth herein. AECOM denies any wrongdoing or fault for the claims being made by JH Kelly in the FAC.

169. Under the EPC Agreement, PG&E assumed certain obligations that necessarily implied an obligation to perform those responsibilities in a proper manner and to discharge foreseeable damages resulting from improper performance of the EPC Agreement, including but not limited to the obligations to avoid changes to the design and/or keep changes to a minimum, review and approve drawings, specifications, bid proposals, purchase orders, change order requests, schedule extensions and contract price increases, timely provide information and responses to design inquiries to allow the Project to proceed according to schedule, and process RFI's and other change requests in a timely manner. AECOM is informed and believes and based thereon alleges that PG&E withheld such approval, in bad faith and without a reasonable or proper basis.

170. PG&E and AECOM owed JH Kelly a joint duty to disclose all material facts that would have a bearing on JH Kelly's work. AECOM and PG&E also jointly owed JH Kelly a duty to refrain from unreasonably denying extensions of time or contract price adjustments. AECOM and PG&E jointly owed JH Kelly a duty not to interfere with JH Kelly's work. AECOM and PG&E jointly owed JH Kelly a duty to timely review and process submittals and requests. PG&E breached these joint duties by failing to disclose to JH Kelly (and AECOM) its intent to implement significant changes to the RFP, failing to approve reasonable extensions of time and contract price adjustments submitted by JH Kelly and AECOM as a result of these changes, interfering in JH Kelly's work, wrongfully withholding sums from AECOM, and failing to timely review and process design submittals and other administrative requests. PG&E understood that AECOM would engage

subcontractors such as JH Kelly for the Project, that those subcontractors would rely on the information that PG&E provided to AECOM to price and plan their work, that the accuracy of PG&E's information would impact the performance of AECOM's subcontractors, and that PG&E's conduct on the Project would affect the performance of AECOM's subcontractors.

171.     AECOM is informed and believes, and based upon such information and belief alleges, that PG&E failed to use reasonable care in its performance of its responsibilities under the EPC Agreement with AECOM and its aforementioned breaches have subjected AECOM to liability from JH Kelly.

172.     PG&E's conduct was a substantial factor in causing JH Kelly's alleged harm.

173.     AECOM further alleges that if AECOM is found liable to JH Kelly on any of the causes of action in its FAC in this action, said liability is vicarious, secondary, passive and/or derivative in nature, and that by reason of the foregoing facts, AECOM is entitled to equitable and implied indemnification from Counter-Defendant PG&E herein for all amounts that AECOM may become obligated to JH Kelly.

## **TENTH CAUSE OF ACTION**

### **(BREACH OF CONTRACT AGAINST COUNTER-DEFENDANT JH KELLY)**

174.     AECOM incorporates the allegations of paragraphs 1-173 as if fully stated herein.

175.     JH Kelly and AECOM entered into the Subcontract on or about October 21, 2016.

176.     In entering into the Subcontract with AECOM, JH Kelly made material representations, which AECOM relied upon, including but not limited to:

 i.     it would "carefully review all the Contract Documents for any conflicts or ambiguities" (Article 1.4.1);

 ii.     "it has examined the Site and the Contract Documents prior to executing this Agreement so as to reasonably ascertain the nature of the Work[9] and the various conditions affecting the Work" (Article 2.2.1);

---

[9] "Work" is a defined term in the Subcontract and generally refers to all of JH Kelly's scope of work to complete the Project.

iii.       it would "perform all construction services efficiently and with the requisite expertise, skill and competence to satisfy the requirements of the Contract Document and the project Schedule" (Article 2.3.1);

iv.       "[i]n the event of any inconsistency, conflict or ambiguity between or among the Contract Documents, the more stringent provision of this Agreement will apply as it relates to Subcontractor's scope of Work, determined by a standard of good faith and reasonableness" (Article 1.4.2);

v.       it would fully cooperate and act in good faith in performing its obligations under the Subcontract (Article 1.5.1);

vi.       its Work would be "of good quality, in conformance with the Contract Documents and free of defects in materials and workmanship" (Article 2.14);

vii.       it would "immediately" bring "omissions from the drawings or specifications or the misdescription of details of Work…" to the attention of AECOM via a Request for Information (RFI) "prior to the commencement of any work" (Article 2.17); and

viii.       "[v]ariations in quantities from as-bid shall be brought to the attention of Design-Builder via a Request for Information (RFI) prior to any purchase of materials" (Article 2.17).

## **Timing & Schedule Obligations**

177.    JH Kelly also agreed that "time [wa]s of the essence" in performing the work, (*see* Article 5.3.12), and made additional promises with respect to timely performance of the Work. (Article 5.2.1).

178.    To that end, the Subcontract obligated JH Kelly to provide AECOM with the schedule for the construction-related activities, as part of its duty to participate in and cooperate with the development of the Project schedule.  (Article 5.2.2).

179.    In the event that PG&E or AECOM directed changes to the schedule or sequence of operations for the Work, and such direction impacted JH Kelly's costs, the Subcontract required JH

Kelly to follow the procedures set forth in Articles 5, 12 and 13 of the Subcontract in order to obtain compensation and/or schedule extensions for such changes.

180. And, in the event there were delays caused by PG&E, JH Kelly agreed it would properly document such delays and follow the contractual process set forth in the EPC Agreement to resolve claims arising out of these delays. (Article 13.3).

181. JH Kelly also agreed that if JH Kelly was responsible for delays, it would compensate and indemnify AECOM for all such costs and expenses, including but not limited to any liquidated damages assessed by PG&E. (Article 5.4.5). And in the event delays or damages were caused by JH Kelly and another entity for which JH Kelly was not liable, AECOM could "reasonably apportion such damages amongst the responsible parties." (Article 5.4.5).

### Property Damage Obligations

182. JH Kelly also agreed to indemnify, hold harmless and defend AECOM against any claims for damages to property. (Article 11.4.1).

183. In the event that JH Kelly caused damage to property, failed to complete work, or its work was defective or deficient, AECOM is entitled to withhold payments if it determined JH Kelly was "not entitled to all or part of an Application for Payment" and for any claims or backcharges remaining unpaid; or where JH Kelly's insurance company refused to promptly defend AECOM or PG&E for such claims. (Articles 7.4.1. and 7.4.2).

a. **Dispute Resolution Requirements**

184. The provisions in the Subcontract governing disputes provide that to the extent any "claim, dispute or controversy arises out of, or relates to, problems caused by Owner or for which Owner is responsible ("Owner Disputes")," then JH Kelly would resolve such claims pursuant to the dispute resolution clause set forth in the EPC Agreement. (Article 13.3.1).

185. The Subcontract also requires JH Kelly "to cooperate in the presentation and prosecution or defense of Owner Disputes" and, at AECOM's determination, where the entitlement to additional compensation is the responsibility of PG&E, present such requests for an extension of time or additional compensation to Owner. *Id.*

186. Article 13.3 further provides:

13.3.2 Notwithstanding any other provisions herein to the contrary, Design-Builder and Subcontractor each agree to accept the relief as to time extension of addition compensation obtained from the Owner, if any, as well as all other aspects of the final decision following appeal or the expiration of the time for appeal, as full and final resolution of any Owner Dispute.

13.3.3 If Design-Builder asserts a claim against Owner involving Subcontractor, each party shall bear its own costs for outside counsel and third-party consultants retained to prosecute claims against Owner and for any other litigation costs. Each party shall present its portion of the claim to Owner.

### b. JH Kelly's Performance on the Project

### <u>JH Kelly Delay</u>

187. JH Kelly failed to perform the work by failing to provide enough qualified workers and failing to properly sequence the work, which delayed the timely completion of the Project. More specifically, JH Kelly caused delays by failing to adjust its construction plan (the order in which the work is done) to ensure its work force was progressing the work. And, JH Kelly did not provide adequate supervision to efficiently complete work. JH Kelly also opted to prioritize non-critical work over critical path work (*i.e.*, work that if delayed would impact the timely completion of the Project) and failed to work in multiple areas at the same time due to lack of manpower. In addition, JH Kelly's work to complete pulling the wire through the conduit pipe and making the connections was slower than it should have been even considering other impacts to the work. These delays caused damage to AECOM, including but not limited to, increased direct costs on the job and the assessment of liquidated damages by PG&E against AECOM.

### <u>Failure to Perform Scope (Incomplete or Defective Work)</u>

188. JH Kelly failed or refused to perform certain scopes of work under the Subcontract, including but not limited to, certain demolition work, certain painting and coating work, and the application of protective coatings for certain above and below-ground piping.

189. With respect to the painting scope, the Subcontract Standard Terms and Conditions Section 1.1.1 requires JH Kelly to "provide all construction and other aspects of the Work consistent with the Contract Documents…" JH Kelly was also required to notify AECOM of any conflicts or ambiguities in the Contract Documents, or omitted or misdescribed work. (Standard Terms and

Conditions Sections 1.1.1, 1.4.1, 1.4.2 and 2.17.1). The Project Specific Information Article 17 clearly states that JH Kelly is required to "[p]aint and coat the equipment, piping and related mechanical equipment in accordance with the requirements stated in Attachment 11 of this Specification." The Detailed Specification required JH Kelly to "Paint all above ground pipe and buildings." (See Project Specific Information, Detailed Scope Paragraph 18 Miscellaneous Station Upgrades). The specification for the paint is included in the contract documents in the scope of work paragraph 4.6.17 (Painting and Coatings) and is based on the relevant PG&E Specifications (PG&E E-30 Selecting and Applying Coatings on Exposed Gas Piping; and PG&E E-31 Rev.00: Specifications for Application of Protective Coating to Meters, Regulators, Valve and Connected Piping). AECOM made demand to JH Kelly to complete this work on multiple occasions. In breach of its contract, JH Kelly refused to paint certain existing buildings and piping on the Project. As a result of JH Kelly's breach of contract, AECOM incurred at least $374,017 to complete this work that JH Kelly refused to perform.

190. JH Kelly similarly failed to properly perform underground pipe coating[10] (as determined in the field by PG&E) which protects the pipe from corrosion, certain asphalt and paving work, and underground water piping in a manner that was free of defects. These, and other defects in JH Kelly's work, caused AECOM to repair and/or redo work at additional costs to AECOM. In addition, AECOM has incurred costs related to rectifying other incomplete or defective work including but not limited to:

      a)     Faulty heat tracing insulation;

      b)     Faulty door installation;

      c)     Incomplete placement of rock/gravel;

      d)     Omission of a vapor barrier at the Fire Water Pump House;

      e)     Installation of a well pump with incorrect voltage;

      f)     Solar rework to realign the compressor;

---

[10] The various contract documents include specifications for the application of protective coatings for all gas pipe. JH Kelly was responsible to apply such coatings in the field in accordance with these specifications. PG&E then used specified testing procedures to ensure that the field or shop applied coatings met the PG&E specification requirements. PG&E's testing found numerous defects in JH Kelly's work, which required JH Kelly to redo the work that failed the PG&E testing. AECOM incurred additional costs related to its on-site personnel for such re-work.

g)      Balancing the compressor building exhaust louvers;

h)      Installing out of spec concrete in the Compressor Building slab foundation; and

i)      Demobilization of equipment, trailers and temporary power.

### The Valve Strike

191.    On or about October 14, 2017, a fuel truck operated by Ed Staub & Sons, a supplier of JH Kelly and for which JH Kelly was responsible, negligently struck a pressurized valve at the site.  Pursuant to the Subcontract, AECOM tendered the claim to JH Kelly for defense and indemnity, but this claim has yet to be resolved by JH Kelly or its insurer.  The valve damage also shut down work at the site and had a detrimental impact on the progress of work for several days. AECOM is entitled to indemnity and defense, and has a right to offset such amounts from the amounts claimed by JH Kelly against AECOM.

### Insufficient Staffing

192.    JH Kelly failed to provide adequate staffing to ensure proper supervision and efficient performance of its work.  This included on site supervision/construction management as well as inadequate safety oversight personnel.  In particular, PG&E often complained of JH Kelly's supervision, or lack thereof, and its poor safety performance.  As a result, AECOM incurred costs to provide additional staff to support the work.

### Failure to Cooperate

193.    The Subcontract requires JH Kelly to cooperate with AECOM in presenting and prosecuting its claims for damages for extra work and delays caused by the actions of PG&E, which requirements are set forth in more detail *supra* at ¶¶ 27-28 and 32-34.  But JH Kelly has routinely refused to comply with its contractual requirements and insists on prosecuting such claims solely against AECOM.  (*See, e.g.,* JH Kelly FAC ¶¶ 57-90).  In particular, JH Kelly has failed to provide the documentation required under the Subcontract to support its claim for additional compensation (and as repeatedly requested by AECOM).  This has directly impaired AECOM's ability to present to PG&E JH Kelly's claims for additional compensation related to PG&E conduct.

194.    Further, JH Kelly has actively impeded AECOM's efforts to have these disputes resolved with the participation of PG&E, as contemplated by the Subcontract.

195.    AECOM has performed all of its material obligations required by the terms and conditions of the Subcontract.

196.    JH Kelly has failed to perform all of its material obligations required by the terms and conditions of the Subcontract, as described herein.

197.    As a result of JH Kelly's breaches, AECOM has incurred damages in an amount to be proven at trial.

<u>**ELEVENTH CAUSE OF ACTION**</u>

**(BREACH OF EXPRESS COVENANTS OF GOOD FAITH AND FAIR DEALING**

**AGAINST COUNTER-DEFENDANT JH KELLY)**

198.    AECOM incorporates the allegations of paragraphs 1-197 as if fully stated herein.

199.    Pursuant to Article 1.5.1 of the Subcontract, JH Kelly agreed "to cooperate fully" with AECOM and "proceed on the basis of trust and good faith, to permit [AECOM] to realize the benefits afforded under the Contract Documents." JH Kelly also agreed that "[i]n the event of any inconsistency, conflict or ambiguity between or among the Contract Documents, the more stringent provision of this Agreement will apply as it relates to Subcontractor's scope of Work, determined by a standard of good faith and reasonableness." (Article 1.4.2).

200.    JH Kelly has breached this covenant by interfering with AECOM's efforts to manage and timely complete the Project; by interfering with AECOM's relationship with PG&E; by failing to perform all contractual obligations necessary for AECOM to meet its obligations to PG&E; by failing to timely address and respond to request for complete documentation; by failing to negotiate in good faith or provide full documentation to AECOM on pending claims or change orders; by improperly asserting that AECOM failed to meet its obligations under the EPC Agreement or Subcontract; by inaccurately asserting that AECOM caused it to incur costs that were actually the product of acts or omissions of PG&E, all in an effort to improperly blame AECOM and/or avoid the contractual dispute resolution process; and by pursuing duplicitous litigation and claim splitting in order to avoid the contractual dispute resolution process.

201.   As a result of JH Kelly's breaches of its express covenants of good faith and fair dealing, AECOM has incurred damages in an amount to be proven at trial.

**TWELFTH CAUSE OF ACTION**

**(BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**AGAINST COUNTER-DEFENDANT JH KELLY)**

202.   AECOM incorporates the allegations of paragraphs 1-201 as if fully stated herein.

203.   In addition to the foregoing express covenants of good faith and fair dealing contained in the Subcontract, the obligation of good faith and fair dealing is also implied in the Subcontract.

204.   JH Kelly has breached this covenant by interfering with AECOM's efforts to manage and timely complete the Project; by interfering with AECOM's relationship with PG&E; by failing to perform all contract obligations necessary for AECOM to meet its obligations to PG&E; by failing to timely address and respond to issues; by failing to negotiate in good faith with AECOM on pending claims or change orders construction; by improperly asserting that AECOM failed to meet its obligations under the EPC Agreement or Subcontract; by inaccurately asserting that AECOM caused it to incur costs that were actually the product of acts or omissions of PG&E in an effort to improperly blame AECOM and/or avoid the contractual dispute resolution process; and by pursuing duplicitous litigation and claim splitting in order to avoid the contractual dispute resolution process.

205.   As a result of JH Kelly's breaches of the implied covenant of good faith and fair dealing, AECOM has incurred damages in an amount to be proven at trial.


**THIRTEENTH CAUSE OF ACTION**

**(EXPRESS INDEMNITY AGAINST COUNTER-DEFENDANT JH KELLY)**

206.   AECOM incorporates the allegations of paragraphs 1-205 as if fully stated herein. PG&E alleges in its Counterclaim that it has incurred damages as a result of certain failures in the construction of the Project.  PG&E's Counterclaim, for purposes of allegations only, is incorporated hereby by this reference as though fully set forth herein.  AECOM denies any wrongdoing or fault for the claims being made by PG&E in its Counterclaim.

SECOND AMENDED COUNTERCLAIM OF AECOM TECHNICAL SERVICES, INC.

207.    Pursuant to Article 11.4.1 of the Subcontract, JH Kelly agreed to "indemnify, hold harmless and defend [PG&E], [AECOM] . . . from and against any and all causes of action demands, claims, losses, damages, and liabilities whatsoever, including attorneys' fees and expenses, including but not limited to, claims for . . . property damage or destruction resulting from the acts, errors or omissions of [JH Kelly], Sub-Subcontractors, anyone employed directly or indirectly by any of them or anyone for whose acts any of them may be liable."

208.    PG&E has withheld payments from AECOM and has alleged additional costs related to the valve strike and for other incomplete, deficient or defective work performed by JH Kelly, including but not limited to allegedly leaving significant construction debris in the gas pipelines thereby damaging valves causing them to leak.  PG&E also has refused to pay AECOM any further amounts owed under the EPC Agreement and has stated that the non-payment is in part due to JH Kelly's overstated and/or unlawful Claim of Lien and incomplete and/or defective work (including, but not limited to, missing protective coatings on gas pipe, incomplete paint and demolition scope, water leaks, and defective pavement).

209.    As a result of JH Kelly's negligent acts, errors and omissions, AECOM has incurred damages and continues to incur damage to which it is entitled to be indemnified, defended and held harmless by JH Kelly.

210.    AECOM has put Counter-Defendant JH Kelly on notice of its obligations to defend and indemnify AECOM from and against all claims asserted by PG&E.

211.    Counter-Defendant JH Kelly has refused to defend and indemnify AECOM. Although AECOM has previously tendered these claims to Counter-Defendant JH Kelly, by the filing of this amended Counterclaim and service on Counter-Defendant JH Kelly, AECOM further notifies said JH Kelly of its tender of defense and indemnity in this action.

212.    Counter-Defendant JH Kelly has breached the Subcontract by failing to defend and indemnify AECOM.

213.    As a direct and proximate result of the breaches identified herein, AECOM has incurred and will continue to incur costs, attorneys' fees and other damages related to the claims of PG&E, which are the responsibility of JH Kelly.  AECOM has been damaged in an amount not yet

fully ascertained, subject to proof at the time of trial, together with interest thereon at the legal rate. AECOM hereby seeks leave to set forth the full amount of said damages at the conclusion of the trial in this matter.

## FOURTEENTH CAUSE OF ACTION

### (EQUITABLE INDEMNITY AGAINST COUNTER-DEFENDANT JH KELLY)

214. AECOM incorporates the allegations of paragraphs 1-213, as if fully stated herein. PG&E's Counterclaim, for purposes of allegations only, is incorporated hereby by this reference as though fully set forth herein. AECOM denies any wrongdoing or fault for the claims being made by PG&E in its Counterclaim.

215. PG&E has withheld payments to AECOM and has alleged additional costs related to the valve strike and for other incomplete, deficient or defective work as more fully described in this Counterclaim as well as PG&E's Counterclaim. PG&E also has refused to pay AECOM any further amounts owed under the EPC Agreement and has stated that the non-payment is in part due to JH Kelly's overstated and/or unlawful Claim of Lien and incomplete and/or defective work (including, but not limited to, missing protective coatings on gas pipe, incomplete paint and demolition scopes, water leaks, and defective pavement). PG&E's non-payment and withholdings due to failures of JH Kelly to meet its obligations under the Subcontract have caused damage to AECOM, and JH Kelly is responsible to compensate AECOM for the same to the extent that such amounts are not specifically covered by JH Kelly's express indemnity obligations.

## FIFTEENTH CAUSE OF ACTION

### (DECLARATORY JUDGMENT AGAINST COUNTER-DEFENDANT JH KELLY)

216. AECOM incorporates the allegations of paragraphs 1-215 as if fully stated herein.

217. JH Kelly has a duty and a contractual obligation to cooperate with AECOM in the presentation and prosecution of claims that relate to the acts and omissions of PG&E, and must indemnify AECOM for any damages that are offset, withheld or awarded to PG&E for the valve strike and for JH Kelly's incomplete, deficient or defective work as more fully described in this Counterclaim and PG&E's Counterclaim.

218. AECOM seeks a declaration of its rights under the written subcontract with JH Kelly under California Code of Civ. Pro. 1060 that JH Kelly must comply with its contractual obligations under the Subcontract and cooperate with AECOM in the presentation and prosecution of its claims that relate to the acts and omissions of PG&E before it can proceed with any judicial action to recover damages for those claims against AECOM, as such cooperation is an express condition precedent and mandatory contractual obligation that must be exhausted before the accrual of JH Kelly's right of recovery for claims that relate to the acts and omissions of PG&E.

219. AECOM also seeks a declaration that JH Kelly's entitlement to compensation for its claims that relate to the acts and omissions of PG&E, and the amount of such compensation, will be established by a full and final determination of the amount AECOM is entitled to obtain from PG&E for such owner-related claims, as set forth in paragraph 13.3.2 of the Subcontract.

220. Further, AECOM seeks a declaration by this Court that JH Kelly must indemnify AECOM, for any damages that are offset, withheld or awarded to PG&E for the valve strike damage caused by JH Kelly's supplier, damage caused by improperly installed water pipe and damage caused by deficient installation of asphalt.

### SIXTEENTH CAUSE OF ACTION

### (CONTRIBUTION/APPORTIONMENT AGAINST ALL COUNTER-DEFENDANTS)

221. AECOM incorporates the allegations of paragraphs 1-220 as if fully stated herein.

222. AECOM alleges that it was and is in no way negligent or responsible for acts, injuries or damages alleged in JH Kelly's FAC or the claims asserted in PG&E's Counterclaim. However, if as a result of the matters alleged in JH Kelly's FAC or PG&E's Counterclaim, AECOM is held liable for all or part of the claims asserted, then Counter-Defendants, and each of them, are obligated to reimburse AECOM and will be liable to AECOM for all or any liability, as determined by the Court.

223. Therefore, AECOM alleges that it may be necessary that a comparative degree of negligence and/or fault or other culpable conduct of Counter-Defendants and each of them be determined and prorated so that AECOM will not be required to pay more than its proportionate share, if any, of the damages, or awards recovered by JH Kelly and/or PG&E, and to pay only

according to the degree of negligence or fault, if any, attributed to AECOM, pursuant to the principles of equitable indemnification, contribution and comparative fault.

## **RESERVATION OF RIGHTS**

224.   AECOM specifically reserves its right to amend this Counterclaim, as of right or with leave of Court, for the purpose of amending the allegations contained herein and/or asserting additional facts and causes of action as appropriate.

## **RELIEF REQUESTED**

WHEREFORE, AECOM prays for the following relief:

1.   For an award of damages in an amount to be proven at trial;

2.   For interest at the prevailing legal rate;

3.   For statutory penalty interest at a rate of 2% per month;

4.   For punitive damages;

5.   For attorneys' fees and costs as allowed by contract, statute, at law or in equity; and

6.   For all such other relief as the Court may deem just and proper.

DATED:  July 19, 2021

**TROUTMAN PEPPER HAMILTON SANDERS LLP**

By:___*/s/ William Taylor*___
Marion T. Hack
Luke N. Eaton
William Taylor

# DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Defendant and Counterclaimant AECOM Technical Services, Inc. hereby demands a trial by jury of all issues so triable on its Counterclaim in this matter.

DATED:  July 19, 2021

TROUTMAN PEPPER HAMILTON
SANDERS LLP


By:___/s/ William Taylor___
        Marion T. Hack
        Luke N. Eaton
        William Taylor

# EXHIBIT 1



# Contract (Long Form)

This is a Contract between the below named Contractor ("Contractor"), a California corporation, and Pacific Gas and Electric Company ("PG&E"), a California corporation with its headquarters located at 77 Beale Street, San Francisco, California 94105.

| | | | |
|---|---|---|---|
| **Contractor's Legal Name:** | AECOM Technical Services Inc. | **PG&E Contract No. 2501335149** | |
| **Contractor's Address:** | 515 S. Flower St. 4th Floor Ste. 1050<br>Los Angeles, CA 90071-2201 | **This Contract consists of 1935 pages.** | |

| | |
|---|---|
| **Project Name:** | Burney K2 Replacement Project |
| **Job Location:** | Burney Compressor Station, California |

**WORK**: Contractor shall, at its own risk and expense, perform the Work described in this Contract and furnish all labor, equipment, and materials necessary to complete the Work as summarized below and as more fully described in Attachment 1, Project Specific Information. Contractor shall perform all engineering procurement and construction services to complete the Burney K2 Replacement project.

**ATTACHMENTS:** Each of the following documents is attached to this Contract and incorporated herein by this reference:

See Page 3 for the listing of the Attachments and Exhibits to this Contract.

| | |
|---|---|
| **CONTRACT TERM:** | This Contract is effective upon signature by both parties and expires on 12/31/2017. |
| **COMPLETION:** | Contractor shall commence performance hereof when directed to do so by PG&E. Work shall be completed by the completion date of 12/31/2017. Time is of the essence. |
| **INSURANCE:** | Contractor shall maintain insurance in accordance with Article 7 of the General Conditions. |
| **TERMS OF PAYMENT:** | In accordance with Section Article 4 of the General Conditions. |

**CONSIDERATION:** As full consideration for satisfactory performance of the Work by Contractor, PG&E's total obligation to Contractor shall not exceed the following amount. This amount is inclusive of all taxes incurred in the performance of the Work. Any change to this amount shall only be authorized in writing by a PG&E Contract Change Order, fully executed by both PG&E and Contractor.

**TOTAL:** $40,510,262.00 @ Lump Sum Pricing

THE PARTIES, BY SIGNATURE OF THEIR AUTHORIZED REPRESENTATIVES, HEREBY AGREE TO THE TERMS OF THIS CONTRACT.

| PACIFIC GAS AND ELECTRIC COMPANY | | CONTRACTOR: AECOM Technical Services Inc. | |
|---|---|---|---|
| **Signature** | | **Signature** | |
| **Name** | Gun Shim | **Name** | Robert K. Turley |
| **Title** | Vice President, Supply Chain | **Title** | Vice President |
| **Date** | 2/11/2016 | **Date** | 2/8/16 |



| ADMINISTRATION | | | | |
|---|---|---|---|---|
| PG&E Negotiator | Francis Del Rosario | | Contractor Representative | |
| Phone | 925-328-5051 | | Phone | |
| Email | fpd3@pge.com | | Email | |
| Accounting Reference | s/c 1002685122 / Order# 30603707 | | | |
| PG&E Work Supervisor: | Mel Wong | | Phone: 510-541-2196 | |
| INVOICE INSTRUCTIONS: Contractor shall send invoices for each payment when due, showing the Contract number, to: PACIFIC GAS AND ELECTRIC COMPANY | Send ORIGINAL Invoice to: (See note below if using PG&E's electronic invoicing system) | | PG&E Accounts Payable* PO Box 7760 San Francisco, CA 94120-7760 | |
| | Send COPY of Invoice to: | | GTInvoicing@pge.com | |
| | For information regarding invoice status, call PG&E's Paid Help Line at (800) 756-PAID (7243) or go to AP Web Reporting site at www.pge.com/actpay. *Note: Contractors using PG&E's electronic invoicing system do not need to mail a copy of the invoice to PG&E Accounts Payable. | | | |

| INTERNAL PG&E USE ONLY | | |
|---|---|---|
| Distribution Date | | |
| Distribution of Copies | ☐ Document Services (Signed Original Copy) Mail Code N5D 245 MARKET ST., SAN FRANCISCO | ☒ Contractor (Signed Original Copy) |
| | ☒ Work Supervisor Mel Wong | ☐ Manager |
| | ☒ Invoice Approver | ☐ Supervisor |
| | ☐ V.P. | ☒ Sourcing/ Purchasing |
| | ☐ Director | ☐ Law |


## EXHIBITS & ATTACHMENTS

**Each of the following documents is attached to this CWA and incorporated herein by reference:**

Attachment 1: Project Specific Information, Pages 1 through 1829
Attachment 2: General Conditions, Pages 1 through 48
Attachment 3: Specific Conditions, Pages 1 through 22
Attachment 4: Pricing Workbook, Pages 1 of 1
Attachment 5: Material Traceability, Pages 1 through 20
Attachment 6: Risk Register, Pages 1 of 1
Attachment 7: Boulder Pricing, Pages 1 of 1
Attachment 8: Billing Schedule, Pages 1 of 1
Attachment 9: Organization Chart, Pages 1 of 1
Attachment 10: Questions and Clarifications Set, Pages 1 though 6
Attachment 11: Demo Pricing, Pages 1 through 2



01-5873 (Rev 06/14)
Sourcing

Page 1 of 2

**Pacific Gas and Electric Company**

### List of Subcontractors and Disbursement Record

**EXHIBIT 1-A**

| | |
|---|---|
| Prime Contractor/Supplier: AECOM Technical Services, Inc. | Name of Preparer: Steve Petto |
| PG&E Contract Number (if any): 2501335149 | Telephone: (510) 874-1731 |
| PG&E Project/Product: Burney K2 Replacement Project | E-Mail: steven.petto@aecom.com |
| Contract Duration (Year): From: Feb 2016 To: Dec 2017 | Total Bid Value . Same as (9) below: $40,510,262 |

| Name of Subcontractor (1) | WMDVBE/LGBTBE Status Code* (2) | V** (3) | NV* ** (4) | Address (5) | Description of Work (6) | Estimated Amount to be Paid to Subcontractors (7) |
|---|---|---|---|---|---|---|
| BECI Electrical Inc. | WBE | V | | 8137 Capwell Dr., Oakland, CA 94621 | Procurement Agent | $14,394,864 |
| CM Distributor Inc. | WBE | V | | 118 S. Hale Ave., Escondido, CA 92029 | Valve Supplier | $857,493 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

\* Refer to Instructions/Codes/Definitions on page 2.
\*\* V = Subcontractor is a verified WMDVBE or LGBTBE
\*\*\* NV = Subcontractor is <u>not</u> a verified WMDVBE or LGBTBE

**Certification Agencies:**

WMBE: **CPUC Clearinghouse : DVBE:**
Department of General Services LGBT:
National Gay and Lesbian Chamber of
Commerce (NGLCC)

| | | |
|---|---|---|
| (8) | Estimated Total Amount to be Paid to All Verified WMDVBE and LGBTBE Subcontractor(s): | $15,252,357 |
| (9) | Total Bid Value: | $40,510,262 |
| (10) | Estimated Percentage to be Paid to All Verified WMDVBE and LGBTBE Subcontractor(s) (8÷9): | 37.6% |

Signature: _Steve R. Petto_ / Date 2/5/16

I hereby verify that the listed information is true and accurate to the best of my knowledge.

The successful bidder(s) will be expected to register and report all monthly subcontracting spending with verified WMDVBE and LGBTBE subcontractors for the duration of the contract at: https://cvmas10.cvmsolutions.com/pge/default.asp

## EXHIBIT 4

### INJURY AND ILLNESS PREVENTION PROGRAM

Contractor acknowledges that it has an effective Injury and Illness Prevention Program which meets the requirements of all applicable laws and regulations, including but not limited to Section 6401.7 of the California Labor Code. Contractor ensures that any Subcontractor hired by Contractor to perform any portion of the Work under this Contract shall also have an effective Injury and Illness Prevention Program. This Compliance Certificate shall be executed by the person with the authority and responsibility for implementing and administering such Injury and Illness and Prevention Program.

### Injury and Illness Prevention Program Compliance Certificate

The undersigned, the _____Project Manager_____ of
                              (title/position)

___AECOM Technical Services, Inc._____ (Contractor), hereby certifies to PG&E as follows:
         (name of Contractor)

1.  That Contractor has an effective Injury and Illness Prevention Program which meets the requirements of all applicable laws and regulations, including but not limited to Section 6401.7 of the California Labor Code and that any Subcontractor hired by Contractor to perform any portion of the Work under this Contract has an effective Injury and Illness Prevention Program; and

2.  That he or she is the person with the authority and responsibility for implementing and administering Contractor's Injury and Illness Prevention Program.

IN WITNESS WHEREOF, the undersigned has executed this Compliance Certificate on                     .

_____
                Signature

_____
         Steven R. Petto
              Print Name

### PACIFIC GAS AND ELECTRIC COMPANY
### NONDISCLOSURE AND USE OF INFORMATION AGREEMENT

THIS AGREEMENT is by and between ___AECOM Technical Services, Inc.___ ("Company"), ___Steven R. Petto___ ("Undersigned"), the authorized employee of Company (together, Company and Undersigned are referred to as the "Receiving Party"), and PACIFIC GAS AND ELECTRIC COMPANY ("PG&E") on the date set forth below.

Undersigned and Company agree as
follows:

1.      The Receiving Party acknowledges that in the course of the Burney K2 Replacement Project, the Receiving Party will be given access to technical information and materials including, but not limited to, original design and construction drawings and documents in electronic and/or hard-copy format_____, which are owned by PG&E, its parent company, subsidiaries, or affiliates, and/or owned by third parties and in the possession of or licensed to PG&E, and which constitute valuable, confidential and proprietary information, know-how, and trade secrets, belonging to PG&E, its parent company, subsidiaries, or affiliates and/or third parties (hereinafter referred to as "Proprietary Information").

2.      In consideration of being made privy to such Proprietary Information, and of the contracting for the Receiving Party's professional services by PG&E, the Receiving Party hereby agrees to hold the same in strict confidence, and not to disclose it, or otherwise make it available, to any person or third party, including but not limited to any affiliate of PG&E that produces energy or energy-related products or services, without the prior written consent of PG&E. The Receiving Party agrees that all such Proprietary Information:

(a)      shall be used only for the purpose of performing the required engineering design activities prerequisite to procuring equipment and materials and developing an Issued For Construction drawing and specifications package for the construction of the new project facilities; and

(b)      shall not be reproduced, copied, in whole or in part, except as specifically authorized and in conformance with PG&E's instructions when necessary for the purposes set forth in (a) above; and

(c)      shall, together with any copies, reproductions or other records thereof, in any form, and all information and materials developed by the Receiving Party therefrom, be returned to PG&E when no longer needed for the performance of Receiving Party's services for PG&E.

3.      The Receiving Party hereby agrees that any third parties owning any Proprietary Information are express third party beneficiaries of this Agreement.

4.      The Receiving Party hereby agrees that for any violation of any provision of this Agreement, a restraining order and/or injunction may be issued against the Receiving Party in addition to any other remedy PG&E may have at law.

5.      This Agreement shall be governed by and interpreted in accordance with the laws of The State of California.

UNDERSIGNED:                                        COMPANY

_Steven R. Petto_                                    AECOM Technical Services, Inc.
_____                       _____
Signature                                           Company Name
        Steven R. Petto                             _____
_____                       Signature of Authorized Agent of Company
Name                                                        Robert K. Turley
        Project Manager                             _____
_____                       Name
Title                                                       Vice President
        AECOM Technical Services, Inc.              _____
_____                       Title
Company                                                     February 5, 2016
        February 5, 2016                            _____
_____                       Date
Date

**EXHIBIT 2**



**Burney K2 Gas Turbine Replacement Project**
**Project order number:  30603707**
# WORK SCOPE DOCUMENT
Issue Date:  7/29/15

## Project Summary

PG&E is initiating the Burney K2 Gas Turbine Replacement project to replace the existing Burney K2 unit with a new unit.  This project will increase system reliability by eliminating an obsolete and failure-prone unit.

The Burney Compressor Station is the second compressor station along the Redwood Gas Transmission Path, which supports Line 400/401 gas main transmission.  The equipment is used to compress (increase gas pressure) natural gas to allow continuous uninterrupted flow on our backbone transmission pipeline.

The reliability of Line 400/401 is critical to maintaining required gas flow to PG&E's Redwood Path customers.  The problem with the current unit includes potential fire, lack of manufacture/ vendor support, and maintenance parts.  The need for a major overhaul or modification is imminent and should be completed prior to potential failure.  Line 400/401 gas flow would have to be modified if the Burney Compressor is lost, potentially impacting customers and increasing the cost of gas in California.


## Work Completed To-Date

1. *30% Design Deliverables:*  In 2014, PG&E engaged Gulf Interstate Engineering to prepare the 30% Design Deliverables package.  These deliverables are included with this RFP in Attachment 17.  The electronic files in their native format will be provided to the successful contractor for further development.

   The 30% Design Deliverables were based on two (2) Solar Taurus 70 compressor units in separate buildings located in an undisturbed area of the existing compressor station site.

   The Scope of Work provided in the next section details the equipment and features of the proposed K2 Replacement Project.  It is the intent of this RFP that a minimum of changes be made to the existing 30% Design Deliverables.  However, subsequent to completion of the 30% package, it was decided to install one (1) Solar Titan 130 unit instead of the two (2) Taurus 70 units.  Also, it was determined that the existing station discharge gas cooler needs to be expanded as described in the next section.

2. *Air Permit to Construct:*  PG&E has obtained the draft Authority to Construct (ATC) and is currently finalizing the permit with the local air district.

   The air permit application was based on two (2) Solar Taurus 70 compressor units in separate buildings located in an undisturbed area of the existing compressor station site.

3. *Gas Turbine Compressor Unit RFP:*  PG&E has issued an RFP for turbine-compressor units to 3 manufacturers.  The RFP included a technical specification and design process conditions.

Burney K2 Gas Turbine replacement Project
Work Scope Document
Issue Date: 7/29/2015

The Turbine-Compressor Unit RFP was based on two equipment configuration options. One option is a single unit that would satisfy all basic design conditions. The other option is a two-unit configuration that would meet the same basic design conditions, plus some additional design conditions.

PG&E has selected a Solar Titan 130 unit.

## Detailed Scope of Work

1.  Engineering Studies

    - Contractor shall hire qualified subcontractors to perform the following studies, subject to approval by PG&E.
        o   Piping Flexibility analysis. This may be performed by the Contractor directly if approved by PG&E in advance.
        o   Noise Study, including pre-construction measurements, noise modeling, recommendations for mitigation techniques, and post-construction noise measurement.
        o   Geotechnical Investigation for the design of building and equipment foundations.

    - Contractor shall participate in the Process Hazards Analysis (PHA) to be conducted by PG&E personnel approximately 2 weeks after completion of the 30% deliverable set. PG&E has an in-house PHA department that will facilitate the session and provide workshop materials in advance.

    - Contractor shall participate in the Pre-Startup Safety Review (PSSR) to be conducted by PG&E personnel. This session will be facilitated by PG&E's in-house PHA department. Workshop materials will be distributed in advance.

2.  Demolition of Existing Unit K-2

    - The demolition of the existing K-2 unit includes but is not limited to, control systems, above and underground piping, conduit and all auxiliary systems. The demolition of the existing building and foundation for K-2 is not in-scope at this time. Contractor shall prepare a cost estimate to retire the existing compressor building and foundation. If PG&E elects to proceed with the demolition, this work will be done under a change order.

    - The K-2 unit that will be replaced is a GE LM-1500 coupled to a Rolls Royce (Cooper Bessemer) RFA 36 centrifugal compressor.

    - No existing K-2 systems shall be reused without the approval of PG&E.

Burney K2 Gas Turbine replacement Project
Work Scope Document
Issue Date: 7/29/2015

3.  New Compressor Unit

- The new BK-1 compressor unit shall be a Solar Titan 130 unit coupled with Solar C752 compressor.  The requirements for this package are included in Attachment 7, the Burney BK-1 Gas Turbine / Centrifugal Compression Package Specifications and Attachment 9, the Burney CS Package Proposal by Solar Turbines.

- Contractor shall install all systems necessary to accomplish the objectives listed herein specific to the new BK-1 turbine/compressor packages.

- Contractor shall be responsible for coordination, interface, delivery, installation, start-up, and commissioning of BK-1.

- Install new unit suction and discharge valves.

- Install new BK-1 hot recycle valve.

- Install new unit piping as necessary to accommodate the new gas compressors.

4.  Station and Unit drawings

- New drawings shall be generated to reflect the new facilities.

- Contractor shall update, obsolete or supersede all existing station drawings to reflect the as-left, post construction condition specific to the scope of this work.

- Contractor shall research all existing drawings maintained by PG&E in electronic format to determine the extent of new and revised drawing requirements.  These drawings are available to all contract employees with a PG&E LanID using ELS/EDMS.

5.  Station and Auxiliary Systems

- Suction Scrubbers/Separation

  o  The existing separators will be evaluated to ensure they will meet the design conditions for the new compressor unit.  Contractor shall perform the necessary calculations and modeling using an in-house Subject Matter Expert or qualified third party.  The manufacturer of the existing equipment shall be consulted.  The deliverable for this effort is a comprehensive report with sufficient data and detail to support a conclusion that the existing equipment is adequate or a recommendation for supplemental capacity or replacement.

  o  Detailed engineering and construction specific to the separation equipment will initially be out of scope.  If Company decides to implement any necessary modifications, this work will be done as a change order.

Burney K2 Gas Turbine replacement Project
Work Scope Document
Issue Date: 7/29/2015

6.  Buildings

- Contractor shall develop new Engineering Specification documents for use in procuring each new building.  These documents shall use the same format as Attachment 7 in order to be used by PG&E for future projects

- BK-1 Compressor Building

   o  The new compressor unit shall be located in a separate, new building with new foundation.  The building will be located south and west of the existing K-2 building (see drawing 489695 in Attachment 7).
   o  Option to the above:  Contractor shall prepare a cost estimate to retire the existing compressor building and foundation and install the new building in the same approximate location.  The cost estimate shall address related issues such as outage duration, costs to minimize outages, benefits of working in an idled facility, etc.  If PG&E elects to proceed with the demolition, this work will be done under a change order.

- Auxiliary Building

   o  A new auxiliary building shall be installed at the southwest corner of the BCS as shown in the plot plan, drawing# 489695, provided in Attachment 7 and layout sketch shown in Attachment 17 (see "Auxiliary Building Sketch").  It shall have a "quiet" office/work space with HVAC, LAN and telephone with storage space for prints and documentation.  Except for the storage space for prints and documentation, no other furniture or fixtures are included in Contractor's proposal price.
   o  A new air compressor system shall be installed in the new auxiliary building.
   o  A new standby generator shall be installed in the new auxiliary building.

- Fuel Gas Building

   o  A new building will be installed to house the fuel gas and domestic gas regulation and filtration equipment.

7.  Air compression facilities:

- New air compression units shall be installed to support all air requirements for the new BK-1 unit.

- Air dryer systems shall be installed to meet all air quality requirements of the BK-1 unit.

- The air compressors shall have adequate capacity and redundancy to allow the removal of one unit from service for maintenance and maintain all station air requirements.  Two (2) 100-percent rated units are to be supplied.

Burney K2 Gas Turbine replacement Project
Work Scope Document
Issue Date: 7/29/2015

- Contractor shall develop new Engineering Specification documents for use in procuring the compressed air system. These documents shall use the same format as Attachment 7 in order to be used by PG&E for future projects.

8. Station Piping

- The station piping will be modeled using commercial software that is compatible with natural gas compressor stations (Contractor to state software trade name in their proposal). It is PG&E's goal to limit the overall station pressure drop to 10 psi. If the station pressure drop is calculated to exceed 10 psi, Contractor will propose and estimate the modifications necessary to achieve this value.

- Design Conditions for station gas flowrates and pressures are included in Attachment 7, compressor unit specifications and Attachment 3, Design Basis Memorandum.

- Detailed engineering and construction specific to the station piping to address pressure drop issues will initially be out of scope. If Company decides to implement the necessary piping modifications, this work will be done as a change order.

- Modify station piping to accommodate the removal of K-2 and installation of new unit BK-1, valves, instrumentation and any other items included within the scope of this specification.

- Evaluate if the existing cold recycle piping system is adequate. Replace as necessary.

9. Gas Coolers

- The existing station gas coolers shall be evaluated by Contractor to determine what the modifications and cost would be required to limit station discharge temperatures to 120 F on Lines 400 and 401 with an ambient temperature of 90F and a flange-flange pressure drop of 2 psi. The existing discharge gas cooler was built in 1969 and has an approximate capacity of 1200 MMScfd (available data will be provided to the successful Contractor).

10. Equipment to be salvaged and made available to PG&E

- PG&E will have the option to retain or sell the following K-2 equipment. Contractor shall include in their proposal line item costs and schedule impacts (for each item) to remove this equipment and place it in a lay-down area within the BCS yard for PG&E to salvage or store.

- LM-1500 gas turbine.

- Gas compressor.

- K-2 lube oil cooler.

Burney K2 Gas Turbine replacement Project
Work Scope Document
Issue Date: 7/29/2015

- If PG&E elects not to salvage any of this equipment, Contractor shall dispose of all equipment.

- Any additional equipment which PG&E wishes to salvage will be considered out of scope and addressed by change order, removed by PG&E personnel or third-party Contractors in advance of Contractor's demolition Work.

## 11. Electrical Facilities

- Contractor shall evaluate and upgrade, if required, any and all electrical system requirements to support all new, modified and existing facilities.

- All station electrical systems are to be evaluated to determine if upgrades are necessary to accomplish the objectives outlined in this Specification. Evaluation shall consider all requirements for the replacement of K-2. This includes but is not limited to the station UPS, DC and AC systems. If upgrades of these systems are necessary, engineering and construction for the upgrades will be considered in the scope of this Specification.

- A new 480V electrical supply will be made available at the station fence line. The exact location where this 480V supply source will enter the plant will be determined by PG&E. Currently it is expected this 480V supply will come from the west side of the plant at the southern half of BCS.

- The 12.47kV/480V transformer and systems will be out of the scope of this specification.

- All existing, new and future station electrical loads shall be supported from the new 480V systems. Provisions for future load will also be included. For estimating and design purposes, see equipment sizing outlined in Attachment 9, the Single Line Diagrams and Electrical Load List from preliminary engineering (Attachment 14).

## 12. Standby Generator

- Contractor shall verify the generator sizing of 750 kW as outlined in Attachment 14 from preliminary engineering. Detailed engineering and construction for the replacement of the standby generator shall be considered in-scope for this specification.

- Contractor shall connect the existing standby generator into the revised station electrical system so that it can support all loads required for operation of the station, including gas cooling.

- Contractor shall develop new Engineering Specification documents for use in procuring the standby generator. These documents shall use the same format as Attachment 7 in order to be used by PG&E for future projects.

Burney K2 Gas Turbine replacement Project
Work Scope Document
Issue Date: 7/29/2015

13. New Station Valves

- Contractor shall be responsible to evaluate and for selection, installation and commissioning of all new station valves.

- Station Cold Recycle and Compression Bypass Valves:

  o Contractor shall replace the existing station cold recycle valve with new valve(s). These shall be adequate to prevent a surge condition of BK-1 when operating separately or together.

  o The cold recycle valve shall also be sized to enable recycle operation to meet operating points outside of the compressor map, as shown in Design Basis Memorandum.

14. Fire Water Suppression System

- Contractor shall install a new fire suppression system for the compressor buildings and pertinent areas of the auxiliary building. Contractor shall either use an in-house Subject Matter Expert to evaluate alternate systems and design the fire suppression system. Contractor shall consult with the equipment manufacturer as well as PG&E to maintain consistency with other PG&E facilities.

- The fire suppression system may include the MCC area of the auxiliary building pending evaluation.

15. Blowdown Silencer

- A new blowdown silencer will be installed to handle the volumes associated with two (2) different systems: station discharge and unit blowdown as shown on the P&ID provided in Attachment 5.

- The blowdown silencer will have two (2) separate connections, one for each service.

- Contractor shall develop new Engineering Specification documents for use in procuring the blowdown silencer. These documents shall use the same format as Attachment 7.

16. Raw Water System

- Replace existing water well and include particulate filters (sock type) and treatment system

17. Instrumentation and Controls

- The station PLC will be replaced. The product to be used will be defined at a later date by PG&E.

Burney K2 Gas Turbine replacement Project
Work Scope Document
Issue Date: 7/29/2015

- All station field devices, transmitters and wiring will be replaced with new equipment.

    o Reference will be identified for Proposed Burney Main Gas Piping and Instrumentation Diagram for number and location of devices and transmitters.

    o Contractor shall be responsible for all Work between and including all field devices and transmitters, wiring, I/O devices and if necessary conduit.

    o For estimating and design purposes, Contractor shall assume all new I/O devices will be located in the control room. PG&E will consider remote I/O devices (not in the control room). PG&E will have final approval for any new I/O device not located in the control room and may request Contractor to install wiring between remote I/O device and control room.

- PG&E will define vendor and model to be used for the I/O device and field devices.

- Replacement of station PLC hardware and wiring between the I/O devices and the station PLC may be performed by PG&E General Construction.

- Software/logic development for the station control system will be performed by PG&E

- Contractor shall be responsible for all drawings and documentation related to the PG&E scope of work. PG&E will provide guidance in the development of this documentation as related to the PG&E scope of work.

- Contractor shall be responsible for updating the station Control Philosophy PG&E will provide guidance and content as related to the PG&E scope of work. PG&E will provide content for the station control functions per PG&E scope.

- PG&E General Construction may be responsible to patch openings in the controls panel.

- Contractor shall finish paint the control and MCC cabinets. The final color shall be specified by PG&E.

- Start-up and commissioning of software/logic for the station control system will be performed jointly by PG&E and Contractor. Contractor shall develop the commissioning and start-up procedures using content and guidance provided by PG&E for the PG&E scope of work.

- Remove existing hard-wired station ESD system in lieu of a software version to reside in the station PLC. New electrical sourced Emergency Shutdown System (ESD) will be compliant with all provisions of G.O. 112E and be consistent with

Burney K2 Gas Turbine replacement Project
Work Scope Document
Issue Date: 7/29/2015

standard PG&E designs.

- PG&E General Construction may be responsible to replace, install patches or blanks over remaining openings in the control panel.

18. Miscellaneous Station Upgrades

- Reconfigure existing security system as necessary to correspond with the relocation of station fencing.

- The existing check meters for Lines 400 and 401 shall be evaluated and possibly replaced. This issue will initially be out of scope. If Company decides to implement the necessary meter upgrades, this work will be done as a change order.

- Replace V-40 Limitorque actuator.

- Replace Brooks-Brodie station pressurizing valve.

- Replace L-400 station suction, discharge, and mainline valves/actuators (V-1, V-2, and MLV-82.33).

- Replace Shafer actuators on MLV-82.34, V-30, and V-2.

- Replace all station ESD push buttons with a style approved by PG&E (to be determined).

- Replace station blowdown valves, V-C and V-P.

- Paint all above ground pipe and buildings.

19. Excluded Items

- Any modifications associated with new District office building located adjacent to Burney Compressor Station.

- Odorant & gas chromatograph equipment and building.

- Sewage system or piping, other than for new auxiliary building.

- Upgrades to existing station security system.

**EXHIBIT 3**


# RFP Clarifications

REQUEST FOR PROPOSAL NO.:
PROJECT NAME: Burney K2 Turbine Replacement Project
BID EVENT COORDINATOR: Francis Del Rosario

| # | Subject | Clarification Requested | Received On | Response | Status |
|---|---------|------------------------|-------------|----------|--------|
| 1 | 3D Piping Model | Is there any requirement for a 3D piping model of the new installation & if so any specific software required for this? If a 3D piping model is required are "spool sheets" (isometric fabrication drawings generated from a 3D model) required? | 8/20/2015 | None at this time, as long as PG&E can view the model without purchased software.  There is no requirement for the drawings listed in the Drafting Guidelines to be created using the 3-D CAD model. | Closed |
| 2 | Drafting Guidelines, CAD Standards | Attachment 12 (PG&E CAD Specifications and Guidelines) list two cad standards in the document, one dated 12/1/07  and another dated May 1 2013. If there are conflicts between the two versions which should apply to the new work for Burney? Will existing drawings need to be updated to both Cad standards? | 8/20/2015 | The two (2) documents are stand-alone.  The Drafting Guidelines document takes precedence.  If the CAD Standards introduce any conflicts, then Contractor shall request clarification from  PG&E for specific issues.  The CAD Standards apply to new drawings only. | Closed |
| 3 | Demolition of existing Compressor Building | Attachment 1 (Work Scope) Section 2. (Demo of Existing Unit) says "demolition of existing building & foundation is not in scope at this time" but also says to prepare a cost estimate for retirement of the building & foundation. Section 6. Buildings, BK-1 Compressor Bldg. says "Contractor to prepare a cost estimate to retire existing compressor building & foundation and install new building in same location". Are these two separate cost estimates to be prepared? For the main proposal do we assume one new building in a new location without showing any demo work for the existing unit on the drawings? | 8/20/2015 | The proposal should be based on one new building in a new location.  Contractor shall not include a cost for demolition of the existing Compressor Building at this time. | Closed |
| 4 | Auxiliary Building Location | Attachment 1 (Work Scope) Section 6 Buildings, Auxiliary Building refers to Attachment 17" layout sketch" & plot plan drawing #48695. There is no attachment 17 in the documents, but there is a copy of the plot plan drawing in attachment 6. Please supply "Attachment 17" & "Auxiliary Building Sketch" this plot plan shows an "Office Building (By Others)" located in the northwest corner of the station while the scope calls out for a new auxiliary building to be located at the "southwest corner of the BCS". Please clarify which is correct? | 8/20/2015 | For this RFP, the version of 489695 in Attachment 6 shall be used as the plot plan.  The Auxiliary Building is labeled "MCC Back-Up Gen & Air Compressor Aux. Building" but is not clouded.  The Auxiliary Building sketch is located in Attachment 14.  Attachment 17 was renumbered as Attachment 14 but not properly updated in Attachment 1. | Closed |
| 5 | Recycle System Evaluation | In Attachment 1, section 8 it calls for an evaluation study for the existing cold recycle valve.  In Section 13 it calls for replacement of the cold recycle valve.  Which is correct?  Section 4.6.8 of Attachment 3 also calls for an evaluation of the valve. | 8/20/2015 | Both statements are correct.  The cold recycle valve will be replaced.  The evaluation study will determine the sizing, specifications, and other features for the valve(s). | Closed |
| 6 | Gas Cooler Pressure Drop | What is the current pressure drop across the existing gas cooler? Also, what is the gas flow rate and inlet temperature at this pressure drop? | 8/20/2015 | Use the following assumptions for this RFP:  delta-P = 20 psi, Q = 2.2  Bcfd, T(in) = 130F.  All assumptions shall be verified as part of the recycle system evaluation. | Closed |
| 7 | ASME codes | Please verify that ASME B31.3 and B31.1 do not need to be used for any gas piping systems. (Ref. section 2.1.3 of Attachment 3) | 8/20/2015 | ASME B31.1 and B31.3 do not apply to gas piping systems. | Closed |
| 8 | Standby Generator | In Attachment 1, section 12, it indicates that the Standby Generator shall be connected into the revised station electrical system.  In Attachment 3, section 3.1.5, the Standby Generator is shown as Demolished/Removed.  Which is correct? | 8/20/2015 | The new 750 kW Standby Generator will be located in the new Auxiliary Building and shall be connected to the revised station electrical system.  The existing 200 kW generator shall be removed. | Closed |
| 9 | Demolition of existing Compressor Building | Attachment 3, section 3.1.5a and section 4.6.10, indicate the compressor building and foundation will be removed.  Attachment 1, section 2 says these items are not in scope.  Which is correct? | 8/20/2015 | Attachment 1 is correct for purposes of the RFP. | Closed |
| 10 | Air Compressor sizing | Attachment 1, section 7, calls for two 100% air compressors. Attachment 3, section 3.1.11 calls for two 50% air compressors. Which is correct? | 8/20/2015 | Two (2) 100% air compressors shall be installed. | Closed |
| 11 | Compressor Unit Flow Measurement | Attachment 3, section 5.2.2, is this ultrasonic meter being used for unit anti-surge control or is the Solar compressor eye being used? | 8/20/2015 | Contractors shall include pricing to install flow measurement and necessary instrumentation and connect to the Solar unit control panel. The impeller inlet eye measurement will be on-skid by Solar.  Refer to Solar's technical proposal, Attachment 8.  The compressor anti-surge system will be defined at the Solar Kickoff Meeting. | Closed |
| 12 | Cathodic Protection | Attachment 3, section 6.4.1, who is responsible to perform the study to determine the proper adjustment settings for the existing rectifiers? | 8/20/2015 | PG&E will determine the cathodic protection system requirements. Contractor shall add information to drawings and BOM and order materials. | Closed |
| 13 | Fuel Gas Heater | The P&IDs do not show a fuel gas heater, is there an existing one that will be used for supplying fuel to the new equipment? | 8/20/2015 | A fuel gas heater will not be required. | Closed |
| 14 | Pricing | Pricing came up in discussion. | 8/26/2015 | Lump Sum not T&M.  Price will be adjusted later by change order if other options are selected. | Closed |
| 15 | New Standby Generator Location | The question was asked where the new emergency generator was to be place. | 8/26/2015 | The new 750 kW Standby Generator will be located in the new Auxiliary Building and shall be connected to the revised station electrical system.  The existing 200 kW generator shall be removed. | Closed |
| 16 | Site Boundaries | Discussed where the new site boundary would be. | 8/26/2015 | For this RFP, the version of 489695 in Attachment 6 shall be used as the plot plan. | Closed |



# RFP Clarifications

REQUEST FOR PROPOSAL NO.:
PROJECT NAME: Burney K2 Turbine Replacement Project
BID EVENT COORDINATOR: Francis Del Rosario

| # | Subject | Clarification Requested | Received On | Response | Status |
|---|---------|-------------------------|-------------|----------|--------|
| 17 | Tree Removal | Who will remove trees and perform grading on the site? | 8/26/2015 | Contractor shall remove trees and perform all grading. Section 6.8 of the Specification states this and Task 13 of the Pricing Work Book requests a price for site clearing and grubbing, as well as grading and leveling. | Closed |
| 18 | Site Geotechnical | Are there any known issues with the site soils? | 8/26/2015 | A geotechnical investigation will be required. The site is known to contain boulders in the soil and fill materials will need to be specified and imported. | Closed |
| 19 | MOB Date | What is the MOB date? | 8/26/2015 | Some work could be done to prepare the site in late 2016 and that the MOB for the major construction would be in March 2017. Refer to Section 4.1 of the Special Conditions which shows the overall schedule. | Closed |
| 20 | Turbo-Compressor Unit Delivery | The dates of the Solar TC were discussed. | 8/26/2015 | The EPC contract will be executed in January 2016 and the EPC contractor shall issue the PO for the TC in February 2016. We have requested TC delivery in February 2017. | Closed |
| 21 | Air Permit | The status of permits was requested. | 8/26/2015 | PG&E has obtained the air permit (Authorization to Construct) for 2x Taurus 70 Solar TCs. There are no expected issues with going to 1x Titan 130 Solar TC. | Closed |
| 22 | Valve Actuator Shelters | The shelter buildings for individual valves was discussed. Do we need shelter buildings for new valves? | 8/26/2015 | All existing shelters that are removed in order to replace valves shall be replaced in-kind. Any new valves with actuators shall receive new shelters. The compressor unit valves will be located in a valve shed adjacent to the compressor building. | Closed |
| 23 | Fire Suppression System | Do we expect a fire suppression system in the new compressor building and in the new auxiliary building? | 8/26/2015 | Yes. The fire suppression system will include both buildings and require prior evaluation with PG&E personnel. See Section 14 of Attachment 1, the Scope of Work. | Closed |
| 24 | Additional Records | Are additional records available beyond what was provided in the RFP and repositories such as ELS/EDMS, DocuTrak, and ECTS? | 8/26/2015 | PG&E has additional records that will be made available to the successful contractor. These include results of recent Condition Assessments (which include labeled photographs) and the Critical Documents review. Guidance and training to locate other files will be provided by PG&E. However, the Contractor will be required to perform all document research. | Closed |
| 25 | Housing/ Lodging | Where is housing available to the contractors personnel? | 8/26/2015 | There are several motels in Burney and there are at least two trailer parks within ten minutes of the site. There are also places to stay in Fall River to the east of Burney. There are also numerous motels in Redding which is an hour's drive away. Lodging is up to the contractor. | Closed |
| 26 | Road Weight Restrictions | Are there any road weight restrictions? | 8/26/2015 | For public highways and roads, Contractor shall verify with CalTrans. Any weight restrictions, padding, etc. within PG&E's property lines will be address on an as-needed basis. | Closed |
| 27 | Suction Separators | Will new suction scrubbers be installed? | 8/26/2015 | Contractor will have to evaluate to see if the scrubbers need to be replaced. | Closed |
| 28 | Valve Actuators | What provides motive force to valves, regulators and controls? | 8/26/2015 | All new and replaced valve actuators will use compressed air. | Closed |
| 29 | Work Hours | What are the work hours? | 8/26/2015 | The contractor should plan on 6 – Ten hour days. See Section 22.6.3 and 22.6.4 of the Specification which states that for the price proposal the Bidders should plan on working 6 ten hour days Monday through Saturday. However the work may be anytime between 6 AM and 6 PM Monday through Saturday. | Closed |
| 30 | Site Security | What perimeter security devices will the contractor have to install? | 8/26/2015 | Contractor shall move, extend or replace in-kind the existing security measures. Refer to Attachment 1, Statement of Work Items 18 and 19. | Closed |
| 31 | Site Security | Does the contractor need to control who comes on site with a guard and/or gate? | 8/26/2015 | See Section 22.4.1 of the Specification that requires the contractor to maintain security and safeguarding of the Work materials, equipment and tools stored on-site. PG&E does not have a specific requirement for a gate guard or site entrance control in the Specification. | Closed |
| 32 | Fire & Gas Detection | Does gas detection and fire suppression share common panels? | 8/26/2015 | Refer to Specification 14.11 and 16.1.16 also Attachment 1, Statement of Work Section 14. Details regarding Gas Detection, Fire Detection, and Fire Suppression will be determined during detailed design. | Closed |
| 33 | Bid Checklist | General Instruction & Provisions Section 3.0 states "Reference the 'Bid Checklist' for a list of all bid documents and when certain documents are due per the schedule on page one of this documents." Nothing labeled 'Bid Checklist' is provided in the RFP. Please provide the 'Bid Checklist'. | 8/28/2015 | Refer to the table on section 3.0. That is the list of all bid documents for this RFP. Bid Checklist is not required for this specific RFP. | Closed |
| 34 | Engineering Completion Date | Article 2, Specific Conditions to Technical Specification 12107, section 4.1, Schedule, states "Engineering Completion October 2016". On the same page in section 4.5, Major Milestones, paragraph 4.5.2 states "Contractor shall achieve Engineering Completion no later than December 1, 2016." Please confirm date Engineering is to be completed. | 8/28/2015 | Engineering shall be complete by October 1, 2016. | Closed |



## RFP Clarifications

REQUEST FOR PROPOSAL NO.:
PROJECT NAME: Burney K2 Turbine Replacement Project
BID EVENT COORDINATOR: Francis Del Rosario

| # | Subject | Clarification Requested | Received On | Response | Status |
|---|---------|-------------------------|-------------|----------|--------|
| 35 | MAOP | Article 4, Project Specific Information, Specification 12107, paragraph 12.10.2 states: "Contractor warrants that the maximum allowable operating pressure (MAOP) of all high pressure gas piping, valves and heat exchangers will be 1200 psig with a design factor "F" of 0.5 or less, as per 49 CFR Part 192." Also, Article 4, Attachment 3, Burney Compressor Preliminary Design Basis, Tables 1 and 7 specify a 1,200 psig design pressure. However, Article 4, Attachment 4, Burney Operating Diagram 284542 rev 10 shows a station MAOP of 1000 psig. Since the remaining existing facilities will still have a design pressure of 1000 psig after project completion it would seem designing the new facilities for 1200 psig would not be advisable. This would result in the facilities being comprised of two different piping material specifications with spec splits between the new and existing piping. Please confirm or clarify the station design pressure and desired MAOP for the station main gas piping. | 8/28/2015 | The station gas piping design pressure will be 1000 psig. | Closed |
| 36 | Fire Suppression System | Article 4, Attachment 3, Design Basis, Section 4.6.6 specifies that the fire suppression medium shall be water, not foam. However, it also states: "reference/go-by - system at Gerber". Gerber has a foam system. Please clarify desired fire suppression medium. | 8/28/2015 | The fire suppression system medium will be water. The reference system will be from Delevan compressor station. | Closed |
| 37 | Standby Generator | Article 4, Attachment 1, page 6 of 9, states: "12. Standby Generator * Contractor shall verify the generator sizing of 750 kW as outlined in Attachment 14 from preliminary engineering." In Attachment 14 on page 63 of 109, the Preliminary Electric Load List states "Use 750 kW [generator]". This analysis was based on the two turbine/compressor configuration. Article 4, Attachment 3, Design Basis, Section 6.5.4 states "New station backup generator (200kW)." Please advise the desired sizing for procurement and installation pricing of the standby generator. | 8/28/2015 | The new 750 kW Standby Generator will be located in the new Auxiliary Building and shall be connected to the revised station electrical system. The existing 200 kW generator shall be removed. | Closed |
| 38 | Missing Attachment 17 | An "Attachment 17" is referred to twice in Attachment 1. The items purported to be included in Attachment 17 are provided elsewhere in the RFP. Please provide Attachment 17 or confirm there is no missing Attachment 17. | 8/28/2015 | Attachment 17 was renumbered as Attachment 14, but not properly updated in Attachment 1. | Closed |
| 39 | Site Prep | What are the site prep requirements in the area south of the existing southern site boundary inside the new site fence line? Does PG&E have detailed topographical data of this area? | 8/28/2015 | Contractor shall perform site prep. PG&E does not currently have detailed topographical data, but will furnish this information to the successful bidder. | Closed |
| 40 | EIR | There is no Environmental Impact Report on the Shasta County website for the Burney K-2 Replacement Project. Was it determined by PG&E that seeking an EIR was unnecessary? Typically Conditions of Compliance in EIRs can affect a project's design requirements and/or the costs of construction. If there is in fact a draft EIR please provide a copy or please comment on the reasoning of why one is not required. | 8/28/2015 | PG&E has determined that an EIR is not required for this project. | Closed |
| 41 | Demolition of existing Compressor Building | There was some discussion during the job walk that Bidders need not provide some of the optional pricing requested in the RFP narrative sections, including an option to demolish the existing Compressor Building Demolition. RFP Article 5, Pricing Workbook, Cost Proposal worksheet, Task 22 - Demolition, 3rd requests Construction pricing for "Remove Existing Building and Foundations". Please confirm whether or not this line item is to include demolition of the Compressor Building and existing foundations within the Compressor Building, or if this line item should be limited to demolition of all other buildings designated for removal in Article 4, Attachment 6, Area Removal - Plan RMVL-SK1 , e.g., the Fuel Gas Building, and/or any other foundations to be removed. | 8/28/2015 | The cost to demolish the existing Compressor Building shall not be included in the Contractors' bids at this time. | Closed |
| 42 | Tree Removal Permit | Article 4, section 18.3 states: "PG&E shall acquire encroachment permits from city, county and state agencies." Removal of the large number of trees to the south of the exiting fence may require a permit. Will PG&E obtain the tree removal permit if required? | 8/28/2015 | Yes. PG&E will obtain the tree removal permit if required. | Closed |
| 43 | HMI Procurement | Article 4, section 18.12 states: "PG&E will be responsible for the station HMI system. This work shall include specifying, purchasing, programming, delivery to Burney, and de-bugging." However, during the job walk PG&E stated something to the effect: "PG&E would not be buying anything." Please confirm PG&E will be procuring the station HMI. | 8/28/2015 | PG&E will procure the Station HMI. | Closed |



# RFP Clarifications

REQUEST FOR PROPOSAL NO.:
PROJECT NAME: Burney K2 Turbine Replacement Project
BID EVENT COORDINATOR: Francis Del Rosario

| # | Subject | Clarification Requested | Received On | Response | Status |
|---|---------|-------------------------|-------------|----------|--------|
| 44 | HMI Procurement | Article 4, section 18.12 states: "PG&E will be responsible for the station HMI system. This work shall include specifying, purchasing, programming, delivery to Burney, and de-bugging." However, during the job walk PG&E stated something to the effect: "PG&E would not be buying anything." Please confirm PG&E will be procuring the station HMI. | 8/28/2015 | PG&E will procure the Station HMI. | Closed |
| 45 | Posting of all Questions | Will all the participants see the Questions? | 8/31/2015 | Yes. All questions and answers will be posted on Power advocate and sent out to all teams. | Closed |
| 46 | Snow | Is the snow gone by March? | 8/31/2015 | Based on recent history, the snow should be gone by March. | Closed |
| 47 | Optional Pricing | Is there Optional Pricing? | 8/31/2015 | No, options shall be considered later. One price for the project. | Closed |
| 48 | Laydown Area | Where will the Construction lay down area be? | 8/31/2015 | One option is south of the new Compressor Building and east of the pig launchers. This will be finalized during detailed design. | Closed |
| 49 | Fuel Gas Bldg. | Will the existing Fuel Gas Building will be demolished? | 8/31/2015 | Yes. | Closed |
| 50 | Bid Date | I know this was asked by another bidder and denied, but we respectfully request a 2 week bid extension to 10-9-15. This is a large project and in order to accurately estimate construction quantities and material costs, we need to re do a portion of the 30% design provided by PGE as a bid basis. | 9/2/2015 | A bid extension is not planned at this time. The RFP was issued 2 weeks before the bid walk, and the bids are not due until 4 weeks after the bid walk. This should be adequate time to prepare proposals. | Pending |
| 51 | Pricing Workbook | Referring to Article 5 Pricing Workbook, the tasks in worksheet "Engineering Fees" do not directly correspond to the tasks in worksheet "Cost Proposal". For example in the "Cost Proposal" worksheet there is no place to account for project management costs. Also, there are no subtotals for Phase 2 Engineering and Procurement. Please advise how to address these differences so all costs can be reflected in the "Cost Proposal". | 9/2/2015 | (1) Please refer to the revised Article 5 Pricing Workbook. We have revised Tasks 1, 3, and 10 to be more consistent with the "Engineering Fees" and provide places for project management. (2) If there are engineering and/or procurement costs during the construction (Phase 2) you can enter those costs in the appropriate column. The cells we identified with "$0" were only intended as a guideline. (3) We revised the spreadsheet to have subtotals for the cost of Phase 1 and Phase 2. (4) We deleted the tabs for contents of 30, 60, 90 and IFC deliverables since that information is duplicated the specification 12107 Section 20. "Note 1" at the bottom of the cost proposal tab provides that reference. | Closed |
| 52 | Machine Excavation | Will machine excavation be allowed once the contractor has done their due diligence in identifying underground obstructions? | 9/2/2015 | See Article 2, "EPC Bid Spec", paragraph 22.7. Contractor shall base their pricing on machine excavation in areas where there are no obstructions. Potholing and other investigations will be done prior to any machine excavation. PG&E's Construction Manager may direct otherwise during construction, at which time a price adjustment will be negotiated. | Closed |
| 53 | Temporary Power | Will PG&E provide a power drop for construction/temporary power? If so, where will it be located? | 9/2/2015 | See Article 2, "EPC Bid Spec", paragraph 22.3.3. PG&E will provide power for Contractor's office trailer only. | Closed |
| 54 | V-40 | There is conflicting scope definition regarding V-40 (gas cooler by-pass valve) in the RFP documents. Is the V-40 actuator to be replaced or is the entire valve/actuator assembly to be replaced? | 9/3/2015 | The Limitorque actuator for V-40 will be replaced, not the valve itself. | Closed |
| 55 | Unit Valve Actuators | There is conflicting information in the RFP regarding the actuator type for the compressor suction and discharge valves. Are they to be Gas Operated or Air operated (100psi)? | 9/3/2015 | Compressed Air. See drawing 3806843 in Attachment 5. | Closed |

**EXHIBIT 4**

PACIFIC GAS AND ELECTRIC COMPANY
GAS TRANSMISSION
SAN RAMON, CALIFORNIA

PROJECT SPECIFIC INFORMATION, SPECIFICATION NUMBER 12107
FOR ENGINEERING, PROCUREMENT AND CONSTRUCTION
FOR BURNEY K2 COMPRESSOR UNIT REPLACEMENT
AT BURNEY COMPRESSOR STATION,
NATURAL GAS TRANSMISSION LINES 400/401, ORDER 30603707

Requirements Comprised of:
- General Conditions and Exhibits
- Specific Conditions to Specification 12107
- This Specification 12107 and Attachments

The following Attachments are provided in CD form, enclosed with this Request for Proposal:

Attachment 1   Scope of Work
Attachment 2   Burney Location Map
Attachment 3   Burney Compressor Preliminary Design Basis
Attachment 4   Proposed Burney Operating Diagram
Attachment 5   Proposed Burney Main Gas P&ID
Attachment 6   Various Proposed Station Plot Plan Drawings
Attachment 7   Gas Turbine Centrifugal Compressor Package Specification
Attachment 8   Burney Gas Compressor Package Proposal Attachment 9
                Single Line Drawings from Preliminary Engineering
Attachment 10   PG&E Safety, OQ, and GSE Guidelines and Requirements
Attachment 11   PG&E Gas Transmission Standards, Specifications, & Procedures
Attachment 12   PG&E CAD Specifications and Guidelines
Attachment 13   Burney Control Philosophy
Attachment 14   Electronic Version of Preliminary Engineering Deliverables
Attachment 15   Wind and Seismic Design Parameters
Attachment 16   PG&E Project Delivery System Forms

BIDDER SIGN HERE TO INDICATE THIS SPECIFICATION HAS BEEN USED IN PREPARATION OF THE BID

Firm: _____ By: (print)_____

Signature: _____

Date: _____ Telephone No.: _____

TABLE OF CONTENTS

| SECTION | SUBJECT | PAGE NO. |
|---|---|---|
| 1 | DEFINITIONS ------------------------------------------------ | PSI-3 |
| 2 | OBJECTIVE -------------------------------------------------- | PSI-4 |
| 3 | SITE INFORMATION------------------------------------------ | PSI-5 |
| 4 | SCOPE OF WORK --------------------------------------------- | PSI-5 |
| 5 | WORK PHASES ----------------------------------------------- | PSI-8 |
| 6 | PROJECT SCHEDULE ----------------------------------------- | PSI-9 |
| 7 | COMMUNICATION ------------------------------------------- | PSI-11 |
| 8 | PROJECT AND CONSTRUCTION MANAGEMENT---- | PSI-15 |
| 9 | UNIFIER DOCUMENT MANAGEMENT------------------ | PSI-17 |
| 10 | QUALITY ASSURANCE AND QUALITY CONTROL - | PSI-17 |
| 11 | TURBINE/COMPRESSOR UNIT ---------------------------- | PSI-20 |
| 12 | PIPING AND MECHANICAL EQUIPMENT -------------- | PSI-21 |
| 13 | ELECTRICAL SYSTEM --------------------------------------- | PSI-24 |
| 14 | CONTROL SYSTEM ------------------------------------------- | PSI-25 |
| 15 | CATHODIC PROTECTION ----------------------------------- | PSI-27 |
| 16 | CIVIL, STRUCTURAL, AND BUILDINGS ---------------- | PSI-27 |
| 17 | PAINTING ---------------------------------------------------- | PSI-29 |
| 18 | PG&E WORK SCOPE ----------------------------------------- | PSI-30 |
| 19 | DESIGN DRAFTING ------------------------------------------ | PSI-31 |
| 20 | PRODUCTION ENGINEERING ------------------------------ | PSI-33 |
| 21 | PROCUREMENT ---------------------------------------------- | PSI-39 |
| 22 | CONSTRUCTION REQUIREMENTS ----------------------- | PSI-40 |
| 23 | CONSTRUCTION SITE SAFETY ---------------------------- | PSI-63 |
| 24 | SITE ENVIRONMENTAL AND HAZMAT ---------------- | PSI-66 |
| 25 | CONSTRUCTION SUBMITTALS --------------------------- | PSI-70 |
| 26 | PG&E CONSTRUCTION WORK ---------------------------- | PSI-73 |
| 27 | DEMOLITION AND REMOVAL ----------------------------- | PSI-74 |
| 28 | COMMISSIONING AND ACCEPTANCE TESTS -------- | PSI-75 |
| 29 | MAINTENANCE ---------------------------------------------- | PSI-78 |
| 30 | TRAINING FOR PG&E ---------------------------------------- | PSI-78 |
| 31 | DOCUMENTATION, MANUALS AND DRAWINGS --- | PSI-82 |
| 32 | CODES AND STANDARDS ---------------------------------- | PSI-88 |

**Pages Intentionally Omitted**

modifications to Burney Compressor Station are needed to maintain reliability meet customer demands.

2.1    PG&E's objective for the Work is to replace natural gas compressor unit Burney K2 and to perform various upgrades to the Burney Compressor Station (BCS) to improve the reliability and operability. The Work also includes demolition of existing equipment and facilities. The modified BCS must be capable of flowing 2.2 billion standard cubic feet per day of natural gas. Compressor Unit K-1 at BCS was previously removed.

2.2    The existing equipment is becoming difficult to maintain and spare parts are becoming unavailable. Failure to replace the Burney K-2 compressor and associated equipment may result in a reduction in the flow capability of Line 400/401.

2.3    Work includes installation, and disposal lifecycle activities that reduce risk by improving safety, performance, and reliability of PG&E gas asset families that include, but are not limited to gas transmission pipelines, compression, measurement, and control.

# 3    SITE INFORMATION

The site information is provided to Contractor for consideration in Contractor's design, scheduling, resource requirements determination, construction, Work coordination, and estimating purposes.

3.1    The Burney Compressor Station is located in Shasta County of Northern California. BCS is approximately 1.5 miles northeast of Burney, California.

3.2    Refer to the Preliminary Design Basis, Attachment 3, used in the Preliminary Engineering phase for the replacement of K-2 for site- specific conditions. Requirements outlined in Attachment 3 shall apply to all aspects of this Work.

# 4    SCOPE OF WORK

4.1    The Work shall include, but not be limited to the Scope of Work (Attachment 1). Contractor shall engineer, procure, construct and commission the replacement compressor or compressors, auxiliary equipment and support facilities to achieve fully operable systems. Except as specifically provided herein, Contractor shall furnish all project management, construction management, engineering, procurement, construction, installation, commissioning, demolition, labor, tools,

parts, equipment, supplies, facilities, and transportation necessary to accomplish PG&E's objective stated above, whether or not each item or component necessary to do so is described herein.

4.2 Engineering Work Completed To-Date:

4.2.1 30% Design Deliverables:  the 30% Design Deliverables package was developed in 2014 by others.  These deliverables are included with this RFP in Attachment 14.  The electronic files in their native format will be provided to the successful contractor for further development.

4.2.1.1 The 30% Design Deliverables were based on two (2) Solar Taurus 70 compressor units in separate buildings located in an undisturbed area of the existing compressor station site.

4.2.1.2 It is the intent of this RFP that a minimum of changes be made to the existing 30% Design Deliverables.  However, subsequent to completion of the 30% package, it was determined the existing station discharge gas cooler needs to be expanded.

4.2.2 Air Permit to Construct:  PG&E has obtained the draft Authority to Construct (ATC) and is currently finalizing the permit with the local air district.

4.2.2.1 The air permit application was based on two (2) Solar Taurus 70 compressor units in separate buildings located in an undisturbed area of the existing compressor station site.

4.2.3 Gas Turbine Compressor Unit RFP:  PG&E has issued an RFP for turbine-compressor units to 3 manufacturers and has selected the units through a formal review process.

4.3 The existing K-2 compressor will be removed and replaced with a new compressor unit tagged BK2.  It is PG&E's plan to continue to use the existing suction separation equipment (subject to further evaluation per this contract) and the existing connection points for Lines L-400 and L-401.

4.4 Additional major equipment to be installed includes; station and unit recycle valves, station controls, unit controls, upgrades to the station electrical systems, associated switchgear, MCC, UPS, Station Battery, Automatic Transfer System, station compressed air system, new auxiliary building, air compressor replacement, standby generator replacement, and a new compressor building. Contractor shall be responsible for coordination, interface, purchase, delivery,

**Pages Intentionally Omitted**

| | | | |
|---|---|---|---|
| **Project Name:** | Click here to enter Project Name | | |
| **Line:** | Line | Milepoints (From – To): | From - To |
| **Meeting Date:** | Date | Project ID (e.g. R#, V#): | Project ID |
| **Start – End Time:** | Start – End Time | Project Order #: | Order # |
| **Meeting Location:** | Location, Room # | Meeting Facilitator/Timekeeper: | Facilitator |
| **Call-in #, if applicable** | Phone #, Meeting Code | Meeting Recorder: | Recorder |
| Required Attendees: | Construction Mgr or GC; Customer Impact; Design Drafting; District Ops and Maint; Engineering Procurement and Const, if applicable; Environmental Field Specialist; Estimator; Government Relations Specialist; Land Planner; Lead Engineer; Project Controls Analyst; Transmission and Reg Supervisor | | |
| Optional Attendees: | PM Supervisor; Lead Engineer Supervisor; Sourcing, Surveyor; System Planning Engineer | | |
| General Purpose of Meeting: | 30% Project Review Meeting freezes the project scope. The meeting confirms milestone deliverables and readiness to progress from the 30% Project Review milestone to the 60% Project Review milestone. | | |

| Agenda Item | Desired Outcome (e.g. Inform, Discuss, Decide) | Lead | Duration (minutes) | Time (Start – End time) |
|---|---|---|---|---|
| **MEETING KICKOFF** <br> Safety, Introductions, Agenda Review & Desired Outcomes, Plus/Deltas from previous meeting, Parking Lot | Inform, Discuss | PM | 15 | Start – End Time |
| **OLD BUSINESS** <br> Review Action Log and deliverables/Open Issues | Inform, Discuss | PM | 5 | Start – End Time |
| **NEW BUSINESS** <br> 1. Present Project Overview <br> • Review Problem Statement <br> • Review Updated Project Execution (PE) Plan <br> • Review Design Basis Memorandum (DBM) <br> • Review P6 Level 2 Milestone Schedule <br> • Review other dependencies (e.g. other projects, resources, seasonal) <br> • Review Project Team Roster, Agency Contacts and other stakeholders | Inform, Discuss | PM or Lead Engineer | 15 | Start – End Time |
| 2. Review Engineering Documents <br> • Present Route Selection Analysis and Selected Route. <br> • Confirm Project Team has agreement on selected route. PM to escalate, as needed. <br> • Review Pothole Plan <br> • Discuss interdisciplinary review components and interdependencies with other projects | Inform, Discuss, Decision | Lead Engineer or EPC, if applicable | 20 | Start – End Time |