1  ERIC A. GRASBERGER (*admitted pro hac vice*)
   eric.grasberger@stoel.com
2  MARIO R. GRASBERGER (SB #273122)
   mario.Grasberger@stoel.com
3  STOEL RIVES LLP
   760 SW Ninth Avenue, Suite 3000
4  Portland, OR  97205
   Telephone:  503.224.3380
5  Facsimile:  503.220.2480

6  EDWARD C. DUCKERS (SB # 242113)
   ed.duckers@stoel.com
7  STOEL RIVES LLP
   Three Embarcadero Center, Suite 1120
8  San Francisco, CA 94111
   Telephone: 415.617.8900
9  Facsimile:  415.617.8907

10 Attorneys for Plaintiff
   *JH Kelly, LLC*

11

12              UNITED STATES DISTRICT COURT

13             NORTHERN DISTRICT OF CALIFORNIA

14                    OAKLAND DIVISION

| | |
|---|---|
| 15  In Re | Case No. 4:20-CV-05381-HSG (Lead Case) |
| 16  PG&E CORPORATION | (Reference withdrawn from Bankruptcy Case No. 19-30088, Adv. Proc. No. 20-03019 and Adv. Proc. No. 19-03008) |
| 17      v. | |
| 18  AECOM TECHNICAL SERVICES, INC. | (Consolidated with Case No. 3:20-cv-08463-EMC) |
| 19 | |
| 20 | **PLAINTIFF JH KLLY, LLC'S DAUBERT MOTION TO EXCLUDE PORTIONS OF EXPERT TESTIMONY AND REPORTS OF TED SCOTT** |
| 21 | |
| 22 | Hearing Date: May 31, 2022<br>Time: 11:00 a.m.<br>Location: Courtroom 2 |
| 23 | |
| 24 | Complaint Filed:  January 25, 2019<br>Trial Date:  June 20, 2022 |
| 25 | |

26

27

28

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................ 5
II. STATEMENT OF FACTS .................................................................................................. 6
   A. Scott's October 18, 2021 Expert Report ................................................................. 6
III. LEGAL STANDARD .......................................................................................................... 7
IV. ARGUMENT ....................................................................................................................... 8
   A. Scott's Analysis Regarding Phase 1/Window II Should be Excluded Because it is Based on Unsupported Assumptions and is Otherwise Irrelevant and Likely to Mislead the Jury. ................................................................................................... 8
      1. Brief Statement of Facts Regarding Phase 1/Window II (35 Days of Delay Attributed to Kelly). ..................................................................................... 8
      2. Argument Regarding Phase 1/Window II. ................................................... 9
   B. Scott's Analysis Regarding Phase 2/Window I Should be Excluded For the Same Primary Reasons as Phase 1/Window II. ................................................................ 13
      1. Brief Statement of Facts Regarding Phase 2/Window I (32 Days of Delay Attributed to Kelly). ................................................................................... 13
      2. Argument Regarding Phase 2/Window I. ................................................... 13
   C. Scott's Analysis Regarding Phase 2/Window II is Based on a Flawed Methodology and Improper Assumptions, and is Otherwise Irrelevant. ............................................. 14
      1. Brief Statement of Facts Regarding Phase 2/Window II (15 Days of Delay Attributed to Kelly). ................................................................................... 14
      2. Argument Regarding Phase 2/Window II. .................................................. 14
   D. The 6-Day Delay Attributed to Kelly In Phase 2/Window III is Supported Primarily by Irrelevant and Prejudicial Events. ...................................................................... 16
      1. Brief Statement of Facts Regarding Phase 2/Window III (6 Days Attributed to Kelly). ...................................................................................................... 16
      2. Argument Regarding Phase 2/Window III .................................................. 16
   E. Scott's Analysis Regarding Phase 2/Window IV Employs a Flawed Methodology and is Based on Assumptions ....................................................................................... 17
      1. Brief Statement of Facts Regarding Phase 2/Window IV ( Days Attributed to Kelly). ...................................................................................................... 17
      2. Argument Regarding Phase 2/Window IV .................................................. 17
V. CONCLUSION ................................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Daubert v. Merrell Dow Pharmaceuticals, Inc. (Daubert)*,
    509 U.S. 579 (1993) .................................................................................................. 5, 6, 8

*HPS Mechanical, Inc. v. JMR Construction Corp.*,
    2014 WL 3845176 (N.D. Cal. 2014) ............................................................................... 8

*In re Live Concert Antitrust Litig.*,
    863 F. Supp. 2d 966 (C.D. Cal. 2012) ............................................................................. 9

*McGlinchy v. Shell Chem. Co.*,
    845 F.2d 802 (9th Cir. 1988) ................................................................................... 10, 15

*Ollier v. Sweetwater Union High School Dist.*,
    768 F.3d 843 (9th Cir. 2014) ................................................................................... 10, 15

*S&S Cummins Corp. v. West Bay Builders, Inc.*,
    159 Cal. App. 4th 765 (2008) .......................................................................................... 8

*U.S. v. Various Slot Machines on Guam*,
    658 F.2d 697 (9th Cir. 1981) ......................................................................................... 10

**Rules**

Fed. R. Evid. 104(a) ................................................................................................................ 9

Fed. R. Evid. 402 .................................................................................................................... 5

Fed. R. Evid. 403 .................................................................................................................... 5

Fed. R. Evid. 702 ........................................................................................................ 5, 6, 8, 9

Fed. R. Evid. 702(b) .............................................................................................................. 10

Fed. R. Evid. 702(b)-(d) .......................................................................................................... 8

Fed. R.  Evid. 702(c) ............................................................................................................. 15

Fed. R. Evid. 702(d) .............................................................................................................. 15

Fed. R. Evid. 703 ................................................................................................................ 6, 8

**Other Authorities**

*Miller & Starr California Real Estate* § 31:72, Westlaw (4th ed. database updated
    Dec. 2021) ........................................................................................................................ 8

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

DAUBERT MOTION TO EXCLUDE PORTIONS
OF EXPERT TESTIMONY OF TED SCOTT      -3-      CASE NO. 4:20-CV-05381-HSG

113818793.7 0034592-00012

# **DAUBERT MOTION**

Plaintiff JH Kelly, LLC ("Kelly") respectfully submits this Daubert Motion ("Motion") to exclude certain expert testimony and portions of the expert witness reports of Defendant AECOM Technical Services, Inc.'s ("AECOM") expert witness Ted Scott.

This Motion is made pursuant to Federal Rules of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc. (Daubert)*, 509 U.S. 579 (1993), and its progeny on the grounds that such evidence is not based on sufficient facts or data, is not the product of reliable principles and methods, and does not reliably apply the relevant principles and methods to the facts of the case. This Motion is also made pursuant to Federal Rules of Evidence 402 and 403, on the grounds that such evidence is irrelevant, will waste time, will confuse the issues, and is prejudicial.

This Motion is based on the accompanying Memorandum of Points and Authorities, the Declaration of Eric A. Grasberger, the records on file in this action, and any further matters presented at the hearing on this Motion.

DATED: April 14, 2022                    STOEL RIVES LLP

By: */s/ Edward C. Duckers*
ERIC A. GRASBERGER (*admitted pro hac vice*)
EDWARD C. DUCKERS (SB # 242113)
MARIO R. NICHOLAS (SB #273122)

Attorneys for Plaintiff
*JH Kelly, LLC*

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Pursuant to Rules 702 and 703 of the Federal Rules of Evidence and *Daubert v. Merrill Dow Pharmaceuticals, Inc.* (*Daubert*), 509 U.S. 579 (1993), Plaintiff JH Kelly, LLC ("Kelly") moves to exclude the following portions of AECOM's construction delay expert witness Ted Scott's ("Scott") testimony and Expert Reports[1]:

- Scott's opinion and analysis relating to Phase 1/Window II of his Report attributing a 35-day delay to Kelly due to Kelly's alleged failure to catch a design conflict created by AECOM;
- Scott's opinion and analysis in Phase 2/Window I of his Report attributing a 32-day delay to Kelly due to Kelly's alleged failure to catch a design conflict created by AECOM (the same issue addressed above in Phase 1/Window II);
- Scott's opinion and analysis in Phase 2/Window II of his Report attributing a 15-day delay to Kelly due to Kelly's alleged slower than planned progress installing the underground conduit underneath the Auxiliary Building;
- Scott's opinion and analysis in Phase 2/Window III of his Report attributing a 6-day delay to Kelly due to damage to a 4" gas line; and
- Scott's opinion and analysis in Phase 2/Window IV of his Report attributing an 8-day delay to Kelly due to Kelly's alleged slower than planned progress pulling wire and performing terminations.

Scott's opinions regarding the above issues should be excluded because they are based on improper and unreliable reasoning, including unsupported assumptions, flawed methodology, and material that is otherwise more prejudicial than probative and is likely to mislead a jury.

The majority of the delay days attributed to Kelly (67 days) are based on the unsupported assumption that Kelly is 100% at fault for an electrical engineering conflict—the need to reroute a duct bank around the existing utility. Not only is Scott unqualified to opine on this electrical

---

[1] "Expert Reports" includes both Scott's October 18, 2021 Report on Delay ("Report") and his November 16, 2021 Reply Report on Delay.

engineering issue, but the only expert qualified to do so, Steven R. Lewis ("Lewis"), did not allocate fault between Kelly and Pacific Gas and Electric Company ("PG&E"). The delay attributed to Kelly is also unsupported because Scott assumes, without providing any evidence, that AECOM was working on redesigning around the electrical issue for the entire time periods referenced. Finally, Scott's opinion is irrelevant because he agrees with Lewis that PG&E made the ultimate decision to re-route the duct bank at issue. Thus, Scott's opinion and analysis should be excluded, as they are based on unsupported assumptions and are irrelevant.

Further, Scott's opinion attributing 15 days of delay to Kelly for Kelly's allegedly slower than planned progress installing the underground conduit underneath the Auxiliary Building is based on a flawed methodology, as Scott uses an incorrect and substantially higher amount of conduit for his calculation. This led to Scott calculating an erroneously high Kelly planned productivity rate, which ultimately resulted in Scott's incorrect conclusion holding Kelly responsible for the delay. In addition, Scott's opinion is irrelevant because he concludes by stating that it is "unclear what caused the delay."

Moreover, Scott's opinion relating to non-valve strike safety events should be excluded because its only purpose is to suggest that Kelly is an unsafe contractor, which has no bearing on the delay at issue. As such, Scott's opinion is irrelevant and highly prejudicial to Kelly and should be excluded.

Finally, Scott's opinion that Kelly is responsible for an 8-day delay relating to wire pulling should be excluded because Scott's methodology is flawed and based on assumptions. Scott admits that the delay may be due to PG&E's preferential changes and that he did not have the records available to him to determine how much time should be allocated to PG&E.

Accordingly, these portions of Scott's testimony and report should be excluded.

## II.   STATEMENT OF FACTS

### A.   Scott's October 18, 2021 Expert Report.

AECOM retained Scott as an expert witness to opine on the construction delays in this construction dispute. *See* Declaration of Eric A. Grasberger in Support of Daubert Motion to Exclude Expert Testimony of Ted Scott ("Grasberger Decl."), Ex. 1 at Appendix A. On October

18, 2021, Scott produced his expert report. *Id*. The report is organized into three "Phases"—engineering, construction, and commissioning. *Id*. at 4, 9, 12. Phase 1 (engineering) includes two "Windows"; Phase 2 (construction) includes four "Windows"; and Phase 3 (commissioning) includes eight "Windows." *Id*. at 7, 10, 14. For each Window, Scott defines the "critical path" time period at issue and attempts to allocate days of delay to the critical path among PG&E, AECOM and Kelly.[2] Scott's total allocation of days of delay for the entire project is 425 days of delay to PG&E, 40 days of delay to AECOM and its separate third-party subcontractors, and 105 days of delay to Kelly. *Id*. at 14.

While Kelly intends to challenge the entirety of Scott's allocation of 105 days of delay to Kelly at trial, this Motion seeks to exclude only the following allocations of delay to Kelly: (1) 35 days of delay in Phase 1/Window II; (2) 32 days of delay in Phase 2/Window I; (3) 15 days of delay in Phase 2/Window II; (4) 6 days of delay in Phase 2/Window III; and (5) 8 days of delay in Phase 2/Window IV. The facts supporting the Phases/Windows at issue are discussed in detail in Section IV, below.

### III.     LEGAL STANDARD

Under Federal Rule of Evidence 702, the court acts as the gatekeeper to ensure that proposed expert testimony "is not only relevant, but reliable" and that it "is sufficiently tied to the facts of the case [such] that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 595. Federal Rule of Evidence 702 allows an expert witness to testify as to their opinion if: (1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702(b)-(d). Federal Rule of Evidence 703 allows an expert to base an opinion on facts in a case that the expert has been made aware of or personally observed. Fed. R. Evid. 703. However, for the expert to rely on facts that would otherwise be inadmissible, it

---

[2] "Critical path" is a term of art in construction law and means the longest path of work activities on a project that must be accomplished in order to complete the project. *See* 9 *Miller & Starr California Real Estate* § 31:72, Westlaw (4th ed. database updated Dec. 2021); *see also S&S Cummins Corp. v. West Bay Builders, Inc.*, 159 Cal. App. 4th 765, 772 (2008); *see also HPS Mechanical, Inc. v. JMR Construction Corp.*, 2014 WL 3845176, at *27 (N.D. Cal. 2014).

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

DAUBERT MOTION TO EXCLUDE PORTIONS
OF EXPERT TESTIMONY OF TED SCOTT                -7-                CASE NO. 4:20-CV-05381-HSG

113818793.7 0034592-00012

must be established that experts in that particular field would reasonably rely on those kinds of facts. *Id*. "The admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent [of the expert testimony] has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 971 (C.D. Cal. 2012) (quoting Fed. R. Evid. 702, Notes of Advisory Committee on 2000 amendments (internal quotation marks deleted)).

IV.  **ARGUMENT**

    A.  **Scott's Analysis Regarding Phase 1/Window II Should be Excluded Because it is Based on Unsupported Assumptions and is Otherwise Irrelevant and Likely to Mislead the Jury.**

        1.  **Brief Statement of Facts Regarding Phase 1/Window II (35 Days of Delay Attributed to Kelly).**

In Phase 1/Window II, Scott addresses an alleged 70-day delay to the critical path (from February 24, 2017 to May 5, 2017) as a result of the delayed issuance of the "IFC" (Issued for Construction) drawings. Grasberger Decl., Ex. 1 at 6. Scott opines that this 70-day delay is the result of "[1] PG&E's preferential design changes as well as [2] the need to reroute the duct bank around the existing utility conflict." *Id*. Scott attributes 100% of issue 1, "PG&E's preferential design changes," to PG&E, and 100% of issue 2, the "utility conflict," to Kelly. *See id*. at 6, 55. Scott then equally splits, without any analysis to support the reasonableness of an even split, the 70 days of delay between PG&E and Kelly (allocating 35 days of delay to Kelly for this Phase/Window).

Regarding issue 1, "PG&E's preferential design changes," which Scott attributes 100% to PG&E, Scott summarizes the impact of PG&E's design changes as follows:

> As can be seen from Figure 5-13 below, the approved below grade Electrical design was fundamentally different [sic] from what AECOM has submitted at the 90% Design Stage (which were the drawings from which JH Kelly based its bid).
>
> I understand from discussions with Mr. Lewis, that these significant changes were attributable to PG&E's change in design criteria (i.e., preferential changes and nice to have additions).

*Id*. at 52-53 (emphasis added).

The delay attributable to PG&E's preferential design changes identified by Scott extend beyond the time period at issue (February 24, 2017 to May 5, 2017). *See id*. at 54.

Regarding issue (2), the "utility conflict," which Scott attributes 100% to Kelly, Scott summarizes this issue as a "conflict between the new duct bank location and the existing underground gas lines". *Id*. at 50. It is undisputed that AECOM, the engineer of record, designed the new duct bank location knowing there was an existing underground gas line intersecting with the new duct bank location.

### 2. Argument Regarding Phase 1/Window II.

Expert testimony is properly excluded where the expert's opinion is based on assumptions unsupported by sufficient facts or data. *See* Fed. R. Evid. 702(b); *see also McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 806-07 (9th Cir. 1988) (excluding expert's study and future testimony because it was based on unsupported assumptions, including speculation about the amount of the appellants' "lost profits"); *see also U.S. v. Various Slot Machines on Guam*, 658 F.2d 697, 700 (9th Cir. 1981) (stating "an expert must back up his opinion with specific facts"); *see also Ollier v. Sweetwater Union High School Dist.*, 768 F.3d 843, 861 (9th Cir. 2014) (providing that "speculative testimony is inherently unreliable" and excluding expert testimony in part because their opinions were "unsupported by the facts").

Scott attributes half of the 70-day delay for this time period (February 24, 2017 to May 5, 2017) to Kelly as a result of Kelly's alleged late discovery of a "utility conflict" created by AECOM's own design. *See* Grasberger Decl., Ex. 1 at 6, 55. Scott's opinion on this issue is subject to exclusion because it is based on improper assumptions. Specifically, Scott makes the following improper assumptions (each of which are addressed in more detail, below):

- Scott assumes that Kelly is 100% responsible for the utility conflict—which AECOM (as the engineer or record) designed without any input from Kelly—while AECOM's own electrical engineering expert does not apportion any percentage of fault (let alone 100% fault) to Kelly;

- Scott assumes that AECOM worked continuously from February 24, 2017 to May 5, 2017 to resolve the utility conflict without any evidence to support this assumption;

- Scott assumes that PG&E's preferential decision to re-route the duct bank around the property is irrelevant while AECOM's own electrical engineering expert and lead engineer opine and testify that the delay resulting from the utility conflict could have been mitigated or avoided entirely if PG&E had not made that preferential decision; and

- Scott assumes that the impact of the PG&E's preferential design changes and the utility conflict are equal and should be apportioned 50/50 to this time period without any evidence to support this assumption.

**First**, Scott's assumption that Kelly is 100% responsible for failing to catch AECOM's own design error earlier than it did, and the ensuing delay, is improper and unsupported. Scott opines as follows in his opening report:

> <u>Should it be found that JH Kelly was responsible for catching the conflict earlier than they did</u>, then they would share accountability for the delay. For purposes of this report, <u>I assumed this to be the case</u> and have split the delay equally between the two parties (i.e., 35 days to PG&E and 35 days to JH Kelly).

*Id*. at 6, 55 (emphasis added).  Scott is not an electrical engineer and Scott recognizes that he is not qualified to opine on whether or when Kelly should have caught AECOM's design error. *See e.g. id*., Ex. 2 at 38:17-39:4; 213:21-214:1.  As this issue is outside Scott's expertise as a delay expert, Scott relies on the opinion of Lewis, AECOM's electrical engineering expert, to support Scott's assumption that Kelly—who had no design responsibility for the project—is 100% responsible for not catching AECOM's error that created the utility conflict. *See id*.  However, contrary to Scott's assumption, Lewis testified that he did not and will not allocate fault between AECOM and Kelly regarding the utility conflict:

> **Q:** Okay.  And were you asked to allocate fault as between, in your opinion, at least, AECOM and JH Kelly concerning responsibility for the conflict between the gas piping and the existing electrical duct bank?
>
> [objection]
>
> **A:** I'm not sure that I could say specifically to assign fault in those cases.  I was asked to evaluate the genesis and the solutions and – of the conflict.

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

DAUBERT MOTION TO EXCLUDE PORTIONS OF EXPERT TESTIMONY OF TED SCOTT

-10-

CASE NO. 4:20-CV-05381-HSG

113818793.7 0034592-00012

…

**Q:** Correct me if I'm wrong, you are not apportioning out fault in terms of percentages to PG&E, AECOM, and JH Kelly, are you?

**A:** No.

**Q:** And you won't be doing that at trial; right?

**A:** Quantifying is not my scope.

*See id.*, Ex. 3 at 65:18-66:2; 202:3-9. Accordingly, the only AECOM expert qualified to opine on the allocation of fault among Kelly, AECOM, and PG&E for the utility conflict expressly declined to do so. As such, Scott cannot be permitted to assume that Kelly was 100% responsible for catching the electrical engineering conflict earlier than it did, as that assumption is unsupported and will confuse and mislead the jury.

**Second**, there is no evidence to support the assumption that AECOM was working to resolve this electrical design conflict for the entire 70-day time period at issue. *See generally id.*, Ex. 1. Scott did not even attempt to determine when AECOM, Scott's client, began redesigning around the conflict. *See id.* at 55 ("based on the records that have been made available to me, I have not been able to determine exactly when the change to routing of the duct bank was made"). For all Scott knows, AECOM may have only taken one day to make the necessary changes to address the utility conflict. Similarly, Scott's opinion assumes that AECOM began this redesign work on the February 24, 2017. *See id.*, Ex. 1 at 47. This start date is unsupported because there is no evidence provided in Scott's report that AECOM received notice from Kelly of this issue on February 24, 2017.[3] *See id*. There is also no evidence that AECOM was working to address the utility conflict continuously throughout the 70-day time period at issue. Scott's assumption that AECOM was notified of the utility conflict on February 24, 2017 and worked continuously for 70 days to address the conflict is unsupported and will confuse and mislead the jury.

**Third**, Scott's opinion is irrelevant because the decision to re-route the duct bank around

---

[3] Scott's report states on pages 50-51 that Kelly gave notice in February 2017, but there is no evidence supporting this statement, and it appears to be a typographical error, because on page 73, Scott states that Kelly gave notice in March 2017.

1    the property was ultimately a preferential change made by PG&E.  Scott bases his opinion on the

2    opinions of both Dean Goward, AECOM's lead engineer, and Lewis, AECOM's electrical

3    engineering expert.  *Id*. at 51-53.  Scott relies on the following Goward testimony:

> …we collectively worked as a team to resolve the issue and some options were [being put] that the underground duct was going to clash with the existing pipe.  So we had a few options that were presented, one being that we go deeper and that we trench deeper under that pipe to avoid (inaudible).
>
> Second option was that we actually come above ground and – and basically bridge that area with a structure to bring the conduit over and above.
>
> The **third and least desirable, but which ended up being the option that was implemented**, was to completely avoid that area and reroute the duct banks.  That duct bank is basically supplying the gas cooler area, and if we assume north is up on the page, we rerouted the duct bank to the east of the plant in order to supply the gas cooler area and avoid the pipe.

*Id*., Ex. 4 at 99:13-100:5. (emphasis added).  As to Scott's reliance on discussions with Lewis, Scott states:

> I further understand from discussions with Mr. Lewis that he has analyzed the routing of the duct bank with respect to this existing utility and determined that the option selected was indeed a **preferential change by PG&E**, as either of the less impactful solutions would have been possible from an engineering standpoint.

*Id*., Ex. 1 at 51 (emphasis added).  Scott further states:

> As can be seen from Figure 5-13 below, the approved below grade Electrical design was fundamentally different [sic] from what AECOM has submitted at the 90% Design Stage (which were the drawings from which JH Kelly based its bid.
>
> I understand from discussions with Mr. Lewis, that these significant changes were attributable to PG&E's change in design criteria (i.e., preferential changes and nice to have additions).
>
> I also understand from discussions with Mr. Lewis that the change in duct bank routing along the Northern portion of the site in the 5 May 2017 design (the left side of the drawing to the right) **was due [to] PG&E's refusal to allow the duct bank to be routed below or above the gas line**.

*Id*. at 52-53 (emphasis added).  Thus, any alleged delay could have been mitigated entirely if

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

DAUBERT MOTION TO EXCLUDE PORTIONS OF EXPERT TESTIMONY OF TED SCOTT

-12-

CASE NO. 4:20-CV-05381-HSG

113818793.7 0034592-00012

PG&E had not made the "preferential choice" to route around the perimeter of the building, an opinion supported by both Goward and Lewis. Accordingly, Scott's opinion holding Kelly responsible for any delay is irrelevant because PG&E made the ultimate decision to re-route the duct bank around the property.

**Finally**, Scott arbitrarily splits 50/50 the delay during this 70-day time period between PG&E's "significant" and "preferential" changes (Scott's words) and the utility conflict issue. This arbitrary allocation is also unsupported by evidence and is likely to mislead the jury.

For these reasons, Scott's analysis opining that Kelly is responsible for 35 days of delay in Phase 1/Window II based on the alleged utility conflict should be excluded.

**B.   Scott's Analysis Regarding Phase 2/Window I Should be Excluded For the Same Primary Reasons as Phase 1/Window II.**

**1.   Brief Statement of Facts Regarding Phase 2/Window I (32 Days of Delay Attributed to Kelly).**

Scott states that Kelly should have commenced excavation and installation for the Auxiliary Building conduit installation on March 24, 2017. *Id*. at 74. Because Kelly commenced this work on June 1, 2017, the project was 64 days behind schedule, according to Scott. *Id*. Scott attributes half of this 64-day delay of the first delivery of conduit for the Auxiliary Building in Phase 2/Window I of the project to Kelly based again on "both PG&E's preferential design changes as well as the need to reroute the duct bank around the existing utility conflict." *Id*.

**2.   Argument Regarding Phase 2/Window I.**

Because Scott's analysis and opinion are based on these same events, they should be excluded for the same primary reasons as his opinion regarding the 70-day delay in Phase 1/Window II. Scott again expressly states that he <u>assumed</u> that Kelly should have caught the electrical conflict earlier than it did. *Id*. at 74. Scott should not be permitted to make this assumption, as there is no evidence to support this assumption, and he is not qualified to opine on this electrical engineering issue. The only expert qualified to opine on this issue, Mr. Lewis, declined to do so. *See id*., Ex. 3.

Scott's opinion is also based on the unsupported assumption that AECOM was working to

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

DAUBERT MOTION TO EXCLUDE PORTIONS OF EXPERT TESTIMONY OF TED SCOTT

-13-

CASE NO. 4:20-CV-05381-HSG

113818793.7 0034592-00012

1  resolve the electrical engineering conflict for the entire time period at issue. Scott again states that based on the records of his client that have been made available to him, he has "not been able to determine exactly when the change to routing of the duct bank was made." *Id.*, Ex. 1 at 74.

And finally, Scott's opinion is irrelevant because PG&E made the ultimate preferential decision to reroute the duct bank. *Id.* at 51-53.

Accordingly, Scott's opinion and testimony regarding the 64-day delay in Phase 2/Window I should be excluded.

### C. Scott's Analysis Regarding Phase 2/Window II is Based on a Flawed Methodology and Improper Assumptions, and is Otherwise Irrelevant.

#### 1. Brief Statement of Facts Regarding Phase 2/Window II (15 Days of Delay Attributed to Kelly).

In Phase 2/Window II of the report ("UG Conduit Installation"), Scott attributes 7 days of delay to PG&E for "Boulder Excavation", 19 days to PG&E for "Increased underground conduit as a result of PG&E's preferential electrical changes", and 15 days of delay to Kelly based on Kelly's "[s]lower than planned progress installing the underground conduit underneath the Auxiliary Building." *Id.* at 76, 86.

The 15 days attributed to Kelly are based on a calculation of Kelly's productivity rate. *Id.* at 80-86. As discussed below, this calculation is flawed and unreliable.

#### 2. Argument Regarding Phase 2/Window II.

Expert testimony can be excluded where the expert employed an invalid methodology or failed to reliably apply principles and methods to the facts of the case. *See* Fed. R. Evid. 702(c), (d); *see also McGlinchy*, 845 F.2d at 807 (excluding expert testimony where assessment of damages was "hopelessly flawed"); *see also Ollier*, 768 F.3d at 861 (excluding expert testimony where methodology was unreliable).

Scott's opinion attributing 15 days of delay to Kelly for its "[s]lower than planned progress installing the underground conduit underneath the Auxiliary Building" is based on a seriously flawed methodology that is unreliable and likely to mislead the jury. Grasberger Decl., Ex. 1 at 86. Scott's calculation underpinning his analysis for this delay period assumes "900 lf of conduit underneath the Auxiliary Building." *Id.* at 80. This is incorrect because the 900 lf figure

applies to the <u>entire project site</u>—not just the area under the Auxiliary Building, which is a significantly smaller area. *See id*., Ex. 5 (providing that the length of duct bank should be about 900ft for the entire project site). Based on Scott's incorrect assumption, Scott calculates Kelly's productivity rate: "[a]ccording to the Construction Baseline Schedule, JH Kelly planned to complete this work in 4 workdays (between 29 March and 3 April 2017). This equates to a productivity rate of 225 lf of conduit per day (900 lf / 4 days = 225 lf/day)." *Id*., Ex. 1 at 80. As a result of Scott's incorrect reliance on the **project-wide** 900 lf figure, Scott drastically overstates Kelly's planned productivity rate at 225 lf/day for the area only under the Auxiliary Building. Scott's overstatement of Kelly's planned productivity level undermines his entire analysis on this delay event.

Scott uses this drastically overstated 225 lf/day number to calculate how long KELLY's work should have taken. *Id*., Ex. 1 at 80. He writes:

> It is also my understanding that the final IFC Electrical design added 2,800 lf of conduit underneath the Auxiliary Building (for a total of 3,800 lf). Using JH Kelly's planned productivity rate (as described above), this means the added work should have taken an additional 19 days to complete (2,800 lf / 255 lf per day = 19 days).

*Id*. Scott then used this 19 days to attribute 15 days of delay to Scott. Scott states:

> …it actually took JH Kelly 47 calendar days to complete this work (18 July 2017 – 1 June 2017 = 47 days). Considering the planned duration of 6 calendar days to do this work (3 April 2017 – 29 March 2017), JH Kelly took 41 calendar days longer than originally anticipated (47 days – 6 days = 41 days).
>
> Considering the 7-day delay caused by the Boulders and the 19-day delay caused by the additional scope (for a total of 26 days), this means that JH Kelly lost an additional 15 days of delay in this work (41 days – 26 days = 15 days).

*Id*. at 84. Scott ultimately attributed this 15-day delay to Kelly for "[s]lower than planned progress installing the underground conduit underneath the Auxiliary Building." *Id*. at 86.

Moreover, Scott's opinion is irrelevant, as he ultimately concludes his analysis by stating that "[f]rom the documents that are available to me, it is unclear what caused this delay." *Id*. at 84.

Therefore, Scott's analysis regarding the 15-day delay attributed to Kelly in Phase 2/Window II should be excluded.

### D. The 6-Day Delay Attributed to Kelly In Phase 2/Window III is Supported Primarily by Irrelevant and Prejudicial Events.

#### 1. Brief Statement of Facts Regarding Phase 2/Window III (6 Days Attributed to Kelly).

Scott attributes 6 days of non-work time to Kelly between October 14-20, 2017. *Id*. at 95; Ex. 6 at 23. This opinion is based on a "Kelly subcontractor fuel truck [that] struck a 4" gas line on 14 October 2017" ("Valve Strike"), as well as on prior unrelated non-valve strike safety events. *Id*. But as discussed below, Scott's opinion is unsupported by any evidence.

#### 2. Argument Regarding Phase 2/Window III.

As to the October 14, 2017 "Valve Strike" event, there is no evidence that this event delayed the entire project site or the critical path for the project. Indeed, the evidence that Scott references supporting his opinion only show that the east and northeast side of the site, at most, were delayed during this time. For example, Scott references Kelly's report of hindrances, stating, "all work on east fence line has been put on hold by PGE for checking out damaged gas line and cross compression testing." *Id*., Ex. 1 at 94. (emphasis added). He also references AECOM's schedule delay log, which states:

> All work on the east and north east side of the station stopped due to the fuel truck hitting the 4" gas line. PG&E had to blowdown the line and replace the damaged valve. This effected the Demo work on the Main Gas line at Tie-in 22 and 37 locations and DB 7 excavation activities. The gas line valve was replaced by 10-16-17 and line was saved out. PG&E would not let AECOM continue any construction activities on the east and North east side of the station until cross compression was completed on 10-20-17.

*Id*. (emphasis added). Indeed, Torres' report states, "as documented in the Kelly daily reports, only the northeast quadrant of the Project site was impacted through October 20, 2017." *Id*., Ex. 7 at 19. Still, Scott states that, "[a]s the duct banks were on the actual critical path during this time period, I have attributed the 6 days of non-work time between 14 and 20 October as a JH Kelly delay..." *Id*., Ex. 1 at 95. But, as explained in Torres' Rebuttal Report, this is incorrect. *See id*., Ex. 7 at 20 ("The critical path is not through [the] underground ductbank, but rather

through the Auxiliary Building (where the Baseline Schedule critical path was planned)"). There is no evidence to support Scott's opinion that the that work on the duct bank was delayed by the Valve Strike event, or that the work on the duct bank was on the critical path for the project at this time.

Moreover, Scott references certain non-valve strike safety events—events unrelated to the critical duct bank work—which all occurred before October 2017. *Id*., Ex. 6 at 22-23. Despite being unrelated to the duct bank work, Scott concluded:

> Based on the above, **it seems plausible** that JH Kelly was responsible for some of the time it took to perform the critical duct bank work. For certain, it would have contributed to JH Kelly's cla[i]med inefficiencies.
>
> However, given the documents made available to me, **in terms of delay, I have only attributed the 6-day duration that the Project was shut down between 14 and 20 October 2017 to JH Kelly**.

*Id*. at 23. This shows that Scott attributes no days of delay to these non-valve strike events. Because these events do not relate to the critical bank duct work, the only purpose of referencing these events is to suggest that Kelly is an unsafe contractor. *Id*. As Scott is AECOM's delay expert, these events not causing delay are outside Scott's expertise. They should therefore be excluded because they could only serve to confuse the jury and risk unfair bias against Kelly.

As such, the 6-day delay attributed to Kelly and the non-valve strike safety events should be excluded because, as to the delay, it is unsupported, and as to the events, they are irrelevant and prejudicial and are meant to create an unfair bias with the jury.

E. **Scott's Analysis Regarding Phase 2/Window IV Employs a Flawed Methodology and is Based on Assumptions.**

1. **Brief Statement of Facts Regarding Phase 2/Window IV ( Days Attributed to Kelly).**

Scott attributes 8 days of delay to Kelly for taking "longer than planned for JH Kelly to pull wire such that JH Kelly was only 30% complete with this work when the critical path shifted into Commissioning." *Id*., Ex. 1 at 98.

2. **Argument Regarding Phase 2/Window IV.**

Scott's opinion and analysis should be excluded. Scott's methodology is flawed and

1 | likely to mislead the jury because Scott assumes that this issue is entirely Kelly's fault despite

2 | acknowledging that he is making assumptions based on inadequate documentation:

> **While it is possible** that some of this additional time was due to PG&E's preferential changes (i.e., added duct bank and conduit), I do not have the records available to me to determine how much, if any, time should be allocated to PG&E. Therefore, for purposes of this report, I have **assumed** all of the delay is due to JH Kelly as this was part of their scope to complete in a timely manner.

*Id*., Ex. 1 at 98 (emphasis added). Scott's methodology is based on unsupported assumptions and should be excluded.

## V.     CONCLUSION

For the foregoing reasons, Kelly respectfully requests that the Court grant its Motion and exclude the above portions of the expert testimony and reports of Ted Scott.

DATED: April 14, 2022

STOEL RIVES LLP

By: */s/ Edward C. Duckers*
ERIC A. GRASBERGER (*admitted pro hac vice*)
EDWARD C. DUCKERS (SB # 242113)
MARIO R. NICHOLAS (SB #273122)

Attorneys for Plaintiff
*JH Kelly, LLC*