UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JH KELLY, LLC,<br><br>       Plaintiff,<br><br>    v.<br><br>AECOM TECHNICAL SERVICES, INC.,<br><br>       Defendant. | Case No. 20-cv-05381-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART AECOM'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 205 |

Before the Court is Defendant and Counter-Claimant AECOM Technical Services, Inc.'s ("AECOM") motion for partial summary judgment against JH Kelly LLC ("JH Kelly"). Dkt. No. 205 ("Mot."). The motion is fully briefed. *See* Dkt. Nos. 225 ("Opp.") and 227 ("Reply"). The Court finds this matter appropriate for disposition without oral argument and the matter is deemed submitted. *See* Civil L.R. 7-1(b). For the following reasons, the motion is **GRANTED IN PART and DENIED IN PART.**

**I.   BACKGROUND**

This construction dispute arises out of the Burney K2 Replacement Project ("Project"), which involved the replacement of a natural gas compressor unit and various upgrades at a compressor station near Burney, California. Dkt. No. 102 (JH Kelly's Second Amended Complaint or "SAC") ¶ 1. The Burney Compressor Station is part of Pacific Gas & Electric Company's ("PG&E") natural gas distribution system. *Id.* ¶ 11. That system supplies natural gas to the surrounding area and allows compressed gas to travel through pipelines from Oregon to consumers in California. *Id.* In all, PG&E's natural gas distribution system provides service to around 4.2 million customers from Bakersfield, California to the Oregon border. *Id.*

On February 11, 2016, AECOM entered into an agreement (the "EPC Agreement") with

1  PG&E for the Project. *Id.* ¶ 19. Under the EPC Agreement, AECOM agreed to act as the design-
2  builder and prime contractor for the Project. *Id.* On October 21, 2016, AECOM and Kelly
3  entered into an agreement (the "Subcontract") for the construction portion of the work. *Id.* ¶¶ 25-
4  27.

5  Various issues on the Project led to disputes between JH Kelly, AECOM and PG&E.
6  Relevant here, JH Kelly contends that the Project was changed from what it bid and agreed to
7  perform, and that these changes imposed significant additional work and more difficult working
8  conditions. *See* Dkt. No. 162. JH Kelly also asserts that AECOM repeatedly ignored the
9  Subcontract's change-order requirements to pay JH Kelly for the changed work. *Id.* AECOM
10 denies each of those claims and counterclaims that JH Kelly breached the Subcontract. *Id.*

11 JH Kelly filed the First Amended Complaint in January 2021. Dkt. No. 18. AECOM and
12 PG&E reached a settlement in October 2021 and ultimately agreed to dismiss their claims against
13 one another with prejudice. *See* Dkt. Nos. 93, 127. JH Kelly then filed the operative complaint,
14 which AECOM moved to dismiss in part. Dkt. No. 102. AECOM's motion was granted in part
15 and denied in part. Dkt. No. 179. AECOM now moves for partial summary judgment.

## II. LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.* The Court views the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008).

The moving party bears both the ultimate burden of persuasion and the initial burden of producing those portions of the pleadings, discovery, and affidavits that show the absence of a

2

1  genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the
2  moving party will not bear the burden of proof on an issue at trial, it "must either produce
3  evidence negating an essential element of the nonmoving party's claim or defense or show that the
4  nonmoving party does not have enough evidence of an essential element to carry its ultimate
5  burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102
6  (9th Cir. 2000). Where the moving party will bear the burden of proof on an issue at trial, it must
7  also show that no reasonable trier of fact could not find in its favor. *Celotex Corp.*, 477 U.S. at
8  325. In either case, the movant "may not require the nonmoving party to produce evidence
9  supporting its claim or defense simply by saying that the nonmoving party has no such evidence."
10 *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1105. "If a moving party fails to carry its initial
11 burden of production, the nonmoving party has no obligation to produce anything, even if the
12 nonmoving party would have the ultimate burden of persuasion at trial." *Id.* at 1102–03.

"If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. In doing so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. A nonmoving party must also "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). If a nonmoving party fails to produce evidence that supports its claim or defense, courts enter summary judgment in favor of the movant. *Celotex Corp.*, 477 U.S. at 323.

**III.  DISCUSSION**

AECOM contends that it is entitled to partial summary judgment on three different components of JH Kelly's damages claim. It first argues that JH Kelly's consequential damages—consisting of loss of financing, lost profits, costs paid to third party experts, and costs for preparing claims against AECOM—are barred as a matter of law because the parties' Subcontract includes an express waiver of consequential damages. Mot. at 1. It then argues that JH Kelly also waived any right to recover the bulk of its costs for labor performed and materials furnished through September 12, 2018. *Id.* And finally, AECOM argues that JH Kelly may not use the

3

1   "total cost" method for quantifying its delay and disruption damages because JH Kelly cannot

2   satisfy the required four-factor test for a total cost claim. *Id.*

### A. JH Kelly's Consequential Damages

The contract between JH Kelly and AECOM contains the following provision:

> **13.7 CONSEQUENTIAL DAMAGES.**
>
> **13.7.1** NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NEITHER DESIGN-BUILDER NOR SUBCONTRACTOR SHALL BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL LOSSES OR DAMAGES, WHETHER ARISING IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, INCLUDING BUT NOT LIMITED TO LOSSES OF USE, PROFITS, BUSINESS, REPUTATION OR FINANCING.

Dkt. No. 205-1, Declaration of Marion T. Hack in support of AECOM's Motion for Partial Summary Judgment ("Hack Decl."), Ex. 2 ("Subcontract") § 13.7.1. Under that provision, JH Kelly unambiguously waived any claims it may have for "consequential losses or damages." *Id.* Broadly speaking, AECOM contends that this waiver bars several categories of JH Kelly's damages claims, and JH Kelly argues that its respective claims are not "consequential" damages.

When one party breaches a contract, the injured party is generally entitled to damages that would put it in as good a position as it would have occupied if the breach had not occurred. *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 968 (2004) ("*Lewis Jorge*").[1] There are two types of contractual damages: direct damages (sometimes called general damages) and consequential damages (sometimes called special damages). *Id.* Direct damages flow directly and necessarily from a breach of contract and are therefore considered a "natural result of a breach." *Id.* Courts in other jurisdictions have explained that direct damages are those which the party lost from the nonperformance of the contract itself—in other words, they are the costs of replacing the defendant's performance. *See Jay Jala, LLC v. DDG Constr., Inc.*, No. CV 15-3948, 2016 WL 6442074, at *2 (E.D. Pa. Nov. 1, 2016) ("*Jay Jala*").

In contrast, consequential damages do not arise directly and inevitably from the defendant's breach. *Lewis Jorge*, 34 Cal. 4th at 968. Instead, they are derivative or collateral

---

[1] The parties do not dispute that California law governs the construction of the Subcontract. *See* Mot. at 3; Opp. at 2.

4

losses from economic harm beyond the immediate scope of the contract. *Id.* The plaintiff might not have incurred these costs if the defendant had not breached the contract, but they are not part of what the plaintiff was originally supposed to get from the defendant. *Jay Jala*, 2016 WL 6442074, at *2. With this distinction in mind, the Court proceeds to the merits of AECOM's arguments.

### i. JH Kelly's Financing Costs

JH Kelly seeks to recover the interest it incurred on two loans. The first loan was for $5,000,000, and JH Kelly paid $199,028 of interest on that loan. Mot. at 2. JH Kelly obtained the second loan for $3,500,000 and then accrued interest of $134,990. *Id.* JH Kelly obtained both loans from the Evans Family Trust I, of which Mr. Evans—who is JH Kelly's President, CEO, and sole owner—is the sole beneficiary. *Id.* JH Kelly claims that it was forced to obtain these loans because of a cash flow shortage caused by delays in payment by AECOM and accordingly now seeks to recover $334,018 for the interest payments it made on the loans. Opp. at 2.

AECOM contends that JH Kelly waived this claim by signing and agreeing to the Subcontract, which explicitly says that neither AECOM nor JH Kelly "shall be liable to the other for any consequential losses or damages . . . including . . . losses of . . . financing." Mot. at 4-5; Subcontract § 13.7.1. JH Kelly acknowledges that the waiver bars consequential damages for "financing" but claims that the financing costs it seeks here are different in kind. Opp. at 3-4. As JH Kelly sees it, the interest it seeks was essentially an additional cost of performing the Subcontract work, and therefore constitutes direct damages. *Id.* The question, then, is whether the interest JH Kelly seeks to recover is consequential damages subject to the Subcontract's waiver, or recoverable direct damages.

Courts interpreting similar costs under California law have found them to be consequential damages.[2] But as JH Kelly notes, there is a line of (unpublished and out-of-circuit district court)

---

[2] *See Pac. Coast Eng'g Co. v. St. Paul Fire & Marine Ins. Co.*, 9 Cal. App. 3d 270, 273-75, 88 Cal. Rptr. 122 (1970) (additional loan interest incurred by plaintiff as the result of the delayed payment constitutes consequential damages); *Chinese Hosp. Ass'n v. Jacobs Eng'g Grp., Inc.*, No. 18-CV-05403-JSC, 2019 WL 6050758, at *5 (N.D. Cal. Nov. 15, 2019) (plaintiff's costs stemming from delayed construction were barred by the parties' consequential damages waiver under California law).

5

cases holding that if a plaintiff was forced to take out a loan to get what it expressly contracted for, i.e., the benefit of the defendant's performance, then the interest on that loan may be a direct cost of defendant's breach.[3]

      Even if the Court were to find this theory persuasive, however, it would not necessarily save JH Kelly's claim here. This is because JH Kelly has failed to identify evidence that the loans it took were necessary to replace the cost of AECOM's alleged nonpayment. JH Kelly's brief says that it "was required to obtain financing to fill the cash shortfall as an additional cost of performing the Subcontract work," but this assertion is not followed by a citation to the record. Opp. at 4. Somewhat helpfully, JH Kelly's expert writes that "[a]s a result of AECOM's withholding payment on the Project, JH Kelly was denied access to funds it would rely upon for day-to-day operations." *See* Hack Decl., Ex. 3 ("Ibbs Report") ¶ 312. But even this testimony is undermined by that of JH Kelly's CEO, Mr. Evans, who testified at his deposition that JH Kelly's "sole reason" for obtaining the two loans was to achieve more favorable financing terms on a line of credit. *See* Hack Decl., Ex. 6 at 98:23-25;100:21-24; 101:12-14; 103:7-12; and 106:9-12. No party has identified evidence that the more favorable line of credit was necessary to complete work contemplated by the Subcontract. And Mr. Evans further testified that JH Kelly could have received a line of credit (albeit a lower one and at a higher rate) based on the working capital it had before it received the loans. *See id.* at 103:18-23. The record therefore calls into question whether the underlying loans were necessary at all, let alone for the specific reason of replacing AECOM's alleged nonperformance.

      But at bottom, the nature of JH Kelly's motivation for taking out the underlying loans presents factual questions that cannot be resolved on this record at this stage. While the Court has some skepticism that JH Kelly's financing costs can be a measure of its direct damages, it will deny AECOM's motion—without prejudice to AECOM raising this issue again after the parties

---

[3] *See Jay Jala*, 2016 WL 6442074, at *6 (finding that a construction loan was a "necessary construction input" of the subcontract work and therefore flowed directly and necessarily from the defendant's breach); *Bartram, LLC v. C.B. Contractors, LLC*, No. 1:09-CV-00254-SPM, 2011 WL 1299856, at *3, n.3. (N.D. Fla. Mar. 31, 2011) (finding that financing costs are direct damages when they "flow from construction delay" and are consequential damages when they instead may have also been caused by other factors like lost profits and rents due to construction defects).

6

have presented their evidence at trial.

### ii. JH Kelly's Lost Profits

JH Kelly's Second Amended Complaint includes claims for breach of contract/modified total cost recovery and quantum/meruit/abandonment of contract against AECOM. As part of its damages under those claims, JH Kelly seeks to apply a 10.53% home office overhead and profit ("OH&P") markup to its costs for uncompensated work it performed on the Project. *See* Dkt. No. 226-1, Declaration of Eric A. Grasberger in support of JH Kelly's Opposition to AECOM's Motion for Partial Summary Judgment, Ex. 3 (JH Kelly bid summary worksheet).

AECOM contends that JH Kelly waived its claim to this markup by signing and agreeing to the Subcontract, which explicitly says that neither AECOM nor JH Kelly "shall be liable to the other for any consequential losses or damages . . . including . . . losses of . . . profits." Mot. at 4-5; Subcontract § 13.7.1. JH Kelly responds that it seeks profits on the Subcontract itself, which are direct damages and therefore not subject to the waiver. Opp. at 7.

JH Kelly is correct that lost profits may constitute direct damages under California law. In so holding, California courts have distinguished the profits a plaintiff is due from the breached construction contract itself from the profits it would have received on future or unidentified contracts. *See Lewis Jorge*, 34 Cal. 4th at 971. The former can be a measure of direct damages—particularly when the defendant's conduct prevented the plaintiff from performing and therefore receiving full payment of the contract price. *See id.*[4] The latter are consequential damages unless there is evidence that the parties' bargain contemplated the plaintiff's potential profits on other construction projects. *Id.* at 973.

Here, neither the parties' briefing nor their citations to the record adequately explain the source and basis for the 10.53% OH&P markup that JH Kelly seeks. As the movant, this was AECOM's responsibility. Because the Court cannot readily determine whether the markup is for uncompensated work performed on the Project or lost profits on other projects, the Court finds that AECOM has not met its initial burden of producing the evidence showing an absence of a

---

[4] *See also Stark v. Shaw*, 155 Cal. App. 2d 171, 181, 317 P.2d 182 (1957); *De Flavio v. Estell*, 173 Cal. App. 2d 226, 232-233, 343 P.2d 150 (1959).

genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. AECOM's motion as to JH Kelly's claim for lost profits is **DENIED**.

### iii. JH Kelly's Change Management Support Fees

JH Kelly seeks to recover the cost of fees it paid to two of its consultants, C2G International and the Ibbs Consulting Group, from December 2017 through October 2019. JH Kelly contends that it incurred these fees because AECOM directed it in November 2017 to commission a "delay analysis" and measure lost productivity. Opp. at 8. JH Kelly says the "change management support fees" it now seeks are the fees it paid those two consultants for performing AECOM's requested analyses, and it clarifies that these fees are not the ones it paid to its expert witnesses for their work to prepare the expert reports in this case. *Id.*

AECOM contends that the change management support fees are nonetheless barred by Subcontract § 13.3.3. That provision says that in the event AECOM asserts a claim against PG&E involving JH Kelly, "each party shall bear its own costs for outside counsel and third-party consultants retained to prosecute claims against Owner and for any other litigation costs." Subcontract § 13.3.3.

At the heart of this dispute is whether JH Kelly retained the experts and incurred the change management support fees to prosecute claims against PG&E (in which case they would be waived by § 13.3.3), or merely to support AECOM's change orders in the ordinary course of the Project (in which case they would not be). This is a factual question. And after reviewing the parties' briefs and the relevant citations to the record, the Court finds that it cannot be readily resolved at the summary judgment stage. *See, e.g.*, Mot. at 9 ("these costs no doubt represent fees paid to retained experts in assisting in the mediation of the case with PG&E and preparation of expert reports for litigation"); Opp. at 9 ("Kelly's 'change management support fees' are the external consultant fees that it incurred to perform delay and damage analyses at AECOM's direction for purposes of supporting Kelly's and AECOM's change orders on the Project."); Ibbs Report ¶ 308 ("The damages in this section include fees JH Kelly incurred for portions of its request for equitable adjustment and delay analysis."). AECOM's motion for summary judgment

1   as to JH Kelly's claim for change management support fees is therefore **DENIED**.[5]

###        iv.    JH Kelly's Post-Project Completion Costs

As explained above, JH Kelly contends that AECOM directed it to perform "delay and productivity analyses" to support AECOM's claims or change order requests. Opp. at 8. JH Kelly's "post-project completion costs" are allegedly the "internal costs" that JH Kelly incurred to support AECOM's directive. *See id.* at 10. These damages allegedly include "overhead expenses," like the cost of JH Kelly's field and home office staff that coordinated with AECOM to close out the Project after its completion. *Id.* AECOM contends that JH Kelly's post-project completion costs are consequential damages either subject to Subcontract § 13.7 or otherwise waived by § 13.3.3. *See* Subcontract §§ 13.3.3, 13.7.

The Court makes two preliminary findings as to the post-project completion costs. First, the Court cannot conclude on this record that § 13.3.3 applies. As noted above, that provision precludes the recovery of "costs for outside counsel and third-party consultants," but JH Kelly says that the post-project completion costs are for *internal* field overhead costs. *See* Subcontract § 13.3.3; Opp. at 11. This alone raises a factual dispute that cannot be resolved at this stage. Second, JH Kelly has failed to identify evidence from which the Court can conclude that the post-project completion costs are direct damages. JH Kelly merely claims that it incurred these costs "at the express directive of AECOM to support AECOM's change requests to PG&E." Opp. at 12. It has not produced evidence that these costs arise directly and inevitably from AECOM's alleged non-performance, so the Court has no basis to conclude that these costs are part of the benefit that JH Kelly was originally supposed to get from AECOM as part of the Subcontract. *See Lewis Jorge*, 34 Cal. 4th at 968. The Court accordingly finds that the post-project completion costs are not direct damages. They are therefore subject to the consequential damages waiver in § 13.7, to the extent they are recoverable at all. The only remaining question is whether another

---

[5] While AECOM also takes the position that the change management support fees are consequential damages that are subject to the consequential damages waiver in Subcontract § 13.7, it does so in one cursory sentence and offers no analysis or case law. Mot. at 9. The Court accordingly will not grant summary judgment on this basis.

9

provision in the Subcontract separately authorizes recovery of the post-project completion costs.

JH Kelly contends that § 12.3.2 does. *See* Opp. at 11-12. That provision governs the Subcontract's change order process, and it directs AECOM and JH Kelly to "mutually agree upon any changes to scope of Work, schedule or price." Subcontract § 12.3.2. JH Kelly says that it may recover the post-project completion costs because § 12.3.2 goes on to provide the following:

> In the event that cumulative change orders equal or exceed ten percent (10%) of the Contract Price, [JH Kelly] reserves the right to recover additional general conditions and applicable overhead expense.

*Id.* AECOM, however, contends that this provision is inapplicable. In its view, this provision only allows JH Kelly to recover overhead expenses on "specific changes in the Work," as opposed to "all expenses for claims preparation costs performed after the Project." Reply at 5.

The Court agrees with AECOM. Nothing in § 12.3.2 authorizes JH Kelly to recover overhead expenses incurred after the completion of the Subcontract work and not tethered to specific change order requests. JH Kelly has identified no evidence that shows that the field office overhead costs it now seeks—which were indisputably incurred after JH Kelly demobilized in June 2018—are related to a specific change order request. *See* Ibbs Report ¶ 301. The Court accordingly finds that § 12.3.2 does not authorize JH Kelly's "post-project" completion costs. To the extent these costs are foreseeable damages at all, they are consequential damages waived by § 13.7. AECOM's motion for summary judgment is **GRANTED** as to JH Kelly's post-project completion costs.

### B. JH Kelly's Claim for Labor and Materials

Subcontract § 7.2.1 requires JH Kelly to submit invoices accompanied by lien waivers to AECOM as a precondition to getting paid. Attached to the Subcontract are form lien waivers for JH Kelly to use, and those form waivers track language mandated by Cal. Civ. Code §§ 8132-8138. *See* Subcontract § 7.2.1. Specifically, the form lien waivers required by California law provide the following:

> ***This document waives and releases lien, stop payment notice, and payment bond rights*** the claimant has for labor and service provided,

10

> and equipment and material delivered, to the customer on this job through the Through Date of this document. Rights based upon labor or service provided, or equipment or material delivered, pursuant to a written change order that has been fully executed by the parties prior to the date that this document is signed by the claimant, are waived and released by this document, unless listed as an Exception below. This document is effective only on the claimant's receipt of payment from the financial institution on which the following check is drawn

Cal. Civ. Code § 8132 (emphasis added).

Instead of using the form lien waivers required by California law, however, JH Kelly repeatedly sent its own lien waivers along with its invoices. And its lien waivers were more broadly worded than the form ones. For example, JH Kelly's September 19, 2018 final retention invoice to AECOM included the following lien waiver:

> The undersigned, a duly authorized officer of *JH Kelly, LLC*, (herein called "*Contractor*"), first being duly sworn, states that he/she is duly authorized and appointed as its agent to execute this Lien Waiver. That he/she does hereby certify that *Subcontractor* has furnished all materials and labor and has fulfilled all of its obligations under its contract with **AECOM Technical Services Inc.** on the above-described project through **09/12/2018**.
>
> That the sum of **Nine Hundred Fifteen Thousand Four Hundred Twenty Five and 05/100 dollars ($915,425.05)**, is the balance due and owing, less applicable retention, for all labor performed and materials furnished by the undersigned, its subcontractors, material vendors, suppliers, agents and employees on the above-referenced project through the date noted above and that on the receipt of such sum from **AECOM Technical Services Inc.**, and when the check has been properly endorsed and paid by the bank upon which it is drawn, this document will become effective to release and relinquish pro tanto any and all claims and lien rights **JHK** may have for and in connection with the above-referenced project for said labor performed and materials furnished through such date.

*See* Mot. at 12 (alterations adopted).

While the waivers required by statute apply to "lien, stop payment notice, and payment bond rights," JH Kelly's waiver applies to "any and all claims and lien rights" that JH Kelly may have for the labor performed and materials furnished through the invoice date. *Id.* JH Kelly's waiver also states that $915,425.05 was AECOM's "balance due and owing less applicable retention for all labor performed and materials furnished" on the project by JH Kelly through the effective date of September 12, 2018. *Id.* On January 3, 2022, AECOM made a payment of $6,648,734.95, fully paying the amount noted in the waiver by JH Kelly. Hack Decl., Exs. 22-23.

AECOM now argues that, by their plain terms, JH Kelly's lien waivers released all its

claims for labor performed and materials furnished on the project through September 12, 2018. Mot. at 14-15. In response, JH Kelly argues that when the waiver is read in context, "any and all claims and lien rights" means "lien claims"—not *all* claims. Opp. at 13-14.

The scope of partial lien waivers is a frequently litigated issue, so this is not a question of first impression. The easiest way to avoid JH Kelly's dilemma is to use different provisions to separately waive liens and claims. Contractors often do this.[6] When parties like JH Kelly instead conflate lien and claim waivers, they do so at their own peril because courts usually interpret the conflated waiver as a broad and unambiguous general release.[7] This Court concurs and finds as a matter of law that the clear and plain language of JH Kelly's waiver releases "any and all claims" for labor and materials through the release date. This outcome is consistent with California law, under which written contracts are generally governed by their plain terms, and written release agreements bar any claim covered by the release's terms, absent evidence of fraud, deception, misrepresentation, duress, or undue influence.[8]

---

[6] *See, e.g.*, *Artistic Stone Crafters v. Safeco Ins. Co.*, 726 F. Supp. 2d 595, 602 (E.D. Va. 2010) ("The release agreement contains two waiver clauses: the first waives all claims against Tesoro and the second waives liens against property owned by Tesoro."); *Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 290-91 (5th Cir. 2010) (first provision of the partial lien waiver releases "lien and right to claim a lien for labor, services, or materials furnished," and the second provision releases "any claim for damages due to delay . . . or any other claim of any kind."); *First American Bank of Virginia v. J.S.C. Concrete Constr.*, 259 Va. 60, 69, 523 S.E.2d 496 (2000) (noting that waiver agreement contained two parts, one of which waived all claims and the other of which waived liens).

[7] *See Bergelectric Corp. v. Sauer, Inc.*, No. 5:18-CV-00612-EJD, 2019 WL 1746061 (N.D. Cal. 2019) (where subcontractor executed waiver releasing "any and all rights, claims demands, liens, claims for relief," the court did not limit the waiver to "lien claims" and instead concluded that all the subcontractor's claims were encompassed by the "broad" releases that it had knowingly and voluntarily executed); *United States v. Hartford Accident & Indem. Co.*, 168 F. Supp. 3d 824, 837 (D. Md. 2016) (where subcontractor's waiver releases "all liens and claims and demands" in any manner arising out of labor or materials performed or furnished, "the plain language conveys only one plausible meaning: the parties agreed to a broad waiver of all claims, save those specifically excluded, stemming from work performed through the covered periods"); *Fixture Specialists, Inc. v. Glob. Const. Co. L.L.C.*, No. CIV.A.07-5614 FLW, 2010 WL 4387548, at *7 (D.N.J. Oct. 29, 2010) (where subcontractor's waiver releases any and all "liens, claims or causes of action" related to the contract work, "the plain language of the Waivers appears to release [general contractor] from all liability for additional work performed by [subcontractor] prior to the date of the Waiver").

[8] *See* Cal. Civ. Code § 1639 ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible[.]"); *id.* § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."); *Skrbina v. Fleming Cos.*, 45 Cal. App. 4th 1353, 53 Cal. Rptr. 2d 481, 489 (1996).

1    JH Kelly makes two attempts to limit the effect of its partial lien waivers.  First, JH Kelly
2 argues that AECOM's payment was untimely.  It notes that AECOM did not pay JH Kelly's
3 September 19, 2018 final retention invoice until over three years later on January 3, 2022.  *See*
4 Hack Decl., Exs. 22-23.  And it further notes that while the Subcontract itself requires AECOM to
5 pay JH Kelly within seven days after receiving payment from PG&E, *see* Subcontract § 7.2.4,
6 AECOM received its payment from PG&E "on or around" December 24, 2021, but did not pay JH
7 Kelly until January 3.  *See* Opp. at 15.

8    The problem with this argument, however, is that nothing in the waivers or the Subcontract
9 says that untimely payment renders JH Kelly's waivers unenforceable.  The only condition
10 precedent to AECOM's contractual rights identified in the waivers is JH Kelly's full receipt of
11 AECOM's funds.  *See* Mot. at 12 ("[O]n the receipt of such sum from AECOM Technical
12 Services Inc., and when the check has been properly endorsed and paid by the bank upon which it
13 is drawn, this document will become effective"); *see also Realmuto v. Gagnard*, 110 Cal. App. 4th
14 193, 199, 1 Cal. Rptr. 3d 569, 573 (2003) ("The existence of a condition precedent normally
15 depends upon the intent of the parties as determined from the words they have employed in the
16 contract.") (citations omitted).  Nor does anything in the Subcontract say that untimely payment
17 (by about four days) renders the subcontractor's lien and claim waivers unenforceable.  The Court
18 therefore finds no basis to find that the waivers JH Kelly drafted and executed are unenforceable
19 as a matter of law.

20    Second, JH Kelly contends that even if its waivers are enforceable, they are "limited to the
21 extent of the corresponding payment," which would mean that JH Kelly only waived its claims to
22 the $6,648,734.95 that AECOM already paid it.  Opp. at 16.  The Court does not share that view.

23    Again, JH Kelly's waivers provide the following: "[T]his document will become effective
24 to release and relinquish pro tanto any and all claims and lien rights JHK may have for and in
25 connection with the above-referenced project for said labor performed and materials furnished
26 through such date."  Mot. at 12.  The Court finds that the scope of JH Kelly's releases, by their

13

1  plain terms, are only limited by the effective date, not by the amount of corresponding payment.[9]
2  This finding is consistent with California law, and it makes sense. As the *Halbert's Lumber* court
3  explained, limiting the scope of the release to the extent of payment "would make the release
4  nothing more than a glorified receipt," since no rights would be released other than those that
5  would be released by virtue of the payment anyway. *Halbert's Lumber, Inc. v. Lucky Stores, Inc.*,
6  6 Cal. App. 4th 1233, 1250, 8 Cal. Rptr. 2d 298 (1992).[10]

7  JH Kelly maintains that Judge Davila's opinion in *Bergelectric Corp. v. Sauer, Inc.* is "on
8  all fours" with this case and compels a different result. No. 5:18-CV-00612-EJD, 2019 WL
9  1746061 (N.D. Cal. 2019). The Court disagrees. First, *Bergelectric* is persuasive, not controlling
10 authority. Second, while the *Bergelectric* court limited the subcontractor's lien and claim waiver
11 to the amount the subcontractor had been paid, it did so based on the plain terms of the applicable
12 subcontract, which specifically stated that "[i]n no event shall Design-Builder require the
13 Subcontractor to provide an unconditional waiver of lien or claim, either partial or final, before
14 receiving payment *or in an amount more than what has been paid*." *Id.* at *4 (emphasis added).
15 In other words, the *Bergelectric* court simply interpreted the contract according to its plain terms.
16 *See id.* at *5. The case thus stands for little more than the proposition that a party can contract for
17 a glorified receipt if it so chooses.

18 But here, JH Kelly did not so choose. The Subcontract simply provides that "[a]s a
19 prerequisite for any payment, Subcontractor must provide with each progress invoice a completed
20 Conditional/Unconditional Waiver and Release on Progress Payment form, as appropriate
21 (attached as Exhibit C1 and C2) from Subcontractor[.]" Subcontract § 7.2.1. Nothing in it

---

[9] Contrary to JH Kelly's view, the Court does not find the "pro tanto" language in the waivers to be very helpful. Pro tanto is a Latin phrase that means "only to that extent," or more colloquially, "as far as it goes." *Halbert's Lumber, Inc. v. Lucky Stores, Inc.*, 6 Cal. App. 4th 1233, 1247, 8 Cal. Rptr. 2d 298, 306 (1992). So when a waiver releases claims *pro tanto*, to emphasize the words "pro tanto" is simply to beg the question: "For so much as what? For as much as what may be? As far as what goes?" *Id.*

[10] *See also Tesco Controls, Inc. v. Monterey Mech. Co.*, 124 Cal. App. 4th 780, 797, 21 Cal. Rptr. 3d 751, 764 (2004) (finding that the trial court erred by limiting waiver to the extent of corresponding payment as opposed to the date listed); *J.A. Jones Constr. Co. v. Superior Ct.*, 27 Cal. App. 4th 1568, 1584, 33 Cal. Rptr. 2d 206 (1994).

14

expressly limits JH Kelly's release to the amount paid.[11]  *See also Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 297 (5th Cir. 2010) (distinguishing the waiver before it on the ground that it did not contain the limiting language "to the extent such monies have been paid" and declining to "turn back the clock and insert exceptions where [plaintiff] failed to do so").

The Court accordingly finds as a matter of law that the clear and plain language of JH Kelly's waiver releases its claims for labor and materials through the release date.  AECOM's motion for summary judgment as to JH Kelly's claim for labor and materials through the release date is **GRANTED**.

### C.   JH Kelly's Methodology for Measuring Loss of Productivity Damages

JH Kelly uses the "modified total cost method" to calculate loss of productivity damages, which is one of the several categories of damages it claims.  AECOM contends that JH Kelly may not use this method for quantifying its damages because JH Kelly cannot satisfy the applicable four-factor test.  Mot. at 1.  At least at this stage, the Court disagrees.

Under the total cost method, damages are determined by subtracting the contract amount from the total cost of performance.  *Amelco Elec. v. City of Thousand Oaks*, 27 Cal. 4th 228, 243-44, 38 P.3d 1120 (2002).  Before this method may be used, the plaintiff must make a prima facie showing that (1) it would be impractical to prove its actual losses directly; (2) its bid was reasonable; (3) its actual costs were reasonable; and (4) it was not responsible for the added costs.  *Id.* at 243.  If some of the contractor's costs were unreasonable or caused by its own errors or omissions, then those costs are subtracted from the damages to arrive at a "modified total cost."  *Dillingham-Ray Wilson v. City of Los Angeles*, 182 Cal. App. 4th 1396, 1408, 106 Cal. Rptr. 3d

---

[11] The model lien waivers referenced by and attached as exhibits to the Subcontract do not overcome the plain language of the operative waivers that JH Kelly ultimately and repeatedly chose to submit and execute.  And while California law makes lien waivers "null, void, and unenforceable" unless they are "substantially" in the form required by Cal. Civ. Code § 8132, this Court agrees with Judge Davila that that law only applies when the parties are waiving and releasing *California Mechanics Lien Law remedies*—which are the mechanics lien, the stop notice, the payment bond, and the prompt payment penalties.  *See Bergelectric*, 2019 WL 1746061, at *4.  It does not apply here because JH Kelly went further and waived other types of remedies, like "any and all claims and lien rights."  *See* Mot. at 12.

691, 701 (2010). If the plaintiff provides prima facie evidence of those factors, the trier of fact then applies the same test to determine the amount of total cost or modified total cost damages to which the plaintiff is entitled. *Id.* (citations omitted).

AECOM contends that JH Kelly cannot satisfy the first element and show that it would be impractical to prove its actual losses from AECOM's alleged breach. Mot. at 17-25. But in the Court's view, there is evidence in the record from which a reasonable jury could conclude that JH Kelly could not directly calculate its loss of productivity damages.

Tom Lee, JH Kelly's Executive Vice President and Chief Operating Officer, testified about the "job costs accounting system" that JH Kelly used to track its costs for various aspects of the Project. *See* Dkt. No. 226-3, Declaration of Tom Lee in support of JH Kelly's Opposition to AECOM's Motion for Partial Summary Judgment. Lee explained that JH Kelly's accounting system can accommodate "discrete" changes in budgets by segregating the existing scope of work from any added or changed scope. *Id.* ¶ 12. But on the Project, Lee claims, JH Kelly experienced "multiple, overlapping impacts" attributable to AECOM and/or PG&E, such as design changes, delayed permitting, delayed procurement, acceleration, fatigue from working excessive overtime, and winter work conditions. *Id.* ¶ 17. Lee testified that JH Kelly could not segregate and track individually the cost of each of those impacts. *Id.* ¶ 18. Steve Lennon, JH Kelly's Senior Project Manager on the Project, agrees and also testified that "in many cases it was impractical for Kelly to track the discrete amount of cost associated with the change due to the overlapping nature of the change with the original scope of work." Dkt. No. 226-2 ¶ 8.

As AECOM points out, there is evidence in the record that could undermine JH Kelly's position. For example, Larry Nulliner, JH Kelly's superintendent in charge of field personnel, testified that his field staff did "an excellent job of monitoring what costs got inputted into the change orders" and had no difficulty tracking the change costs. *See* Mot. at 22. But ultimately, whether and to what extent JH Kelly's accounting system could accurately and comprehensively measure loss of productivity is a genuine factual dispute that will be resolved at trial. At this stage, the Court must view the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party and may not weigh the evidence or make credibility

16

determinations. *Matsushita*, 475 U.S. at 587-88; *Freeman*, 125 F.3d at 735.  Applying that standard, the Court finds that JH Kelly has shown that a genuine issue of fact exists as to whether the multiple, overlapping delays and disruption it experienced (1) were caused by AECOM and (2) made it impractical or impossible for JH Kelly to track its productivity losses directly.  AECOM's motion is therefore **DENIED** as to JH Kelly's methodology for measuring loss of productivity damages.

**IT IS SO ORDERED.**

Dated: 5/20/2022

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge