UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JH KELLY, LLC,

                    Plaintiff,

          v.

AECOM TECHNICAL SERVICES, INC.,

                    Defendant.

Case No.  20-cv-05381-HSG

**ORDER ON DAUBERT MOTIONS**

Re: Dkt. Nos. 203, 204, 206, 207, 208, 209, 210

Before the Court are various motions to exclude expert opinions and testimony brought by both JH Kelly LLC ("JH Kelly") and Defendant and Counter-Claimant AECOM Technical Services, Inc. ("AECOM").  Considering the significant number of disputes both parties have raised in this case generally and in these motions specifically, the Court will endeavor to provide succinct rulings on these motions as described below.  The general theme is that the parties' motions mostly function as previews of their cross-examinations, and are largely based on issues that go to the weight the jury should assign the expert testimony instead of whether it is admissible.  Most of them are accordingly denied.

I.    BACKGROUND

    This construction dispute arises out of the Burney K2 Replacement Project ("Project"), which involved the replacement of a natural gas compressor unit and various upgrades at a compressor station near Burney, California.  Dkt. No. 102 (JH Kelly's Second Amended Complaint or "SAC") ¶ 1.  The Burney Compressor Station is part of Pacific Gas & Electric Company's ("PG&E") natural gas distribution system.  *Id.* ¶ 11.  That system supplies natural gas to the surrounding area and allows compressed gas to travel through pipelines from Oregon to consumers in California.  *Id.*  In all, PG&E's natural gas distribution system serves around 4.2

United States District Court
Northern District of California

1    million customers from Bakersfield, California to the Oregon border.  *Id.*

2          On February 11, 2016, AECOM entered into an agreement (the "EPC Agreement") with

3    PG&E for the Project.  *Id.* ¶ 19.  Under the EPC Agreement, AECOM agreed to act as the design-

4    builder and prime contractor for the Project.  *Id.*  On October 21, 2016, AECOM and JH Kelly

5    entered into an agreement (the "Subcontract") for the construction portion of the work.  *Id.* ¶¶ 25-

6    27.

7          Various issues on the Project led to disputes between JH Kelly, AECOM and PG&E.

8    Relevant here, JH Kelly contends that the Project was changed from what it bid and agreed to

9    perform, and that these changes imposed significant additional work and more difficult working

10   conditions.  *See* Dkt. No. 162 ("Joint Pretrial Statement").  JH Kelly also asserts that AECOM

11   repeatedly ignored the Subcontract's change-order requirements to pay JH Kelly for the changed

12   work.  *Id.*  AECOM denies each of those claims and counterclaims that JH Kelly breached the

13   Subcontract.  *Id.*

14         JH Kelly filed the First Amended Complaint in January 2021.  Dkt. No. 18.  AECOM and

15   PG&E reached a settlement in October 2021 and ultimately agreed to dismiss their claims against

16   one another with prejudice.  *See* Dkt. Nos. 93, 127.  JH Kelly then filed the operative complaint,

17   which AECOM moved to dismiss in part.  Dkt. No. 102.  AECOM's motion was granted in part

18   and denied in part.  Dkt. No. 179.

## II.   LEGAL STANDARDS

### A.   Rules 26 and 37

21         Federal Rule of Civil Procedure 26 provides that a party must, without awaiting a

22   discovery request, provide to the other parties:

23

24         (i)    the name and, if known, the address and telephone number of
                  each individual likely to have discoverable information—
25                along with the subjects of that information—that the
                  disclosing party may use to support its claims or defenses,
26                unless the use would be solely for impeachment;

27         (ii)   a copy—or a description by category and location—of all
                  documents, electronically stored information, and tangible
28                things that the disclosing party has in its possession, custody,
                  or control and may use to support its claims or defenses, unless

2

the use would be solely for impeachment.

Fed. R. Civ. P. 26(a).

Rule 26(e), in turn, provides the framework under which a party may supplement those initial disclosures. Specifically, it states that a party who has made an initial disclosure, or who has responded to an interrogatory, request for production, or request for admission, "must supplement or correct its disclosure or response in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e).

And finally, Rule 37(c)(1) provides: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." In addition, or instead, the court may also impose other appropriate sanctions provided for in Rule 37. *See* Fed. R. Civ. P. 37(c)(1)(A)-(C). "The party facing sanctions bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless." *R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1246 (9th Cir. 2012).

### B.   Rules 402 and 403

The Court has broad discretion to manage the conduct of a trial and the evidence presented by the parties. *Navellier v. Sletten*, 262 F.3d 923, 941-42 (9th Cir. 2001). "To be admissible, evidence must be relevant under Fed. R. Evid. 402 and its probative value must not be substantially outweighed by the danger of unfair prejudice under Fed. R. Evid. 403." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1019 (9th Cir. 2004).

Under Federal Rule of Evidence 401, evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Fed. R. Evid. 401. And under Federal Rule of Evidence 403, and as is true with all evidence, the Court must consider whether the probative value of proffered evidence "is substantially outweighed by a danger of one or more of the following:

unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  The Federal Rules of Evidence confer "broad discretion on the trial judge to exclude evidence on any of the grounds specified in Rule 403." *United States v. Hearst*, 563 F.2d 1331, 1349 (9th Cir. 1977); *see also United States v. Olano*, 62 F.3d 1180, 1204 (9th Cir. 1995) ("trial courts have very broad discretion in applying Rule 403") (citations omitted).

### C.    Rule 702

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise" where: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.  Expert testimony is admissible under Rule 702 if the expert is qualified and if the testimony is both relevant and reliable.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *see also Hangarter*, 373 F.3d 998, 1015 (9th Cir. 2004).  Rule 702 contemplates a "broad conception of expert qualifications." *Hangarter*, 373 F.3d at 1018 (emphasis in original).

Courts consider a purported expert's knowledge, skill, experience, training, and education in the subject matter of his asserted expertise. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000); *see also* Fed. R. Evid. 702.  Relevance, in turn "means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.") (quotation omitted). Under the reliability requirement, the expert testimony must have a "reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565.  To ensure reliability, the Court "assess[es] the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.* at 564.

4

### III.   DISCUSSION

#### A.   AECOM's *Daubert* Motions

##### i.   AECOM's Motion to Exclude Testimony of Greg McKinnon (Dkt. No. 203)

JH Kelly retained a forensic accountant, Mr. Greg A. McKinnon, to opine on the "Project budgets and costs of AECOM and PG&E and progress billings and payments between AECOM and PG&E and Kelly and AECOM." *See* Dkt. No. 203, Declaration of Luke Eaton ISO AECOM's Motion to Exclude Testimony of Greg McKinnon, Ex. 1 ("McKinnon Report") ¶ 5. Mr. McKinnon's assignment was "limited to review and analysis of the billing and payment record in order to calculate that part of the Subcontract balance" that AECOM owed JH Kelly, based on payments received from PG&E. *Id.* ¶ 14. Mr. McKinnon opined that this amount is $6,265, 276. *Id.* He was also asked "to determine where AECOM and PG&E cost overruns occurred and to compare design cost overruns to construction cost overruns," and he opined that AECOM had "significant" cost overruns for the Project. *Id.* ¶ 15.

AECOM first contends that Mr. McKinnon should not testify before the jury because his analysis is solely related to JH Kelly's prompt payment claim, which was bifurcated and will be decided by the Court. Dkt. No. 203 at 1. It then argues that Mr. McKinnon's testimony would invite the jury to infer that design cost overruns on the Project caused construction cost overruns without a factual basis for doing so. *Id.* As explained below, the Court will not preclude Mr. McKinnon from testifying for either reason.

The Court begins with AECOM's first argument. The parties stipulated that the Court will determine JH Kelly's prompt payment claim and its request for litigation costs, attorney fees, and interest after the jury has rendered a verdict. *See* Dkt. No. 147. AECOM contends that Mr. McKinnon's report "almost exclusively relates to the bifurcated prompt payment claim" and therefore is irrelevant and should be excluded. Dkt. No. 203 at 2. In response, JH Kelly argues that Mr. McKinnon's testimony about the flow of payments from PG&E to AECOM and down to JH Kelly is directly relevant to its breach of contract claim. Dkt. No. 222 at 6.

JH Kelly's prompt payment claim and breach of contract claim have some overlap, since JH Kelly ultimately argues that AECOM breached the Subcontract and violated California's

1    prompt payment laws by failing to timely pay amounts owed to JH Kelly.  *See* Joint Pretrial

2    Statement at 2.  Mr. McKinnon's testimony on the flow of payments therefore bears some

3    relevance to both claims.  And as to the helpfulness of Mr. McKinnon's testimony under Rule

4    702(a), the Court finds that Mr. McKinnon's expertise in construction accounting can help the jury

5    track the complicated billings between the parties to the EPC agreement and Subcontract.

6         AECOM also argues that Mr. McKinnon's opinions on the relationship between design

7    cost overruns on the Project and construction cost overruns are not proper expert opinions because

8    they are not based on any forensic accounting analysis.  Mot. at 6.  But AECOM's challenge bears

9    on the weight of the expert's testimony as opposed to its admissibility.  After reviewing Mr.

10   McKinnon's report, the Court finds that his analysis of AECOM's cost overruns, when viewed as

11   a whole, is sufficiently based on his analysis of the billings at issue and his experience in

12   accounting, auditing, and analyzing costs related to construction projects to be admissible under

13   Rule 702.  And as to the risk of unfair prejudice under Rule 403, the probative value of Mr.

14   McKinnon's analysis is not substantially outweighed by the risks of unfair prejudice, undue delay,

15   or any other Rule 403 concern.  To the extent AECOM fears the jury will assign undue weight to

16   Mr. McKinnon's causal analysis (or lack thereof) between design and construction costs, it will

17   have every opportunity to undermine that testimony through effective cross-examination.  Mr.

18   McKinnon will testify and, after AECOM's cross-examination, the jury will decide how much

19   weight to give the testimony.  *Primiano v. Cook*, 598 F.3d 558, 566 (9th Cir. 2010) (where the

20   foundation is sufficient, the litigant is entitled to have the jury decide upon the experts' credibility,

21   rather than the judge).  AECOM's motion is **DENIED.**

22        **ii.    AECOM's Motion to Exclude Testimony of Gerald Zamiski (Dkt. No. 204)**

23        JH Kelly intends to offer Dr. Gerald Zamiski to provide expert testimony in support of its

24   defense to an AECOM counterclaim that seeks reimbursement for the replacement of a leaking gas

25   valve on the Project known as "GOV-2."  Dr. Zamiski's assignment was to determine if sufficient

26   evidence exists to conclude (1) what caused the minor GOV-2 valve seat leakage, (2) what or who

27   is responsible for the minor GOV-2 valve seat leakage, or (3) whether the GOV-2 valve is

28   functional and if replacement is necessary.  Dkt. No. 204-2, Declaration of R. Zachary Torres-

United States District Court
Northern District of California

1   Fowler ISO Motion to Exclude Testimony of Gerald Zamiski, Ex. A ("Zamiski Report") at 1.  Dr.

2   Zamiski concluded that (1) there is no evidence sufficient to conclude with a reasonable degree of

3   engineering certainty what caused the GOV-2 valve leak; (2) it is not possible to determine who or

4   what is responsible for the GOV-2 valve leak; and (3) the GOV-2 valve is "functional" and does

5   not require replacement.  *See id.* at 15-18.  AECOM's motion seeks to preclude Dr. Zamiski from

6   testifying based on four categories of arguments, which the Court briefly addresses below.

7       AECOM's first major argument is that Dr. Zamiski's opinion will not be helpful to the jury

8   and is not premised on reliable methods because it is not based on visual inspection or laboratory

9   analysis of the GOV-2 valve and is instead simply based on his review of the evidentiary record.

10  Dkt. No. 204 at 12.

11      The Court disagrees.  AECOM is right that Dr. Zamiski did not conduct a laboratory test or

12  inspection to determine the root cause of the GOV-2 valve leak.  As Dr. Zamiski explains in his

13  report, he could not do so because PG&E decided to leave the valve in use underground, making it

14  impossible for anyone to perform a visual examination or laboratory inspection.  Zamiski Report

15  at 14.  But in the Court's view, that does not mean that Dr. Zamiski's testimony is necessarily

16  unreliable or unhelpful under Rule 702.  For one, just because Dr. Zamiski did not conduct

17  "laboratory testing" does not mean that he did not still use specialized knowledge and experience

18  to assess whether there is sufficient evidence of the root cause of the GOV-2 valve leak.  Dr.

19  Zamiski was clear during his deposition that his expertise in material failure analysis requires and

20  generally allows him to determine the cause of failure of various types of components:

> Q. As I understand it -- and you can tell me if I'm wrong. I don't want
> to mischaracterize this area of practice. But material failure analysis
> is when you kind of study a particular type of material and the stresses
> that -- physical stresses or temperature stresses that that material
> experiences and how it reacts. Is that about right?
>
> A. That's one part of it. Sure. Basically, the bigger picture is as you
> take a component, it's got materials in it. You find out how it failed
> or what failed, and then you determine is it cracking, is it wear, is it
> corrosion, is it abrasion. I mean, there's a whole list of things,
> corrosion -- so there's a whole core of failure modes for materials
> used in components. And that's what I do.

United States District Court
Northern District of California

1    Declaration of Eric A. Grasberger ISO JH Kelly LLC's Opposition, Ex. 16 at 28-29.  Even though

2    he did not conduct laboratory testing, Dr. Zamiski's analysis of the GOV-2 valve leak still falls

3    within the broad scope of that expertise.  Nor is it dispositive that Dr. Zamiski based his review on

4    a survey of the available evidentiary record rather than physical testing.  As Judge Chhabria

5    explained, "[a] broad survey of the available evidence is neither unusual in expert testimony nor

6    necessarily inappropriate." *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1130 (N.D.

7    Cal. 2018) (citations omitted).  And while AECOM argues that the jury could understand and

8    interpret the documents and testimonial evidence that Dr. Zamiski reviewed themselves, the Court

9    disagrees and finds Dr. Zamiski's testimony on the cause of the GOV-2 valve leak and

10   responsibility for the valve leak to be sufficiently helpful and based on his experience and review

11   of the record to survive scrutiny under Rules 702 and 403.  *See* Dkt. No. 204 at 13.

12            Second, AECOM argues that Dr. Zamiski's opinion on the cause of the GOV-2 valve leak

13   is an improper opinion regarding whether AECOM satisfied its burden of proof and therefore

14   invades the province of the jury.  *Id.* at 14.  But while Dr. Zamiski's opinion certainly embraces

15   the ultimate issue to be decided the jury, the Federal Rules of Evidence make clear that "[a]n

16   opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a); *see*

17   *also Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) ("It is well-

18   established that expert testimony concerning an ultimate issue is not per se improper.") (citations

19   omitted and cleaned up).  Of course, an expert witness cannot give an opinion as to her legal

20   conclusion.  *See id.*  But Dr. Zamiski does not do that.  His opinion that there was not sufficient

21   evidence to conclude what caused the GOV-2 valve leak or who was responsible for doing so goes

22   to factual causation, and it is admissible.

23            Third, AECOM challenges Dr. Zamiski's opinion that there is no physical or other

24   evidence sufficient to conclude with a reasonable degree of engineering certainty that the GOV-2

25   valve requires replacement.  Dkt. No. 204 at 15.  To begin, AECOM reprises its argument that Dr.

26   Zamiski's opinion should be excluded because he conducted no independent analysis and because

27   it is an improper legal conclusion.  *Id.* at 16.  These are the same arguments AECOM made about

28   the extent of the GOV-2 leak, and the Court rejects them in this context for the same reasons.

United States District Court
Northern District of California

More substantively, AECOM argues that although there is no dispute that Dr. Zamiski is qualified to opine on issues related to mechanical or material failure analysis, the question of whether the GOV-2 valve must be replaced implicates important considerations that fall outside Dr. Zamiski's expertise. *Id.* at 16-17. While that question requires a detailed understanding of PG&E's operations and industry, AECOM contends, Dr. Zamiski is not privy to PG&E's maintenance procedures, has not interviewed anyone from PG&E, and has no understanding of PG&E's business practices/considerations. *Id.* at 17.

The Court does not find Dr. Zamiski's opinion on whether the GOV-2 valve requires replacement helpful or adequately supported. Dr. Zamiski's opinion that the GOV-2 valve is "functional and does not require removal" is primarily based on his observation that PG&E has decided to leave the valve in use since May 2018. *See* Zamiski Report at 18-19. This testimony lacks the kind of specialized knowledge required by Rule 702(a), and the Court will not allow Dr. Zamiski to put the imprimatur of his expertise on it. *See White v. Ford Motor Co.*, 312 F.3d 998, 1008-9 (9th Cir. 2002) ("A layman, which is what an expert witness is when testifying outside his area of expertise, ought not to be anointed with ersatz authority as a court approved expert witness for what is essentially a lay opinion."). Dr. Zamiski may not testify that the GOV-2 valve is "functional and does not require removal." *See* Zamiski Report at 18-19.

And fourth, AECOM raises two procedural challenges to Dr. Zamiski's opinion. First, AECOM moves under Federal Rule of Civil Procedure 26 to prevent Dr. Zamiski from testifying about the POV-166 back-charge, which is a separate counterclaim against JH Kelly for the replacement costs of the POV-166 valve after PG&E discovered that the valve was damaged by significant amounts of clay, sand, and other debris. Dkt. No. 204 at 18. And second, AECOM argues that Dr. Zamiski must be prohibited from testifying at trial because JH Kelly improperly redacted a series of hand-written notes that Dr. Zamiski allegedly considered when preparing his rebuttal report. *Id.* at 19-21. JH Kelly contends that these challenges are overblown because JH Kelly will not ask Dr. Zamiski to opine about the cause of the damage to POV-166, and the "redactions" were comprised of comments made by JH Kelly's counsel that Dr. Zamiski did not rely on. Opp. at 17-18.

United States District Court
Northern District of California

1    The Court finds these disputes inconsequential.  Because AECOM has failed to

2  adequately articulate how it suffered prejudice because of the challenged conduct in light of JH

3  Kelly's explanations, the Court will not preclude Dr. Zamiski from testifying for either reason.

4  *See* Fed. R. Civ. P. 37(c)(1).  To summarize, Dr. Zamiski may not testify that the GOV-2 valve is

5  "functional and does not require removal," but AECOM's motion is otherwise **DENIED.**

6    **iii.    AECOM's Motion to Exclude Testimony of Dr. William Ibbs (Dkt. No. 206)**

7    JH Kelly claims that it suffered loss of productivity damages because of AECOM's

8  excessive changes to the Project.  *See* Dkt. 102 ¶ 49.  JH Kelly retained Dr. William Ibbs to

9  quantify the impact of those changes.  To do so, Dr. Ibbs used four different methodologies for

10  measuring loss of productivity – (1) Measured Mile; (2) Ibbs Curve; (3) MCAA Factors and (4)

11  Modified Total Cost, as reflected below:

| Damage Category 1 | |
| --- | --- |
| **Quantification Method** | **D&D Damages** |
| Measured Mile | $ 8,465,712 |
| IBBS Curves | $ 8,806,423 |
| MCAA Factors | $ 8,524,734 |
| Modified Total Cost | $ 8,941,595 |
| **Average** | **$ 8,709,616** |

21  *See* Declaration of Marion T. Hack ISO Motion to Exclude Testimony of Dr. Williams Ibbs

22  ("Hack Decl."), Ex. 1 ("Ibbs 2021 Report") ¶ 286.  And he identified five categories of lost

23  productivity damages: (1) damages for the delay and disruption ("D&D") that the craft labor

24  employed directly by JH Kelly suffered; (2) JH Kelly's equipment D&D damages; (3) JH Kelly's

25  staff D&D damages; (4) and JH Kelly's subcontractor D&D damages.  *Id.* ¶ 283.

26    AECOM contends that all of Dr. Ibbs's damages calculations rely on unsubstantiated

27  speculation and subjective beliefs and thus run afoul of Rule 702.  *See* Dkt. No. 206 at 7.

28

10

AECOM raises four categories of challenges, which the Court addresses below.[1]  The major theme here is that while the Court agrees that some of AECOM's criticisms of Dr. Ibbs's analysis have significant force, it will ultimately allow the jury to determine how much weight to assign his opinions.

### a.  JH Kelly's Subcontractor and Staff D&D Damages

AECOM first seeks to exclude Dr. Ibbs's opinions on JH Kelly's alleged subcontractor and staff D&D costs.  *See* Ibbs 2021 Report ¶ 255.  AECOM primarily criticizes Dr. Ibbs for assuming that it was responsible for 99.72% of JH Kelly's staff and subcontractor cost overruns.  Dkt. No. 206 at 10.  Specifically, AECOM contends that Dr. Ibbs applied the same amount he quantified for JH Kelly's craft labor's self-inflicted D&D (.28%) to also calculate JH Kelly's staff and subcontractor D&D—despite allegedly doing "absolutely no analysis" or investigation to confirm that the staff or subcontractors experienced similar productivity impacts.  *Id.*  JH Kelly disputes that Dr. Ibbs used the same self-inflicted loss figure to calculate both categories of D&D.  *See* Dkt. No.223 at 17 ("Based on the aforementioned calculation summary, AECOM's complaint that Dr. Ibbs assigned only .28% of the costs to Kelly and its subcontractors is simply not accurate.").

The Court agrees with AECOM that Dr. Ibbs's opinions about JH Kelly's alleged subcontractor and staff D&D costs appear to rest on a shaky foundation.  At deposition, Dr. Ibbs admitted that he could not particularize his analysis to JH Kelly's subcontractors and therefore applied the same self-inflicted loss figure:

> Q. Well, Dr. Ibbs, you didn't do any actual calculation as to what -- you didn't do any investigation as to what the subcontractors could have actually caused on their own, did you?
>
> **A. I -- I -- I -- I didn't have that level of information. I used what was self-inflicted problems for Kelly, and I applied that to the other subs. That was the best information that I had available. I didn't have any other quantitative information that would allow me to particularize it to the subs beyond that**.
>
> Q. But you agree that, I mean, JH Kelly could have had a small

---

[1] The Court finds AECOM's challenge to Dr. Ibbs's use of the modified total cost method moot in light of its prior Order denying AECOM's motion for summary judgment on this ground.  *See* Dkt. No. 229 at 15-17.

1  amount of problems, but their subs could have been terrible, right? I mean, you just don't know, do you?

2  MR. GRASBERGER: Objection. Argumentative.

3  THE WITNESS: I used a method that I thought was the focus given the information that was available. **A lot of these subs had fixed price contracts and they wouldn't disclose or they're not going to disclose that type of information.** So I did what I thought was a reasonable -- provided what I thought was a reasonable estimate for the subs using the information that I had available.

7  Hack Decl. ¶ 5, Ex. 2 ("Ibbs Dep.") at 144-145 (emphases added).  Dr. Ibbs's explanation for

8  assuming that AECOM was responsible for 99.72% of JH Kelly's staff and subcontractor cost

9  overruns appears weak.  His argument is essentially that he did so because he had no choice.  But

10  in the end, the Court finds that AECOM's assertion that Dr. Ibbs made an unsupported assumption

11  and therefore reached faulty conclusions bears on the weight of his testimony, not its

12  admissibility.  *See United States for Use & Benefit of Bergelectric Corp. v. Sauer, Inc.*, No. 5:18-

13  CV-00612-EJD, 2020 WL 470273, at *2 (N.D. Cal. Jan. 29, 2020) ("District courts within and

14  outside this district have often concluded that experts' decisions about what data to use in their

15  analysis bear on the weight, not the admissibility, of expert testimony.") (citations omitted and

16  cleaned up).  Dr. Ibbs says that his decision to impute JH Kelly's craft labor's self-inflicted loss

17  figure to its subcontractors still provides for a "reasonable estimate," and that judgment is based

18  on his extensive experience quantifying productivity loss.  *See* Ibbs Dep. at 144-145; Ibbs Report ¶

19  4.  The Court accordingly finds that his opinion on JH Kelly's alleged subcontractor and staff

20  D&D costs narrowly survives scrutiny under Rule 702.  The probative value of the testimony is

21  also not substantially outweighed by the risk of unfair prejudice, undue delay, or any other Rule

22  403 consideration.  To the extent AECOM fears the jury will assign undue weight to Dr. Ibbs's

23  opinion, it will have every opportunity to undermine the testimony through vigorous cross-

24  examination.

25  ### b.  Measured Mile Method

26  Second, AECOM argues that Dr. Ibbs has not reliably applied the "measured mile" method

27  of calculating loss of productivity damages.  The measured mile method is a technique where an

28  expert compares unimpacted construction work to work that has been disrupted and measures the

United States District Court
Northern District of California

United States District Court
Northern District of California

difference.  *See United States of Am. for the Use of Salinas Constr., Inc. v. W. Sur. Co.*, No. 14-1963 JLR, 2016 WL 3632487, at *3 (W.D. Wash. July 7, 2016) (citations omitted).  The assumption is that the difference between the labor or equipment hours in the unimpacted and impacted work represents the loss to the contractor.  *Id.*  It is a recognized and accepted method of calculating loss of productivity.  *Id.*  But as a matter of common sense, for the measured mile method to work the impacted and unimpacted activities being compared must be reasonably similar.  As AECOM notes, Dr. Ibbs himself has written that "[t]he measured mile analysis technique requires identical or substantially similar work for productivity comparisons. If the affected work is unique, or if the contractor did not keep good contemporaneous records, no measured mile may exist."  *See* Dkt. No. 206 at 11 (citing Daniel E. Toomey, Joshua S. Marks, Dr. Tong Zhao, P.E. & J. Mark Dungan, *Calculating Lost Labor Productivity: Is There a Better Way?*, THE CONSTRUCTION LAWYER, Spring 2015, at 6).

AECOM argues that Dr. Ibbs misapplies the measured mile method because he does not compare identical or even reasonably similar work in his analysis.  *Id.*  Specifically, AECOM contends that Dr. Ibbs calculated the disruption of one trade activity on the Project—main gas piping—to be 36.1%, and then applied that calculation to all other scopes of work including one of the largest trades, electrical work activity.  *Id.* at 10-16.  JH Kelly explains that Dr. Ibbs had no choice but to use this approach because after an initial minimally-impacted time period (during which the main gas piping work was performed), the entire project was so impacted that it became "extremely difficult" to derive a measured mile for the other impacted work activities.  Dkt. No. 223 at 18-21.

The Court again agrees with AECOM that Dr. Ibbs's extrapolation of one type of work to an entire project—particularly a project as broad as this one—warrants scrutiny.  But as JH Kelly notes, Judge Davila recently found that similar flaws in a construction expert's loss of productivity analysis "bear on the weight of [the expert's] testimony not its admissibility." *United States for Use & Benefit of Bergelectric Corp. v. Sauer, Inc.*, No. 5:18-CV-00612-EJD, 2020 WL 470273, at *2 (N.D. Cal. Jan. 29, 2020) ("The alleged flaws in [expert]'s measured mile analysis . . . may be tested during trial through competing evidence and incisive cross-examination.").  This Court

1   agrees.  *See also id.* at *2 ("District courts within and outside this district have often concluded

2   that experts' decisions about what data to use in their analysis bear on the weight, not the

3   admissibility, of expert testimony.").  And as to the risk of unfair prejudice under Rule 403, the

4   probative value of Dr. Ibbs's analysis is not substantially outweighed by the risk of unfair

5   prejudice, undue delay, or any other Rule 403 consideration.  To the extent AECOM fears the jury

6   will assign undue weight to Dr. Ibbs's extrapolation, it again will have every opportunity to

7   undermine the testimony through effective cross-examination.

8                                          **c.   Ibbs Curves Method**

9          AECOM also challenges Dr. Ibbs's use of the "Ibbs Curves" methodology to quantify

10   delays and disruption on the Project.  Dkt. No. 206 at 17.  Before ruling on those challenges, the

11   Court will briefly explain how this method works.  Dr. Ibbs has a "database" of historical projects

12   that have experienced loss of productivity, which comes from research he has performed over the

13   past three decades.  Ibbs 2021 Report ¶ 260.  His research has essentially found that there is a

14   statistical relationship between (1) the amount and timing of changes to a project and (2) a

15   contractor's loss of productivity from that project.  *Id.* ¶¶ 260-64.  As reflected below, the Ibbs

16   Curves method accordingly measures this relationship with three separate axes for the percentage

17   of change, the timing of those changes (separated by early, median, or late), and the percentage of

18   productivity loss:

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Id.* at 132.  Dr. Ibbs classified the Project as a "late change" project and estimated JH Kelly's D&D damages to be $8,806,423.  *Id.* ¶ 266.

AECOM first contends that the Ibbs Curves method should be excluded because it has not been endorsed by the industry and has not been peer-tested due to proprietary underlying data. Dkt. No. 206 at 17.  As evidence, AECOM relies on a 2007 academic paper where a commentator said that the Ibbs Curves Method "has not yet been endorsed by the industry."  *Id.* (citations omitted).  But that was fifteen years ago.  Dr. Ibbs declared under penalty of perjury that since 2007, his method has been published in "numerous peer-reviewed scientific journals," has been "tested and meets the standards of the reviewers and readers of those scientific journals," and has a "known" rate of error reported by way of the statistical standard deviation accompanying the formulas he uses.  *See* Dkt. No. 223-2, Declaration of Dr. William Ibbs ISO JH Kelly's Opposition to AECOM's Daubert Motion ¶ 4.  Based on this representation, the Court finds that there is

United States District Court
Northern District of California

1  sufficient evidence that Dr. Ibbs's analysis "has been tested in accordance with proper scientific

2  methodology, that the articles were subject to peer review, or that the theory is generally accepted

3  in the relevant (or any) scientific community."  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.

4  137, 149-50 (1999).

5      AECOM also takes issue with the "subjective" nature of the Ibbs Curves method and cites

6  its own expert's testimony for the proposition that the Ibbs Curves method is "not appropriate for

7  or used in dispute resolution engagements."  Dkt. No. 206 at 20.  This challenge plainly goes to

8  the weight of the evidence.  At trial, AECOM will be able to show why it believes the Ibbs Curves

9  is unreliable by questioning the underlying data, pointing out its proprietary nature, challenging

10  Dr. Ibbs's assumptions, and putting on its own expert.

### d.  MCAA Factors

12      AECOM also challenges Dr. Ibbs' Mechanical Contractors Association of American

13  ("MCAA") factors analysis.  Dkt. No. 206 at 21.  This approach proceeds in two steps.  First, there

14  are 16 factors recognized by mechanical industry observers as being harmful to labor productivity,

15  like crew size inefficiency, fatigue, or season and weather change.  *See* Ibbs Report at 138.

16  Aligned against those factors are three degrees of severity: minor, average, and severe.  *Id.*

17  MCAA factors analysis consists of matching an impact with the appropriate severity level and

18  applying that figure to labor hours to estimate project disruption.  *Id.* ¶ 269.

19      AECOM relies on three out-of-circuit district court cases for the proposition that MCAA

20  factors analysis per se fails to satisfy *Daubert* standards.  Dkt. No. 206 at 21.  But AECOM may

21  have misread those cases.  Two of them disprove AECOM's point because they are post-trial cases

22  where the courts clearly allowed testimony on MCAA factors analysis.  *See N. Am. Mech., Inc. v.*

23  *Walsh Const. Co. II, LLC*, 132 F. Supp. 3d 1064, 1081 (E.D. Wis. 2015) (allowing a witness to

24  testify about his MCAA factors analysis but ultimately declining to use that approach to calculate

25  damages because the witness failed to analyze the specific conditions of the project to arrive at an

26  appropriate inefficiency rate); *Sunshine Const. & Eng'g, Inc. v. United States*, 64 Fed. Cl. 346, 371

27  (2005) (defendant's expert testimony demonstrated that the plaintiff's expert's MCAA factors

28  analysis was not recognized as an accepted approach by his peers or by any trade association).

The third case concerned a *Daubert* motion, but that court clarified that it was *not* analyzing the type of MCAA factors analysis that Dr. Ibbs undertook.  *See Trane US Inc. v. Yearout Serv., LLC*, No. 5:17-CV-42-MTT, 2019 WL 2553100, at *4 (M.D. Ga. June 20, 2019) (distinguishing the sixteen-factor MCAA methodology used here from the MCAA methodology the expert before it had used, and noting that several Board of Contract Appeals cases had approved the sixteen-factor methodology).  The Court accordingly finds no basis to conclude that MCAA factors analysis per se fails to satisfy *Daubert* standards.

As to Dr. Ibbs's application of the MCAA factors to this case, AECOM suggests that he manipulated his analysis to arrive at a predetermined outcome.  For instance, AECOM argues that because Dr. Ibbs's 2021 report has a lower calculation of loss of productivity labor hours than his 2019 report, he increased other MCAA factors "to support the ultimate damages claim by JH Kelly."  Dkt. No. 206 at 22-23.  And AECOM also criticizes Dr. Ibbs for basing approximately half of his lost labor productivity hours on the "vague" logistics factor.  *Id.* at 23.  Again, this challenge goes to the weight of the evidence, and it does not pose a risk of unfair prejudice.  The proper manner of demonstrating that Dr. Ibbs misapplied the MCAA factors is through "through competing evidence and incisive cross-examination," as the case AECOM cited reflects.  *Murray v. S. Route Mar. SA*, 870 F.3d 915, 925 (9th Cir. 2017) (citations omitted); *see also Sunshine Const.*, 64 Fed. Cl. at 371.

To summarize, AECOM's motion is **DENIED** in its entirety.

**B.    JH Kelly's *Daubert* Motions**

**i.    JH Kelly's Motion to Exclude Portions of Expert Testimony of Denise Martini (Dkt. No. 207)**

Ms. Martini is a civil engineer who provides her clients with construction consulting services, including advising on and analysis of project planning, management and controls, construction delay and disruption claims, and the calculation of financial damages.  *See* Dkt. No. 207-1, Declaration of Eric Grasberger ISO Daubert Motion, Ex. 1 ("Martini Report").  She was originally retained as an expert witness by PG&E, but after the settlement between PG&E and AECOM, AECOM retained her to help prosecute five PG&E counterclaims against JH Kelly.

1    Dkt. No. 218 at 2.  On October 18, 2022, while still acting on behalf of PG&E, Ms. Martini

2    submitted a single expert report in this case.  *See generally* Martini Report.  As part of this report,

3    PG&E asked Ms. Martini to conduct an accounting of the damages associated with five PG&E

4    backcharge claims.  *See id.* at 1-2.  Ms. Martini opines that PG&E has incurred or will incur a total

5    cost of $1,382,576 to repair, replace, or complete discrete items of work on the Project.  *Id.* at 2.

6              JH Kelly seeks to exclude Ms. Martini's opinion on the overhead or "indirect" expenses

7    that PG&E has allegedly incurred in connection with damages for repair of the V-35 valve, the

8    POV-166 valve, and for other Project elements.  *See generally* Dkt. No. 207.  The crux of JH

9    Kelly's argument is that Ms. Martini's testimony is unhelpful because it merely reiterates

10   allegations made by PG&E without performing any independent analysis into whether the

11   allegations were accurate or reliable.  *Id.*

12            The Court agrees with JH Kelly that Ms. Martini's report is, at times, light on substance.

13   For example, Ms. Martini wrote that PG&E added "discrete overhead costs" to the "direct labor

14   costs" to arrive at its "total fully burdened labor cost," and that an alternative to this approach is to

15   add a single 250% labor overhead to its labor cost.  Martini Report at 6.  But as far as analysis

16   goes, she merely wrote that "[b]oth of these practices are a reasonable way to capture the full cost

17   of labor to PG&E."  *Id.*  She takes a similar approach when opining on the indirect expenses that

18   PG&E has allegedly incurred.  *See, e.g.*, *id.* at 7 ("PG&E employees charged time and other costs

19   related to this repair to a specific cost code for the POV-166 valve repair, which I understand is

20   consistent with PG&E practice and is, in my opinion, a reliable cost accounting procedure."); *id.*

21   ("These amounts appear to be reasonable, based on the fact that the estimate from an external

22   contractor was substantially higher than the internal cost").  In short, the Court agrees with JH

23   Kelly that Ms. Martini has no basis to opine on the reasonableness of PG&E's costs themselves or

24   whether AECOM is entitled to recover for them.

25            But as AECOM points out, JH Kelly's argument for exclusion misrepresents the scope of

26   Ms. Martini's opinion.  AECOM engaged Ms. Martini only to confirm that PG&E's costs were

27   supported by the underlying cost documentation and to issue an opinion on whether she believed

28   PG&E's *methodologies* for calculating its costs were reasonable based on her experience in

United States District Court
Northern District of California

construction cost management.  Dkt. No. 218 at 7.  The Court will allow Ms. Martini to testify for

this limited purpose.  Ms. Martini's testimony on whether PG&E's methodologies were

reasonable is sufficiently based on her review of the record and experience in construction cost

management to survive scrutiny under Rule 702.  *See, e.g.*, Martini Report at 5 (explaining that

Ms. Martini's assessment of PG&E's markups to determine whether they were reasonable and

consistent with industry practice included reviewing purchase orders, invoices, and other backup

provided by PG&E, and verifying that those costs are as reflected as having been incurred by

PG&E).  While JH Kelly contends that Ms. Martini's testimony creates a danger of misleading the

jury because her testimony is not supported by any independent evaluation or analysis, the Court

finds this criticism to raise questions that are more appropriately addressed through cross-

examination and competing evidence.  *See Primiano*, 598 F.3d at 564-65 ("Shaky but admissible

evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of

proof, not exclusion.").  JH Kelly's motion is **DENIED.**

### ii.   JH Kelly's Motion to Exclude Expert Testimony of Larry Smith (Dkt. No. 208)

JH Kelly alleges that AECOM directed it to undertake significant work not within the

originally subcontracted scope of work, including extensive pipe coating work.  *See* SAC ¶ 42.  JH

Kelly allegedly incurred $2,126,741 in costs doing this pipe coating work, has not been paid by

AECOM for it, and is now suing to recover those costs.  *Id.* ¶ 43.

AECOM retained Mr. Larry Smith to opine on the limited issue of fusion bonded epoxy

("FBE") coated piping at the Project.  *See* Dkt. No. 208-1, Declaration of Eric A. Grasberger ISO

Daubert Motion to Exclude Expert Testimony of Larry Smith, Ex. 1 ("Smith Report") ¶ 5.  JH

Kelly now seeks to preclude Mr. Smith from testifying on four separate grounds.  As explained

below, the Court does not find any of them persuasive and will deny JH Kelly's motion.

First, JH Kelly argues that Mr. Smith has no experience with and is not qualified to opine

on FBE-coated pipe issues, mostly because he testified at his deposition that he has not personally

performed "holiday testing" on FBE-coated pipes before.  Dkt. No. 208 at 6.[2]  But Mr. Smith also

_____

[2] As described in JH Kelly's motion, coating systems applied to pipe must be tested for

United States District Court
Northern District of California

1    explained at his deposition that he has performed holiday testing before in general, and that the

2    process of holiday testing of coatings does not depend on the type of coating being used.  *See* Dkt.

3    No. 219-3, Declaration of John H. Conrad ISO Opposition to JH Kelly's Motion to Exclude Expert

4    Testimony of Larry Smith, Ex. 2 ("Smith Dep") at 115 ("Well, you know, a coating is a coating. It

5    doesn't matter if it's FBE, paint, or rubber or what. It's the same principle. And I have done that

6    over and over again."); *see also* Smith Report ¶ 88 ("My experience as a mechanical contractor

7    has enabled me to handle, install, and holiday test many feet of coated pipe.").  The Court finds

8    Mr. Smith's testimony on FBE pipe coating and holiday testing to be sufficiently based on his

9    experience in the field of underground coated steel pipe installation and coating thickness to

10   survive scrutiny under Rule 702(a).  JH Kelly is free to cross-examine Mr. Smith on whether his

11   experience with validating other construction materials and inspections is applicable here, and it

12   can explain to the jury in closing argument why Mr. Smith's testimony lacks credibility and

13   should not be given weight.

14        Second, JH Kelly contends that all Mr. Smith's opinions must be stricken under Rule

15   702(c) because he admitted after submitting his report that various sections of the appendix

16   contain duplicate holiday inputs.  Dkt. No. 208 at 8.  JH Kelly claims that Mr. Smith's

17   acknowledgement of these errors demonstrates that his principles and methods are "undoubtedly

18   unreliable" and that the data he has produced is "grossly deficient and untrustworthy."  *Id.*

19   Adjectives aside, however, JH Kelly's motion fails to explain how these errors, which AECOM

20   says were inadvertent, affect the substance of Mr. Smith's opinions.  The Court accordingly will

21   not preclude Mr. Smith from testifying on this ground.

22        Third, JH Kelly seeks to preclude Mr. Smith's opinions on JH Kelly's alleged mishandling

23   of FBE-coated pipe at the project site.  Dkt. No. 208 at 8-9.  To rebut Dr. Ibbs's point that JH

24   Kelly's field-coating was affected by wet and cold winter weather, Mr. Smith wrote in the

25   challenged paragraph that "[i]nspectors reported that incoming coated materials and field coated

26   materials were often unloaded by forklift, secured by chain instead of straps, stored on the ground

27   _____

28   "holidays," which are holes or voids in the coating film, by using an electric test method
     commonly referred to as "jeeping."  *See* Dkt. No. 208 at 6, n.2.

1    without soldiers, [and were] handled, stored and moved without protection for coatings," and he

2    concluded that "[g]ood practices, in any weather, yield fewer field impacts to quality materials."

3    Smith Report ¶ 67.

4         JH Kelly's motion argues that Mr. Smith has failed to cite "specific project records" or any

5    admissible evidence to support his assertion that it mishandled any of the FBE-coated pipe.  Dkt.

6    No. 208 at 8.  But at Mr. Smith's deposition, he clarified that his opinion was based on daily

7    reports from the Project and statements made by PG&E's inspector, Mr. Kuns.  *See* Smith Dep. at

8    170-71.  Because Mr. Smith claims that he relied on project documents to support his opinion, the

9    Court finds that, at least at this stage, AECOM has shown that Mr. Smith's expert opinion is based

10   on sufficient facts to meet the standard of FRE 702(b).

11        And fourth, JH Kelly seeks to exclude Mr. Smith's opinions regarding JH Kelly's

12   entitlement to payment for the pipe coating work.  Mr. Smith generally opines that JH Kelly is not

13   entitled to recover the cost of (1) coating applied in a heat-affected area of the piping system; (2)

14   correcting or repairing defective or damaged coating; or (3) correcting or repairing any factory

15   applied coating that was damaged while in the custody of JH Kelly.  *See* Smith Report ¶¶ 16.3-

16   16.6.  He generally concludes that JH Kelly improperly seeks reimbursement because it failed to

17   provide sufficient information to reasonably evaluate its claim.  *Id.* ¶¶ 87-95.

18        JH Kelly argues that Mr. Smith's testimony is not based on sufficient facts or data and is

19   not the product of reliable principles or methods because he did not personally perform a "cost

20   analysis" of JH Kelly's change order requests.  Dkt. No. 208 at 9.  JH Kelly's argument appears to

21   seize on a disclaimer at the end of Mr. Smith's report, in which he writes that "a cost analysis of

22   the CORs is being handled by others."  Smith Report ¶ 95.  But the Court cannot assess the import

23   of this disclosure because neither Mr. Smith nor JH Kelly have explained what this "cost analysis"

24   would entail and why its absence renders Mr. Smith's opinions unreliable.  The Court accordingly

25   does not conclude that Mr. Smith's lack of cost analysis renders his opinion speculative or

26   unreliable under Rule 702 or unfairly prejudicial under Rule 403.  In sum, JH Kelly's motion is

27   **DENIED**.

28

United States District Court
Northern District of California

### iii.   JH Kelly's Motion to Exclude Expert Testimony of Anthony Gonzales (Dkt. No. 209)

AECOM retained Mr. Gonzales to provide an analysis and quantification of the backcharges it seeks to recover from JH Kelly and to rebut the opinions of Mr. McKinnon and Dr. Ibbs.  *See* Dkt. No. 209-1, Declaration of Eric A. Grasberger ISO Daubert Motion to Exclude Expert Testimony of Anthony Gonzales, Ex. 1 ("Gonzales Report").  JH Kelly raises two categories of arguments to preclude Mr. Gonzales from testifying.  As explained below, the Court agrees with the first category but rejects the second.

JH Kelly first asks the Court to exclude as "improper legal opinions" Mr. Gonzales's opinion that JH Kelly is not entitled to recover its: (1) post-project completion damages; (2) change management support fees; and (3) costs for changed work due to untimely and insufficient notice based on the Subcontract provisions, including Sections 12.3.2, 13.1.1 and 13.3.3.  Dkt. No. 209 at 6-9.

After reviewing the Gonzales Report, the Court agrees with JH Kelly that although these opinions are purportedly based on Mr. Gonzales's reading of the Subcontract, they are at bottom attorney argument dressed up as expert opinion.  Mr. Gonzales's opinion that various provisions of the Subcontract preclude JH Kelly from recovering its costs is just straightforward contract interpretation, and as such it impermissibly treads on ultimate issues of law.  *See United States Postal Serv. v. Jamke*, No. 115-CV-01806-LJO-EPG, 2017 WL 131991, at *5 (E.D. Cal. Jan. 12, 2017) ("Generally, contract interpretation is not an appropriate subject for expert testimony, because it requires an expert to make conclusions of law.") (citing *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004)); *see also Aerojet Rocketdyne, Inc. v. Global Aerospace, Inc.*, No. 2:17-cv-1515 KJM-AC, 2021 WL 1839695, at *3 (E.D. Cal. May 7, 2021) (excluding portions of expert's proposed testimony that reflected contract interpretation because they were "inadmissible as treading on ultimate issues of law").  Accordingly, Mr. Gonzales may not opine at trial that JH Kelly is not entitled to recover: (1) Post Project Completion Damages; (2) Change Management Support Fees; and (3) costs for changed work due to untimely and insufficient notice based on the Subcontract provisions.

JH Kelly then generally argues that Mr. Gonzales's opinion that JH Kelly underbid the

22

Project is based on assumptions unsupported by sufficient facts or data under FRE 702(b) and creates a substantial risk of unfair prejudice under FRE 403. *See* Dkt. No. 209 at 9-16. Similarly, JH Kelly also contends that Mr. Gonzales relies on unreliable methodology and insufficient facts to opine that JH Kelly is not entitled to compensation for changed work and damages for productivity loss. *Id.* at 17-21.

In the Court's view, these arguments primarily reflect JH Kelly's substantive disagreements with Mr. Gonzales. *See, e.g.*, *id.* at 10 ("To draw his conclusions, Gonzales compared (1) time and material unit rates for change order work (the rates specified in the Subcontract) to (2) bare labor rates used in deriving the bid for the base Subcontract work. This is a comparison of apples to oranges.") (citations omitted); 14 ("Gonzales's opinion that Kelly underbid because it paid incentives to workers is not tethered to the underlying facts."); 16 ("Gonzales's opinion that a variance should call into question Kelly's bid is not consistent with Gonzales's own opinions about the insignificance of bid to budget variances."); 18 ("[B]ecause of Gonzales's failure to analyze the history of change order requests, Gonzales improperly, and arbitrarily, refused to provide credit to Kelly for certain change order requests."). The other arguments simply point out alleged flaws in Mr. Gonzales's analysis. *See id.* at 20 ("This superficial analysis led to several critical missteps. Gonzales could not verify the cost report that he relied upon to form his opinion."); *id.* ("Gonzales's analysis, however, is not consistent with industry standards and relies upon an insufficient sample of work."). As the Ninth Circuit has repeatedly instructed, alleged errors in Mr. Gonzales's analysis should be tested during trial "through competing evidence and incisive cross-examination." *Murray v. S. Route Mar. SA*, 870 F.3d 915, 925 (9th Cir. 2017) (citations omitted). The Court also finds no risk of unfair prejudice and accordingly will not preclude Mr. Gonzales from testifying on this ground.

JH Kelly's motion is **GRANTED** as to Mr. Gonzales's opinion that JH Kelly is not entitled to recover: (1) Post Project Completion Damages; (2) Change Management Support Fees; and (3) costs for changed work due to untimely and insufficient notice pursuant to the Subcontract provisions but is **DENIED** on all other grounds.

### iv.    JH Kelly's Motion to Exclude Portions of Expert Testimony and Reports of Ted Scott (Dkt. No. 210)

AECOM retained Mr. Scott as an expert witness to quantify the construction delays that impacted the Subcontract work.  *See* Dkt. No. 210-1, Declaration of Eric A. Grasberger in Support of Daubert Motion to Exclude Expert Testimony of Ted Scott, Ex. 1 ("Scott Report") ¶ 1.5.  Mr. Scott's report is organized into three "Phases"—engineering, construction, and commissioning. *Id.* ¶ 1.7.  Phase 1 (engineering) includes two "Windows"; Phase 2 (construction) includes four "Windows"; and Phase 3 (commissioning) includes eight "Windows."  *See id.* at 3-14 (executive summary).  For each Window, Mr. Scott defines the "critical path" time period at issue and attempts to allocate days of delay to the critical path among PG&E, AECOM and JH Kelly.  *Id.* Mr. Scott's total allocation of days of delay for the entire project is 425 days of delay to PG&E, 40 days of delay to AECOM and its separate third-party subcontractors, and 105 days of delay to JH Kelly.  *See id.* at 14.

While JH Kelly intends to challenge the entirety of Mr. Scott's allocation of 105 days of delay to JH Kelly at trial, its present motion seeks to exclude the following allocations of delay to JH Kelly: (1) 35 days of delay in Phase 1/Window II; (2) 32 days of delay in Phase 2/Window I; (3) 15 days of delay in Phase 2/Window II; (4) 6 days of delay in Phase 2/Window III; and (5) 8 days of delay in Phase 2/Window IV.  Dkt. No. 210 at 7.

JH Kelly generally argues that Mr. Scott's testimony is based on assumptions unsupported by sufficient facts or data under FRE 702(b) and creates a substantial risk of unfair prejudice under FRE 403.  JH Kelly's challenge to Mr. Scott's analysis of the delay in Phase 1/Window II is representative of its overall approach.  There, Mr. Scott addresses an alleged 70-day delay to the critical path (from February 24, 2017, to May 5, 2017) because of the delayed issuance of certain drawings.  Scott Report at 6.  Mr. Scott opines that this 70-day delay is the result of two different issues: (1) PG&E's preferential design changes; and (2) the need to reroute the duct bank around the existing utility conflict.  *Id.*  Mr. Scott attributes 100% of the first issue, "PG&E's preferential design changes," to PG&E, and 100% of second issue, the "utility conflict," to JH Kelly.  *See id.* at 6, 55.  Mr. Scott then equally splits the 70 days of delay between PG&E and JH Kelly, allocating 35 days of delay to each for this Phase/Window.  *Id.*

United States District Court
Northern District of California

JH Kelly argues that Mr. Scott's opinion on this issue should be excluded "because it is based on improper assumptions" and then lists the following assumptions:

- Scott assumes that JH Kelly is 100% responsible for the utility conflict—which AECOM (as the engineer or record) designed without any input from Kelly—while AECOM's own electrical engineering expert does not apportion any percentage of fault (let alone 100% fault) to JH Kelly;

- Scott assumes that AECOM worked continuously from February 24, 2017 to May 5, 2017 to resolve the utility conflict without any evidence to support this assumption;

- Scott assumes that PG&E's preferential decision to re-route the duct bank around the property is irrelevant while AECOM's own electrical engineering expert and lead engineer opine and testify that the delay resulting from the utility conflict could have been mitigated or avoided entirely if PG&E had not made that preferential decision; and

- Scott assumes that the impact of the PG&E's preferential design changes and the utility conflict are equal and should be apportioned 50/50 to this time period without any evidence to support this assumption.

*See* Dkt. No. 210 at 9-10.  The rest of JH Kelly's motion follows suit.  *See id.* at 13 ("Scott should not be permitted to make this assumption, as there is no evidence to support this assumption, and he is not qualified to opine on this electrical engineering issue."); *id.* at 15 ("As a result of Scott's incorrect reliance on the project-wide 900 lf figure, Scott drastically overstates Kelly's planned productivity rate at 225 lf/day for the area only under the Auxiliary Building."); *id.* at 17 ("There is no evidence to support Scott's opinion that the that work on the duct bank was delayed by the Valve Strike event, or that the work on the duct bank was on the critical path for the project at this time.").

The Court agrees with AECOM that JH Kelly's challenge is an attempt to repackage its anticipated cross-examination of Mr. Scott as a *Daubert* motion.  *See* Dkt. No. 220.  As the Court has explained, the inquiry into the admissibility of expert testimony is "a flexible one" where "shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."  *TechShop, Inc. v. Rasure*, No. 18-cv-01044-HSG, 2019 U.S. Dist. LEXIS 69800, at *3 (N.D. Cal. April 24, 2019) (citing *Primiano*, 598 F.3d at

564).  Here, the Court finds that Mr. Scott's opinion is sufficiently based on his experience in the field of schedule analysis, his review of Project documents including schedules issued by both AECOM and JH Kelly, and the testimony of persons with knowledge of the key events on the Project, to meet the standards of Rule 702.  And the Court finds his testimony relevant to JH Kelly's claims for costs caused by delays on the Project.  JH Kelly's assertion that Mr. Scott made "improper" or "unsupported" assumptions and reached faulty or irrelevant conclusions plainly bear on the weight of his testimony, not its admissibility.  *See United States for Use & Benefit of Bergelectric Corp. v. Sauer, Inc.*, No. 5:18-CV-00612-EJD, 2020 WL 470273, at *2 (N.D. Cal. Jan. 29, 2020) ("District courts within and outside this district have often concluded that experts' decisions about what data to use in their analysis bear on the weight, not the admissibility, of expert testimony.") (citations omitted and cleaned up).  And as to the risk of unfair prejudice under Rule 403, the probative value of Mr. Scott's analysis is not substantially outweighed by the risk of unfair prejudice, undue delay, or any other Rule 403 consideration.  To the extent AECOM fears the jury will assign undue weight to Mr. Scott's "improper" assumptions, it will have every opportunity to undermine the testimony through effective cross-examination.  JH Kelly's motion is accordingly **DENIED**.

**IT IS SO ORDERED.**

Dated:  6/2/2022

HAYWOOD S. GILLIAM, JR.
United States District Judge